**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FICARE FEDERAL CREDIT UNION,

                                                      Case No. 8:26-cv-00231-JLB-TGW

    Plaintiff,

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

    Defendants.

_____ /

**DEFENDANTS FISERV SOLUTIONS, LLC'S AND FISERV, INC.'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants Fiserv Solutions, LLC ("Fiserv") and Fiserv, Inc. [1] (collectively,

"Defendants") hereby move to dismiss Plaintiff FiCare Federal Credit Union's

Complaint and Demand for Jury Trial (ECF No. 1, the "Complaint") in its entirety,

pursuant to Federal Rule of Civil Procedure 12(b)(6).

**INTRODUCTION**

This is a contractual dispute between sophisticated parties. Plaintiff FiCare

Federal Credit Union ("FiCare") is a regional credit union with branches located

---

[1] Fiserv, Inc., Fiserv Solutions, LLC's parent company, has no contractual relationship with FiCare and is not a proper defendant.

1

throughout Florida. Fiserv is one of the nation's leading financial technology companies and provides various account processing services and products to clients across the financial services sector, including banks and credit unions.

FiCare and Fiserv have been parties to a master agreement for nearly thirteen years, under which Fiserv has provided products and services to FiCare with minor variation. FiCare has used the online and mobile banking products at issue in the Complaint since at least 2019 and thus has been aware of the security features these products possess for nearly seven years. FiCare now asserts contract, tort, and statutory claims based on its new-found subjective conclusion that Fiserv uses deficient security controls—specifically, multi-factor authentication ("MFA") features—in breach of the agreement and allegedly applicable law. Remarkably, despite these supposedly "deficient" security features, FiCare demands that Fiserv *not implement* a security upgrade to one of the authentication features of Fiserv's online and mobile banking products.

FiCare's claims contradict the plain language of the parties' agreement. That agreement does not obligate Fiserv to utilize a specific type of MFA, let alone the types of MFA that FiCare now claims to prefer. Although the Complaint is lengthy, it does not identify a single contractual provision mandating possession-based MFA, biometrics, or any other form of MFA FiCare wants—because there is no such provision. FiCare also is wrong that any "regulations" or "guidance" require

2

Fiserv to implement FiCare's preferred form of MFA. Faced with this reality, FiCare tries to contort a reciprocal confidentiality provision into a unilateral obligation that Fiserv (a global company) provide FiCare with security features identical to Fiserv's own. But that's not what the agreement requires.

Taking a kitchen sink approach, FiCare also complains that Fiserv's upgrade of its security features constitutes a breach, that Fiserv's generic description of its security practices constitutes "fraud," and that Fiserv is somehow responsible for a "security incident" that occurred in 2024. These allegations do not salvage the Complaint. Fiserv has the contractual right to upgrade its products. Fiserv's descriptions do not supplant its contractual obligations and do not constitute fraud and, regardless, FiCare did not plausibly rely on them. As to the alleged security incident, FiCare does not even allege what happened much less plausibly plead that: (i) Fiserv breached the agreement; or (ii) any breach caused the alleged security incident. FiCare's statutory claims likewise fail: FiCare does not allege a "trade secret" or "misappropriation," and FiCare's FDUTPA claim is an improperly pleaded throwaway. The entire Complaint should be dismissed.

**FACTUAL BACKGROUND**

FiCare has been a Fiserv client for over a decade. In 2013, the parties executed a Master Agreement under which Fiserv provides account processing and related services (as amended, the "Agreement"). (ECF No. 1, ¶¶ 23–24; ECF

No. 1-2). The Agreement provides that the parties may add new products and services through amendments (ECF No. 1-2, § 1(b)); on October 26, 2018, FiCare contracted to receive new and additional account processing services, including Fiserv's core processing system ("Portico"), and Fiserv's online and mobile banking products ("Virtual Branch" and "Mobiliti"). (ECF No. 1-2, at 109–82 ("2018 Amendment")). Virtual Branch, the primary product about which FiCare complains, uses certain security controls, including a service called Enhanced Authentication. (*See id.*, 152–60).

The most recent articulation of Fiserv's obligations related to Virtual Branch (and Mobiliti) is set forth in a December 2021 amendment titled Digital Online Banking Service Schedule, which FiCare failed to attach to the Complaint. (Ex. 1 ("2021 Amendment")).[2] Via the 2021 Amendment, Fiserv offered, and FiCare declined, an additional security control called SecureNow, which provides MFA for Virtual Branch and Mobiliti. (*Id.*, § 3(c); *see id.*, 5, 8).

The Agreement expires on September 30, 2029, pursuant to another amendment that FiCare omitted from its Complaint. (*See* Ex. 2 ("2023 Amendment"), § 2). The Agreement is fully integrated and governed by New York

---

[2] The Court may consider the 2021 Amendment (and 2023 Amendment, *infra*) when evaluating the Motion. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) ("[W]hen resolving a motion to dismiss … a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged.").

law. (ECF No. 1-2, §§ 11(b), (d)). With its exhibits, the Agreement:

- reflects a comprehensive agreement delineating the parties' obligations, risk allocations, and liability limitations;
- includes specific warranties regarding Fiserv's products and services;
- expressly waives FiCare's reliance on unincluded representations or warranties;
- includes FiCare's representation that it verified the products meet its operational and regulatory needs;
- defines in schedules and exhibits Fiserv's obligations concerning the performance, functionality, and security of the products and services; and
- provides that Fiserv may automatically release new versions of the products and services that improve existing functions or performance.

(*Id.*, §§ 1, 6, 7, 11(b); Ex. 1, 2021 Amendment, at 3, § 2(c)).

Despite using the products at issue for years and being well aware of their security features, FiCare now asserts that Virtual Branch and other unidentified Fiserv products are insecure because they allegedly do not use FiCare's preferred form of MFA (*e.g.*, possession-based passcodes, biometrics, etc.). (ECF No. 1, ¶¶ 1, 28–37, 50–54). For Virtual Branch specifically, FiCare also—oddly and counterintuitively—complains that Fiserv is replacing its Enhanced Authentication with the more robust SecureNow. (*Id.*, ¶¶ 1, 50–54). All this ignores that, except where agreed upon in specific schedules and exhibits, the Agreement does not require a specific type of MFA, nor any other specific form of security, and permits Fiserv to unilaterally improve its products.

FiCare's vague allegations that an unauthorized person "obtained control

over online banking accounts" during account creation does not change the terms of the parties' Agreement.  (*Id.*, ¶ 88). In any event, FiCare never explains how this happened or whether it occurred because of Fiserv's security features.

## ARGUMENT

A well-pleaded complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is only plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## I.    FICARE DOES NOT PLEAD A BREACH OF ANY CONTRACTUAL OR QUASI-CONTRACTUAL OBLIGATION.

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).

### A.    FiCare Has Not Pleaded a Breach of Sections 3 or 4 of the Agreement.

FiCare relies primarily on an inapplicable confidentiality clause (Section 3) and a general provision regarding an information security program (Section 4) to

contort run-of-the-mill contractual language into an obligation that Fiserv provide to FiCare whatever security features FiCare deems "adequate." That's not what these sections require. Section 3 is a standard confidentiality/non-disclosure clause that has nothing to do with the security features Fiserv provides, and Section 4 mandates only that Fiserv have an "information security program," which FiCare admits Fiserv has. (ECF No. 1-2, §§ 3, 4; ECF No. 1, ¶¶ 59, 63). Neither provision mandates any specific type of security feature—let alone MFA in the form FiCare now contends it wants.

### 1. FiCare Cannot State a Claim Under Section 3 of the Agreement.

FiCare asserts that Section 3 of the Agreement requires Fiserv to use security features for the products it provides to FiCare that are equivalent to those Fiserv uses for its own systems. (*Id.*, ¶¶ 1–4, 26–28). This is wrong.

*First*, the plain language and structure of Section 3(b) confirm it is a *mutual* confidentiality and non-disclosure agreement. Section 3 defines "Discloser" as the entity providing confidential information, and "Recipient" as the entity receiving said confidential information. (ECF No. 1-2, at 3–4, § 3(b)). Section 3(b) does not impose confidentiality obligations *only on Fiserv*, but equally on any "Recipient" of information as it is defined in that section:

> Recipient agrees to hold as confidential all Information it receives from the Discloser. All Information shall remain the property of Discloser or its suppliers and licensors. Recipient will use the same care and discretion to

7

avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law. Recipient may only use Information for the lawful purposes contemplated by this Agreement….

(*Id.*).

Section 3(b) does not once mention information security, MFA, token-generated codes, biometrics, or layered authentication. (*Id.*) It simply states what uses of confidential information are permitted, identifies third parties to whom such information may be disclosed, and defines what happens to that information when the Agreement ends. (*Id.*) Section 3(b) is nothing more than an ordinary, mutual non-disclosure agreement. The Court should apply Section 3(b)'s plain and unambiguous language, *see Piccirilli v. Yonaty*, 204 A.D.3d 1322, 1323 (N.Y. App. Div. 2022), and disregard allegations about security obligations that appear nowhere in Section 3(b). *Weiner v. Fed. Ins. Co.*, 2011 WL 13229316, at *3 (S.D. Fla. Dec. 16, 2011) (disregarding allegation that contradicts language of agreement).

***Second***, under New York law, "a specific provision … governs the circumstances to which it is directed, even in the face of a more general provision." *In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013) (citation omitted). As explained in Part I.B. *infra*, the Agreement defines at length (in more than a dozen exhibits and schedules) Fiserv's performance and, where applicable, security obligations. FiCare's argument that a general confidentiality obligation in Section 3(b)

8

overrides these more specific obligations inverts a basic contract maxim.

*Third*, FiCare's interpretation of Section 3(b) would lead to absurd results given its mutuality and the parties' starkly different institutional capacities. Courts decline interpretations that yield "absurd" or "commercially unreasonable" outcomes. *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012). Fiserv is a Fortune 500 fintech provider serving a variety of global customers; FiCare is a regional credit union. It is implausible that the parties intended "the same" security features apply to both entities, much less that such a sweeping obligation would be hidden in a single sentence of a confidentiality clause while other provisions address information security and product-specific controls. FiCare's reading would render those provisions superfluous and produce a commercially unreasonable (and unlikely) result. *Macklowe*, 99 A.D.3d at 596.

### 2.   FiCare Does Not State a Claim Under Section 4.

FiCare alleges Fiserv breached Section 4(a) by "failing to implement an information security program that appropriately protects the security and confidentiality of FiCare Federal's information." (ECF No. 1, ¶ 114(b)). According to FiCare, Fiserv's information security program did not "appropriately protect[]" FiCare. (*Id.*) But to support this conclusion, FiCare offers only its subjective view as to what is "appropriate." To the extent that FiCare's claim is predicated on Fiserv having to replicate its entire security environment for FiCare, that argument

fails, as explained above.

FiCare also asserts that MFA recommendations from NIST apply to Fiserv (and that Fiserv's "information security program" runs afoul of NIST), but FiCare ignores that Section 4 does not mention NIST, let alone obligate Fiserv to provide services that comply or comport with any and all aspects of NIST's vast framework. Section 4(a) does include Fiserv's agreement to "use security safeguards for all personal information pertaining to Massachusetts residents in accordance with Massachusetts Regulation 201 CMR 17.00," (ECF No. 1-2, § 4(a)), but not even FiCare alleges that regulation is germane here. That Section 4 refers to no other regulations is fatal to FiCare's Section 4 claim. The invocation of the Massachusetts standard means the parties did not incorporate other third-party standards into Section 4. *Gillen v. Town of Hempstead Town Bd.*, 63 Misc.3d 653, 658 (N.Y. Sup. Ct. 2019) (applying *expressio unius est exclusio alterius*).

FiCare suggests Fiserv was required to "adopt[] the *Digital Identity Guidelines* of the [NIST]," which it claims the Federal Financial Institutions Examination Council's ("FFIEC") guidance requires. (ECF No. 1, ¶ 31). Section 4's plain language does not require the adoption of any NIST standards. Moreover, FFIEC guidance (which does not bind Fiserv) says no such thing. Instead, it makes clear that: "[t]his Guidance … ***does not endorse any specific information security***

10

*framework or standard*."[3]

Without an identified standard, FiCare's claim rests on a single, vaguely described "hack" that occurred in 2024. (ECF No. 1, ¶ 88). FiCare's allegations do not plausibly allege that Fiserv breached Section 4(a) or any other provision of the Agreement. FiCare fails to allege even that the "hack" was caused by Fiserv's acts or omissions. Simply alleging that a company has suffered a security breach does not demonstrate that the company did not place significant emphasis on maintaining a high level of security. It is "equally plausible that [the company] did place a high emphasis on security but that the [c]ompany's security systems were nonetheless overcome." *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at \*5 (D.N.J. Dec. 7, 2009); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1226 (N.D. Ga. 2019) ("[A] data breach does not necessarily imply that a company's data security is inadequate."); *In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at \*7 (S.D.N.Y. Sept. 9, 2025) (same).

Recognizing the deficiency of its Section 4 allegations, FiCare attempts to cobble a breach out of Fiserv's alleged failure to "notify [FiCare] as soon as possible" of the alleged "hack." (ECF No. 1, ¶ 114(c)). This is a remarkable argument, given FiCare's allegation that *it* discovered and reported the alleged

---

3  (https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf, at 2) (emphasis added).

"hack." (*Id.*, ¶ 89). FiCare does not allege that Fiserv knew about it first. (*See generally id.*) The alleged failure to send FiCare notice of an event FiCare was already aware of cannot constitute a breach of Section 4.

### B. FiCare Does Not Plausibly Allege that Fiserv Breached Any Obligations Concerning "Enhanced Authentication."

Fiserv agreed to provide the services and products "described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit." (ECF No. 1-2, § 1). Through many schedules and exhibits entered over thirteen years, the parties defined Fiserv's performance obligations, including, where applicable, the security features that Fiserv would provide and those FiCare declined. (*E.g.,* ECF No. 1-2, at 52, § 1(a)(iv); *id.* at 162, ¶ 1(c)(iii)).

FiCare perfunctorily alleges that Fiserv breached its obligations by providing "Enhanced Authentication" in a form that did not include FiCare's preferred type of MFA. (*See* ECF No. 1, ¶¶ 26(c), 114(a$_2$)[4]). But neither the 2018 Amendment nor the 2021 Amendment (the two amendments that specify Fiserv's obligations related to Virtual Branch/Enhanced Authentication) require that Fiserv provide any form of authentication other than what is provided by the Enhanced Authentication product. (ECF No. 1-2, at 109–10, 152–60; Ex. 1, at 2–9). Both amendments refer generically to "Enhanced Authentication" as a line-item

---

[4] FiCare lists subparagraph (a) to Paragraph 114 twice, first on page 34, and then on page 35 of the Complaint. The second subparagraph (a) is referred to as ¶ 114(a$_2$) for clarity.

12

charge, (ECF No. 1-2, at 155; Ex. 1, at 9, Attachment 1), and neither requires "possession-based MFA", (*id.*), which is fatal to FiCare's contract claim. *See Pluviose v. PHH Mortg. Corp.*, 2023 WL 4743687, at *3 (M.D. Fla. July 25, 2023); *Sanfelippo v. Cincinnati Ins. Co.*, 2020 WL 5203531, at *1 (M.D. Fla. Sept. 1, 2020) ("a complaint must…state a plausible material breach and notify defendant of the grounds on which it rests whether through factual allegations or citation to the contract.").

Worse, FiCare tries to manufacture a catch-22 through which Fiserv is in breach irrespective of its conduct. FiCare first complains that Enhanced Authentication renders Virtual Branch insecure, but also claims Fiserv is prohibited from upgrading Enhanced Authentication to Fiserv's newer SecureNow product. (ECF No. 1, ¶ 114(h)). That argument contradicts the Agreement's plain language. The Digital Online Banking Services Schedule to the 2021 Amendment, the most-recent iteration of Fiserv's Virtual Branch-related obligations (including the provision of Enhanced Authentication), authorizes Fiserv to "automatically release new version(s) of the Services that improves existing functions or performance." (Ex. 1, at 3, ¶ 2(c)). And, in that same schedule, FiCare agreed to terms governing SecureNow in the event FiCare receives that product, thereby refuting the contention that FiCare is being "forced" to accept terms it doesn't like. (*Id.*, § 3(c)). As a result, FiCare does not state a breach claim

13

tied to Fiserv's product upgrade. *Pluviose*, 2023 WL 4743687 at *3.

## C. FiCare Does Not State a Breach Claim Under Any Other Sections of the Agreement or Inapplicable Statutes.

### 1. FiCare Does Not Plausibly Allege a Breach of ASP Services Exhibit § 4(h).

Section 4(h) of the ASP Services Exhibit ties Fiserv's duty to "implement an action plan" to "material deficiencies … noted in … audit report[s]." (ECF No. 1-2, at 11, § 4(h)). It does not obligate Fiserv to do ***anything*** in response to unsubstantiated statements in media publications, as FiCare seems to suggest. (*See* ECF No. 1, ¶¶ 38–49). Because FiCare does not allege any audit or audit finding in response to which Fiserv should have adopted an action plan, FiCare does not allege a breach of Section 4(h) of the ASP Services Exhibit.

### 2. FiCare Does Not Plausibly Allege that Fiserv Breached the Agreement's "Audit" Provisions.

FiCare contends Fiserv breached various provisions in the Agreement that purportedly required Fiserv to provide "audit" documents, namely Sections 4(a), 4(b), and 10(b) of the Master Agreement and Sections 4(d), 4(h), and 6(c) of the ASP Services Exhibit. (*See id.*, ¶¶ 114(e)–(f)). FiCare admits Fiserv has already produced some documentation and represented it would provide the rest. (*Id.*, ¶¶ 94, 96). Notably, FiCare does not allege that it suffered any damage or loss due to the alleged timing or manner of Fiserv's production. Without that, there is no breach claim. *Edwards*, 938 F.3d at 12.

14

### 3. FiCare Misapplies N.Y General Obligation Law § 5-903.

FiCare also contends that Fiserv breached the Agreement by violating a New York statute that FiCare asserts prohibits "an automatic renewal of the Master Agreement without providing the required personal or certified mail notice[.]" (ECF No. 1, ¶¶ 114(g), 138). But this statute applies only to contracts involving the "service or repair to or for any real or personal property." N.Y. Gen. Oblig. Law § 5-903(2). It does not apply to administrative services and commercial contracts like those here. *See Trustpilot Damages LLC v. Trustpilot Inc.*, 2022 WL 2124865, at *3 (2d Cir. June 13, 2022) (data service contract); *Trepp, LLC v. McCord Dev., Inc.*, 100 A.D.3d 510 (N.Y. App. Div. 2012) (financial analytics).

More importantly, FiCare does not and cannot allege the Agreement ever automatically renewed. (*See generally* ECF No. 1). The initial term began in 2013 and lasted for 10 years. (ECF No. 1-2, at 13, ASP Services Exhibit, § 8(a)). Before expiration of the initial term, the parties mutually extended that term through at least September 2029. (*See* ECF No. 1-2, at 109, 2018 Amendment, § 2; *see also* Ex. 2, at 2, § 2). No automatic renewal ever occurred and there is nothing for this Court to declare "[d]efective" or "unenforceable."

### D. FiCare's Unjust Enrichment Claim and Requests for Equitable Declaratory Relief Fail.

FiCare alleges the Agreement "constitutes the complete and exclusive statement of the agreement between the parties" (ECF No. 1-2, at 7, § 11(b)) and is

a valid contract. (ECF No. 1, ¶¶ 111, 124). "[A]n express contract governing a dispute precludes an action for unjust enrichment." *Certified Collectibles Grp., LLC v. Globant, LLC*, 2021 WL 1214963, at *7 (M.D. Fla. Mar. 31, 2021).

FiCare's requests for various forms of equitable relief likewise fail. Recission and specific performance are unavailable without a plausibly pleaded breach of contract claim. *WestLB AG v. BAC Fla. Bank*, 912 F.Supp.2d 86, 94 (S.D.N.Y. 2012) (specific performance); *Cherokee Owners Corp. v. DNA Contracting, LLC*, 96 A.D.3d 480, 481 (N.Y. App. Div. 2012) (rescission). Because FiCare does not plausibly plead a viable contract claim, *see* Part I.A–C *supra*, the Court also should dismiss FiCare's requests for recission and specific performance. Beyond this, neither recission nor specific performance is appropriate where there is an adequate remedy at law. *T.F. Demilo Corp. v. E.K. Const. Co.*, 207 A.D.2d 480, 481 (N.Y. App. Div. 1994) (specific performance); *Romanoff v. Romanoff*, 148 A.D.3d 614, 616 (N.Y. App. Div. 2017) (rescission). FiCare concedes the adequacy of money damages by alleging financial loss, including payments for deficient services and reimbursement of members' fraud losses. (ECF No. 1, ¶¶ 37, 74). This is fatal to FiCare's requests for recission and specific performance.

FiCare's declaratory judgment claim is implausibly pleaded and unripe. FiCare requests four different declarations—that: (i) FiCare is not "obligat[ed] to pay for or contract for" the SecureNow product; (ii) the Agreement's exculpation

16

and limitation of liability provisions are unenforceable; (iii) any "automatic renewal" of the Agreement was invalid; and (iv) FiCare is not "obligat[ed] to pay" early termination, deconversion, and post-termination fees or liquidated damages. (*Id.*, ¶¶ 136–39). Each claim is flawed.

With respect to SecureNow, and assuming *arguendo* that Fiserv even intends to charge FiCare for this product, FiCare's allegations are foreclosed by the Agreement. *Griffin Indus., Inc. v. Irvin*, 496 F3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."). As FiCare acknowledges, SecureNow is a "replacement" of the Enhanced Authentication service that FiCare contracted to receive under the Agreement and is intended to provide security features related to FiCare's members' use of the Virtual Branch product. (ECF No. 1, ¶¶ 50–53). The 2021 Amendment unequivocally permits Fiserv to "automatically release new version(s) of the Services that improves existing functions or performance." (Ex. 1, at 3, Digital Online Banking Services Schedule, § 2(c)). Through this amendment, FiCare ***authorized*** exactly what it now complains of—the release of a new service (SecureNow) that improves an existing service (Enhanced Authentication).

FiCare's remaining requests are not ripe. FiCare does not state a breach of contract claim, *see* Part I.A–C *supra*, and does not allege Fiserv ever attempted to invoke the Agreement's exculpation or limitation of liability provisions (*see*

17

*generally* ECF No. 1). These provisions are not yet in dispute, and FiCare is seeking an improper and "hypothetical advisory opinion" that is "unavailable through the declaratory judgment procedure." *Owners Ins. Co. v. Parsons*, 610 F. App'x 895, 898 (11th Cir. 2015). FiCare's request to invalidate "automatic renewals" of the Agreement under N.Y. Gen. Oblig. Law § 5-903 is also flawed, as no auto-renewal occurred and the Agreement does not expire until 2029. *See* Part I.C.3. *supra*.

## II.    FICARE'S FRAUD AND FDUTPA CLAIMS FAIL.

FiCare spends over two dozen paragraphs insisting that Fiserv "defrauded" FiCare, but its allegations are bereft of both plausibility and particularity. (ECF No. 1, ¶¶ 55–74, 159–72). Stripped of rhetoric, FiCare alleges three fraud theories — fraud, fraudulent inducement, and fraudulent concealment.  (*Id.*, ¶¶ 159–72).

Fraud and fraudulent inducement have identical elements. *John Hancock Life Ins. Co. (U.S.A.) v. Soudijn*, 2015 WL 12859315, at *1 (M.D. Fla. Dec. 11, 2015). In Florida, the elements of fraud are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) the consequent injury by the party acting in reliance on the representation." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022) (cleaned up).

Fraudulent concealment is "distinct" from fraud. *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2015 WL 3452517, at *3 (M.D. Fla. May 29, 2015). It has five

18

elements: "(1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known the fact should be disclosed; (3) the defendant knew her concealment or failure to disclose would induce the plaintiff to act; (4) the defendant had a duty to disclose the fact; and (5) the plaintiff detrimentally relied on the misinformation." *Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1315 n.4 (M.D. Fla. 2017) (cleaned up).  No matter the theory, FiCare's fraud claim fails.

### A.   FiCare Does Not Plausibly Plead a Misrepresentation or Reliance.

FiCare contends that Fiserv made fraudulent misrepresentations or omissions in three ways: (1) a "compliance package" that suggested Fiserv's policies and standards are "based on accepted control standards, frameworks, and industry standards," including NIST standards, and that Fiserv "utilized" MFA; (2) a *Fiserv Cybersecurity Fact Sheet 2025* that stated Fiserv's cybersecurity policies were based on regulatory and industry publications and designed to meet regulatory requirements; and (3) a publicly available "Privacy Notice" stating Fiserv has "appropriate security measures" in place.  (ECF No. 1, ¶¶ 55–68).

These alleged "misrepresentations" are not present statements of a material *fact*; they are generic descriptions of Fiserv's information security practices and regulatory guidance. (*Id.*, ¶¶ 59, 61–64, 67). But "in the normal business transaction a person should not rely on…an opposing party's opinions, judgments, or legal

views, but instead should rely on more substantial matters, namely, the opposing party's representations of fact which are material to the transaction." *Hirsh v. Silversea Cruises Ltd. (Inc.)*, 2015 WL 12780626, at *5 (S.D. Fla. Mar. 5, 2015) (cleaned up).

Moreover, the Agreement's provisions governing the specific products and services FiCare receives supplant these general descriptions. The Agreement is fully integrated and disclaims reliance on extracontractual statements. (ECF No. 1-2, at 7, § 11(b)). "A party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract." *Mac-Gray Servs., Inc. v. DeGeorge*, 913 So. 2d 630, 634 (Fla. 4th DCA 2005). Even if FiCare could allege that Fiserv's products do not comply with the Agreement, such claim sounds in contract, not "fraud."

FiCare also fails to plead that it "relied" on these statements by entering into, and continuing to perform under, the Agreement. (*Id.*, ¶¶ 120, 160–61). First, FiCare does not ascribe a date to any of the alleged statements and so does not plead that any of them were made *before* FiCare entered into the Agreement thirteen years ago. (*See*, *id.*, ¶¶ 55–68). In fact, the *Fiserv Cybersecurity Fact Sheet 2025* is dated more than a decade *after* FiCare entered the Agreement. (*Id.*, ¶ 63). FiCare obviously did not rely on that statement in deciding whether to enter the Agreement. In any event, other than conclusory allegations of "reliance," FiCare

20

does not allege that any FiCare representative involved in the decision to enter the Agreement: (i) received the statements; (ii) read them; or (iii) relied on them in deciding to enter the Agreement. (*See, id.*, ¶¶ 55–68, 159–72).

The same pleading deficiencies apply to FiCare's threadbare allegations that it "relied" on these statements in continuing to perform under the Agreement. Who received the statements and how? Did that individual have a role in selecting FiCare's account processing vendor? Was that person involved in FiCare's decision to execute several amendments over the last thirteen years? Were the statements received before FiCare elected to enter those amendments (and, if so, before which amendments)? Did FiCare consider transitioning to a new vendor but elect not to based on the alleged statements? The Complaint leaves all these questions unanswered and fails to plead any *facts* plausibly alleging reliance.

### B.      FiCare's Allegations Fail Rule 9(b)'s Heightened Standard.

FiCare's fraud claim—again, no matter the theory—fails to satisfy Rule 9(b). Fed. R. Civ. P. 9(b). "The particularity requirement … is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (cleaned up). A plaintiff alleging fraud against an entity must identify the agent or corporate representative who

21

participated in the alleged fraud. *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (11th Cir. 2007) (affirming dismissal where complaint did not identify the corporate agent or representative who participated in the alleged fraud).

FiCare claims misrepresentations were made in Fiserv's compliance package offered to customers, but FiCare does not specify when Fiserv allegedly provided these compliance packages to customers, who these customers were, who at Fiserv made the representations, or how these compliance packages were disseminated. (ECF No. 1, ¶ 56). Similarly, FiCare claims Fiserv made false and misleading statements in its *Fiserv Cybersecurity Fact Sheet 2025* and "Privacy Notice," but FiCare does not specify when or how Fiserv allegedly disseminated these statements, nor does it specify who at Fiserv did so. (*Id.*, ¶ 63). In other instances, FiCare provides even less detail. (*See e.g., id.*, ¶ 72 (merely alleging that "Fiserv knew about material security defects … [and] misrepresented them"), ¶ 120 ("Fiserv misrepresented [the existence and nature of Fiserv's security controls] to FiCare Federal")). All this is insufficient to satisfy Rule 9(b).

### C. FiCare Does Not Plausibly Plead an FDUTPA Claim.

FiCare's throwaway FDUTPA claim also fails. To assert an FDUTPA claim, a plaintiff must allege (1) a deceptive or unfair act; (2) causation; and (3) actual damages. *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 860 (11th Cir. 2023) (cleaned up).

The "factual" allegations underpinning FiCare's FDUTPA claim are

indistinguishable from those supporting its contractual claims. (*See, e.g.*, ¶¶ 114(h), 178). Although Florida law does not prohibit a separate FDUTPA claim related to the defendant's alleged breach of an agreement, not every breach of contract constitutes an FDUTPA claim. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003). Instead, a plaintiff must show "that the acts underlying the breach of contract are, by themselves, unfair and deceptive." *Rebman v. Follett Higher Educ. Group, Inc.*, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008). The only "deceptive or unfair" act FiCare attempts to allege is fraud.  But, as noted above, FiCare falls far short of plausibly pleading its fraud claim. *See* Parts II.A–B *supra*. As a result, FiCare's FDUTPA claim necessarily fails.

## III.   FICARE DOES NOT PLAUSIBLY PLEAD "TRADE SECRETS" OR "MISAPPROPRIATION."

To plausibly plead a DTSA claim, a plaintiff must allege, *inter alia*, that it "owns a valid trade secret" and that the defendant "misappropriated that trade secret."  *See KOVA Com. of Naples, LLC v. Sabin*, 2024 WL 2019872, at *2 (M.D. Fla. May 7, 2024). To be a trade secret, FiCare cannot merely conclude that the information is "of value," but rather "must tie the value of the information at issue to its secrecy." *WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1320 (N.D. Fla. 2024); 18 U.S.C. § 1839(3)(B).  To "misappropriate" under the DTSA, a party must either disclose or use a trade secret without consent, or acquire a trade secret through "improper means." 18 U.S.C. § 1839(5).  FiCare does not

23

plausibly plead a "trade secret" or "misappropriation."

FiCare contends its "trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information," (ECF No. 1, ¶ 146), and that its "trade secrets provide it with economic advantages over its competitors," (*id.*, ¶ 150). But financial histories, transactions, and credit information do not derive economic value from being kept secret; rather, they are valuable *because* they can be shared with third parties to establish, for example, that an individual consumer is not a credit risk or to facilitate transactions. This means this information does not constitute a "trade secret" under 18 U.S.C. § 1839(3)(B). *Cf. Bellwether Cmty. Credit Union v. Chipotle Mexican Grill*, Inc., 353 F.Supp.3d 1070, 1087 (D. Colo. 2018). The same is true of the alleged "identities and contact information" of FiCare's members and employees. (ECF No. 1, ¶ 146). A list of names and contact information is not a trade secret. *See Nationwide Equip. Co. v. Allen*, 2005 WL 1228360, at *5 (M.D. Fla. May 24, 2005) (customer list did not constitute trade secret where the customer list was accessible to third parties).

FiCare's descriptions of the harm that might occur if a person's name, contact information, financial history, and transactions are accessed by a bad actor do not rehabilitate FiCare's DTSA claim. (*See e.g.*, ECF No. 1, ¶¶ 75–87). FiCare

24

confuses the harm a person may suffer from disclosure with the proper inquiry under the DTSA: specifically, whether FiCare realizes independent economic value specifically because member and employee information is kept secret. 18 U.S.C. § 1839(3)(B); *WWMAP*, 711 F. Supp. 3d at 1320. FiCare does not (and cannot) allege the latter and thus has not alleged a valid trade secret.

FiCare also does not plausibly allege "misappropriation." FiCare's misappropriation theory is premised on FiCare's "trade secrets [being] stored and accessible on Fiserv's insecure systems." (ECF No. 1, ¶ 152). But FiCare has been a Fiserv client for years, and the parties have shared information under the Agreement as part of their ongoing commercial relationship. In other words, FiCare solely alleges that Fiserv possesses FiCare's information as part of its performance under the Agreement. (*Id.*, ¶¶ 146–152). That is lawful acquisition in a commercial relationship, not acquisition by improper means.

FiCare also asserts that Fiserv "misappropriated FiCare Federal's trade secrets by disclosing them to hackers." (*Id.*, ¶ 153). But nowhere does FiCare allege that the alleged 2024 incident involved exfiltration or theft of FiCare's alleged trade secrets. The operative allegation is that "a hacker obtained control over online banking accounts during FiCare Federal's Virtual Branch account creation process[.]" (*Id.*, ¶ 88). FiCare does not allege that any database or compilation of member information was copied or removed. To the contrary, the focus on

compromise "during … account creation," (*id.*), implies the attacker already had the members' identity data from some other source. FiCare's DTSA claim fails.

**CONCLUSION**

For the foregoing reasons, the Court should dismiss all claims in the Complaint.

**LOCAL RULE 3.01(g) CERTIFICATE**

Pursuant to Local Rule 3.01(g), the Parties' counsel conferred by email on February 23, 2026. Plaintiff opposes the relief requested in this motion.

Dated this 25th day of February, 2026.

*/s/ Joseph W. Swanson*

Joseph W. Swanson (Lead Counsel)
(FBN  0029618)
Primary email: joe.swanson@foley.com
Secondary email: dmills@foley.com
Ashley C. Grabowski (FBN 1049290)
Primary email: agrabowski@foley.com
Secondary email: dguillen@foley.com
**Foley & Lardner LLP**
100 North Tampa Street
Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

Bryan B. House (*pro hac vice forthcoming*)
Timothy J. Patterson (*pro hac vice forthcoming*)
**Foley & Lardner LLP**
777 E. Wisconsin Avenue

Milwaukee, WI 53202-5306
Telephone: (414)271-2400
Facsimile: (414)297-4900
bhouse@foley.com
tjpatterson@foley.com

Elysia A. Lampert (*pro hac vice forthcoming*)
**Foley & Lardner LLP**
321 N. Clark St., Suite 3000
Chicago, IL 60654-4762
Telephone: (312)832-4500
Facsimile: (312)832-4700
elampert@foley.com

*Attorneys for Defendants Fiserv Solutions, LLC and Fiserv, Inc.*

27