**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FICARE FEDERAL CREDIT UNION,

Plaintiff,

Case No. 8:26-cv-00231-JLB-TGW

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

Defendants.

/

# DEFENDANTS FISERV SOLUTIONS, LLC'S AND FISERV, INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT


Joseph W. Swanson (Lead Counsel)
(FBN 0029618)
Primary email: joe.swanson@foley.com
Secondary email: dmills@foley.com
Ashley C. Grabowski (FBN 1049290)
Primary email: agrabowski@foley.com
Secondary email: dguillen@foley.com
**Foley & Lardner LLP**
100 North Tampa Street
Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

*Attorneys for Defendants Fiserv Solutions, LLC and Fiserv, Inc.*

Bryan B. House (*pro hac vice*)
Timothy J. Patterson (*pro hac vice*)
**Foley & Lardner LLP**
777 E. Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414)271-2400
Facsimile: (414)297-4900
bhouse@foley.com
tjpatterson@foley.com

Elysia A. Lampert (*pro hac vice*)
**Foley & Lardner LLP**
321 N. Clark St., Suite 3000
Chicago, IL 60654-4762
Telephone: (312)832-4500
Facsimile: (312)832-4700
elampert@foley.com

Defendants Fiserv Solutions, LLC ("Fiserv") and Fiserv, Inc.[1] (collectively, "Defendants") move to dismiss FiCare Federal Credit Union's ("FiCare") Second Amended Complaint (ECF No. 45) ("SAC") pursuant to F. R. C. P. 12(b)(6).

## INTRODUCTION

For the third time, rather than pleading viable claims based on plausible factual allegations, FiCare resorts to broadside, *ad hominem* attacks on Defendants, fueled by stale media articles and stories about equally meritless lawsuits (filed by plaintiff's counsel) intended to paint Defendants as bad actors. This is all to disguise that, despite pages of new allegations, FiCare still has no viable claim.

This time, FiCare relies on the new-found allegation that Fiserv's products do not "require" the security controls FiCare now prefers—specifically, multi-factor authentication ("MFA"). FiCare earlier alleged that certain key products (including Portico, FiCare's account processing "core") lack the "right" MFA but (as its latest amendment concedes), that's not true. So FiCare pivots yet again and now complains that Fiserv does not prohibit its clients from choosing not to use MFA "all the time." That Fiserv is contractually obligated to force FiCare to use Fiserv's products and services in ways that FiCare has chosen not to use them is a remarkable proposition that finds no basis in the Agreement.

[1] Fiserv, Inc., Fiserv Solutions, LLC's parent company, has no contractual relationship with FiCare and is not a proper defendant. Notwithstanding, any allegations specific to Fiserv, Inc. are insufficient to state a claim under Counts 6-8. (*See infra*, at Parts II-III).

FiCare continues to allege that other products lack the "right" MFA. After three bites at the apple, FiCare still has not identified a contractual provision requiring any particular form of MFA, much less what FiCare now (after a thirteen-year course of dealing) claims to prefer. Instead, FiCare contorts a mutual confidentiality provision into a unilateral obligation that Fiserv provide FiCare with security features identical to what Fiserv uses internally and replaces the Agreement's language with extra-contractual "guidance." The Master Agreement forecloses this construction. Indeed, with respect to Fiserv's online banking products (Virtual Branch and Mobiliti), FiCare assumed the very security risks and obligations it would place on Fiserv.

FiCare would also transform a contract dispute into "fraud," alleging that generic descriptions of Fiserv's security programs were fraudulent. Even if those descriptions were actionable representations (they are not) and FiCare had satisfied Rule 9(b) (it has not), FiCare alleges that it reviewed them in ***2025***, years after the Master Agreement, precluding FiCare from pleading reliance.

As to its statutory claims, FiCare does not allege any "trade secret" that it employed reasonable measures to protect, or that Defendants "misappropriated" anything. FiCare's FDUTPA claim is a redundant throwaway. Long on rhetoric, the SAC is devoid of substance and fails to state a claim. As a result, this Court should dismiss the entire SAC, with prejudice.

## FACTUAL BACKGROUND

In 2013, the parties executed a Master Agreement under which Fiserv provides account processing and related products (as amended, the "Agreement"). (ECF No. 45, ¶¶ 25–26; Ex. 1[2]). Those services were initially limited to debit card processing, but the Agreement contemplates that the parties may periodically add new products. (Ex. 1, at 2, § 1(b)).

In 2018, FiCare contracted to receive new products, including Fiserv's core processing system ("Portico"), and Fiserv's online and mobile banking products ("Virtual Branch" and "Mobiliti").[3] (*Id.*, at 109–82 ("2018 Amendment")). Virtual Branch and Mobiliti use certain security controls, including a service called Enhanced Authentication. (*See id.*, 152–60). At that time, FiCare agreed to be solely responsible for the authentication and validation procedures required to satisfy its security requirements for Virtual Branch and Mobiliti. (*Id.*, at 152-53, § (1)(c) (ii), (v), (vii); 141 at § 4(c)). The most recent schedule related to Virtual Branch and Mobiliti is part of a 2021 amendment titled "Digital Online Banking Service

[2] Exhibit 1 is a copy of the Agreement and certain amendments that Plaintiff served but did not file due to potential sealing issues. Defendants attach a copy of that exhibit to this motion, as well as 2021 and 2023 amendments that FiCare omitted. The Court may consider these documents in deciding the motion. *See Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

[3] Fiserv provides additional products under the Agreement, including Client360, Nautilus, Portico Reporting Analytics, Wisdom Accounting Suite, File Exchange, Loancierge, Originate, PartnerCare, Fiserv Xchange, and InterAct Web. (*Id.*, ¶ 63).

Schedule." (Ex. 2 ("2021 Amendment")). This amendment disclosed to FiCare a feature called SecureNow, which provides MFA for Virtual Branch and Mobiliti. (Ex. 2, at 6, § 3(c)). FiCare declined to purchase SecureNow at that time.

The Agreement is fully integrated, governed by New York law, and expires in 2029. (Ex. 1, at 7-8, §§ 11(b), (d); Ex. 3 ("2023 Amendment"), at 2, § 2). The Agreement does not require a specific type of MFA for any product, but it does:

- reflect a comprehensive agreement delineating the parties' obligations, risk allocations, and liability limitations;
- include specific warranties regarding Fiserv's products and services, and expressly waives FiCare's reliance on unincluded representations or warranties;
- include FiCare's representation that it verified the products it receives meet its operational and regulatory needs;
- define in schedules and exhibits Fiserv's obligations concerning the performance, functionality, and security of the products and services; and
- provide that Fiserv may automatically release new versions of the products and services that improve existing functions or performance.

(Ex. 1, at 2, 6-7, §§ 1, 6, 7, 11(b); Ex. 2, at 3, § 2(c)).

## <u>ARGUMENT</u>

A well-pleaded complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is only plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.*

## I. FICARE DOES NOT PLEAD A BREACH OF ANY CONTRACTUAL OR QUASI-CONTRACTUAL OBLIGATION.

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).

### A. FiCare Has Not Pleaded a Breach of Sections 3 or 4 of the Agreement.

FiCare relies on a generic confidentiality clause (Section 3) and a general provision regarding an information security program (Section 4) to manufacture an obligation that Fiserv provide to FiCare whatever security features Fiserv uses internally or that may be recommended by NIST guidance. That's not what these sections say. Neither mandates any type of security feature on any product, let alone MFA in the form FiCare now demands.

#### 1. FiCare Cannot State a Claim Under Section 3 of the Agreement.

FiCare asserts that Section 3 of the Agreement requires that the products Fiserv provides to FiCare use security features that are equivalent to those Fiserv uses internally for its own systems. (ECF No. 45, ¶¶ 1–4, 28, 33). This interpretation is textually unsupportable and facially implausible.

***First***, Section 3(b)'s plain language and structure confirm the provision is a

***mutual*** confidentiality and non-disclosure agreement. Section 3 defines "Discloser" as the entity providing confidential information and "Recipient" as the entity receiving said confidential information. (Ex. 1, at 3–4, § 3(b)). Section 3(b) does not impose confidentiality obligations ***only on Fiserv***, but equally on any "Recipient" of "Information" (as defined in that section):

> Recipient agrees to hold as confidential all Information it receives from the Discloser. All Information shall remain the property of Discloser or its suppliers and licensors. Recipient will use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law…. (*Id.*)

Section 3(b) is an ordinary non-disclosure provision. It does not mention information security, much less MFA, token-generated codes, or biometrics. (*Id.*) Section 3(b) simply states what uses of confidential information are permitted, to whom such information may be disclosed, and what happens to that information when the Agreement ends. (*Id.*) The Court should apply Section 3(b)'s actual and unambiguous language, *see Piccirilli v. Yonaty*, 204 A.D.3d 1322, 1323 (N.Y. App. Div. 2022), and disregard textually unsupported allegations about non-existent security obligations. *Weiner v. Fed. Ins. Co.*, 2011 WL 13229316, at *3 (S.D. Fla. Dec. 16, 2011) (disregarding allegation that contradicts language of agreement).

***Second***, under New York law, "a specific provision…governs the circumstances to which it is directed, even in the face of a more general provision." *In re AMR Corp.*, 730 F.3d 88, 99 (2d Cir. 2013) (citation omitted). The Agreement

defines at length Fiserv's performance and, where applicable, security obligations. FiCare's argument that a general confidentiality obligation overrides these specific obligations inverts a basic contract maxim and creates inherent conflict. Under the Digital Online Banking Schedule, FiCare had the option to elect either Enhanced Authentication or SecureNow for authentication. (Ex. 2, at 6, § 3(c); *id.*, at 9, Attach. 1). In the Web Signatures Schedule, FiCare had the option to choose either "Phone Authentication" or "Knowledge Base Authentication." (Ex. 1, at 164, § 2(a)). According to FiCare, it is a breach for Fiserv to provide the types of authentication FiCare selected in these schedules if they differ from what Fiserv uses internally. That is a commercially unreasonable interpretation that would upend the Agreement's specific obligations.

***Third***, FiCare's interpretation of Section 3(b) would lead to absurd results given its mutuality and the parties' starkly different institutional capacities. Fiserv is a Fortune 500 fintech provider serving a variety of global customers; FiCare is a regional credit union. The parties did not plausibly intend that "the same" security features apply to both. And it is equally implausible that such a sweeping obligation would be hidden in a single sentence of a confidentiality clause, when other provisions specifically address information security and product-specific controls. FiCare's reading would render those provisions superfluous and produce a commercially unreasonable result. Courts reject interpretations that

yield "absurd" or "commercially unreasonable" outcomes, *Cole v. Macklowe*, 99 A.D.3d 595, 596 (N.Y. App. Div. 2012), like FiCare's here.

**2. FiCare Cannot State a Claim Under Section 4.**

Section 4 mandates only that Fiserv have an "information security program." FiCare admits Fiserv has one. (Ex. 1, at 3-5, §§ 3, 4; ECF No. 45, ¶¶ 110, 115-16). To manufacture a claim, FiCare imports non-existent language and obligations to Section 4(a) when it alleges Fiserv breached by "failing to implement and maintain an information security program that appropriately protects the security and confidentiality" of FiCare's information. (ECF No. 45, ¶ 159(b)). To support this conclusion, FiCare offers only its subjective and extra-contractual view of what is "appropriate" and FiCare's apparent belief that NIST or FFIEC guidance, rather than the Agreement, govern Fiserv's performance.

Section 4(a) does not adopt or incorporate NIST, FFIEC, or any other federal guidance. It does, however, include Fiserv's agreement to "use security safeguards...in accordance with Massachusetts Regulation 201 CMR 17.00," (Ex. 1, at 4, § 4(a)), which FiCare does not allege to be germane here. The express reference to the Massachusetts standard confirms the parties did not incorporate other "guidance" into Section 4. *See Gillen v. Town of Hempstead Town Bd.*, 63 Misc. 3d 653, 658 (N.Y. Sup. Ct. 2019) (applying *expressio unius est exclusio alterius*).

Lacking a contractual standard, FiCare alleges two "security incidents" in

2024 and 2025 (ECF No. 45, ¶¶ 53-61) and offers the *ipse dixit* that a security incident necessarily equates to a breach of contract. That a member's account was allegedly accessed, however, does not establish that Fiserv lacks an adequate information security program or any other breach of Section 4(a). To the contrary, it is "equally plausible that [the company] did place a high emphasis on security but that the [c]ompany's security systems were nonetheless overcome." *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5 (D.N.J. Dec. 7, 2009); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1226 (N.D. Ga. 2019) (data breach does not imply inadequate security). FiCare must allege a breach of contract that proximately caused a security incident (and damage to FiCare); it cannot merely allege a security incident and presume a breach. The SAC does not plausibly allege Fiserv breached Section 4(a) or any other provision of the Agreement.

**B. FiCare Does Not Plausibly Allege Breach of Section 4(e)(iv) of the ASP Services Exhibit.**

On its third attempt to state a claim, FiCare invokes Section 4(e)(iv) of the ASP Services Exhibit for the very first time. It states, "functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry." (ECF No. 45, ¶¶ 52, 159(c)). FiCare contends a representation about the functionality of Fiserv's internal systems extends to the separate products and services FiCare receives under the Agreement and guarantees they will conform to the guidance cited in

the SAC. FiCare's latest attempt to plead a contract claim fails for two reasons.

### 1. FiCare's Interpretation of Section 4(e)(iv) Ignores the Master Agreement's Plain Language and Structure.

***First***, FiCare ignores the Agreement's plain language and structure. The "Services" and "Products" (collectively defined as "Deliverables") FiCare receives under the Agreement are distinct from the "Fiserv System."[4] That the Agreement defines "Fiserv System" independently of "Services," "Products," and "Deliverables" makes this plain. The parties defined "Fiserv System" as the internal systems "used in the delivery of Services."[5] The Fiserv System is used to deliver the Services and is necessarily distinct from them.

Indeed, contrary to FiCare's interpretation, Section 4(e) makes clear that the required performance and features of the Services are set forth exclusively in the Agreement's Schedules. Section 4(e)(i) warrants that the "Services will conform to the specifications set forth in the Schedules to this Exhibit." (Ex. 1, at 10). FiCare does not allege that the security features Fiserv provides in connection with the Services fail to conform to any requirement in the Schedules. And Section 4(e)(ii)

---

[4] As to the "Deliverables," the parties agreed to a specific allocation of risk and liability in which FiCare assumed responsibility for ensuring that the Deliverables satisfied its needs and specifications: "FISERV DOES NOT REPRESENT THAT THE DELIVERABLES MEET CLIENT'S REQUIREMENTS" and "CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS." (Ex. 1, at 6, § 6(c)).

[5] The parallel definition of "Client Systems" as internal "networks and computer systems" further supports this straightforward interpretation. (Ex. 1, at 10, § 3).

and (iii) also make representations and warranties about the "Services" that Fiserv provides under the Agreement. (*Id.*) In contrast, Section 4(e)(iv), on which FiCare relies, makes no warranty about "Services" (or "Products" or "Deliverables"), referring only to the "Fiserv System." (*Id.*, at 11). The Agreement's plain language and structure demonstrate that Section 4(e)(iv)'s representation about the "functionality" of the Fiserv System is unrelated to the performance or features of the Services, Products, or Deliverables. (*See, id.*) This is fatal.

Tellingly, the parties' actions over their long course of dealing were fundamentally inconsistent with the interpretation of Section 4(e)(iv) that FiCare now advances. Most importantly, when FiCare first contracted to receive Virtual Branch and Mobiliti – the online and mobile banking products at the heart of the SAC – it unambiguously assumed responsibility for the security and financial risk of providing these products, including authentication and validation of those attempting to use these products. Specifically, in the Virtual Branch Services Schedule to the ASP Services Exhibit, FiCare agreed:

> (ii) Client will complete and perform any and all validation procedures it determines, in its sole discretion, are necessary to authenticate the identity and ensure the financial integrity of a particular Member or potential Member.
>
> (v) With respect to all Virtual Branch Services, Client is and shall remain solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Member accessing the Virtual Branch Services. Fiserv shall not be liable in any manner for such risk.

> (vii) Client agrees that it will use, and will instruct its Members to use, the Virtual Branch Services in accordance with such rules as may be established by Fiserv from time to time. Client will be responsible for the supervision, management and control of its use of Virtual Branch Services, including, without limitation, implementing sufficient procedures to satisfy its requirements for the security and accuracy of data.

(Ex. 1, at 152-53, §§ (1)(c) (ii), (v), (vii)). And in the Mobiliti Services Schedule, FiCare assumed the obligation to "complete and perform any and all procedures it determines, in its sole discretion, are necessary to validate the identity of its Users." (Ex. 1, at 141, § 4(c)). Both schedules control in the event of a conflict with the ASP Services Schedule or the Agreement. (*Id*. at 139; 160, § (4)(k)).

**2. None of the "Guidance" That FiCare Cites in the SAC Is Mandatory.**

***Second***, even if Section 4(e)(iv) meant what FiCare now claims (it does not), FiCare has not plausibly alleged a breach, because the FFIEC guidance upon which FiCare relies, (ECF No. 45, ¶ 37), is not a regulation and does not mandate compliance with NIST: "This Guidance does not interpret or establish a compliance standard for these laws or impose any new regulatory requirements on financial institutions," and "***does not endorse any specific information security framework or standard***." (https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf, at 2) (emphasis added).

Similarly, the Automated Cybersecurity Evaluation Toolbox, (*id.*, ¶ 45), is

"completely voluntary and does not introduce any new requirements or expectations on credit unions." And 12 C.F.R. Part 748, Appendix A—the only actual regulation cited in the SAC—merely requires that credit unions implement procedures to safeguard information. It does not incorporate NIST or mandate any particular form of MFA or security. Finally, FiCare's allegation that the NCUA has implemented NIST standards for its own systems, (*id.*, ¶ 46), says nothing about regulations applicable to FiCare.

In sum, none of this ***requires*** FiCare to use a specific form of authentication or adhere to NIST. Were that not the case, FiCare would be able to identify particular regulations rather than rely on a convoluted web of guidance. FiCare has not alleged any failure of the Fiserv System that precludes FiCare's compliance with applicable federal regulation. FiCare's claim fails for this reason as well.

### C. FiCare Does Not Plausibly Allege that Fiserv Breached Any Obligations Concerning "Enhanced Authentication."

FiCare perfunctorily alleges that Fiserv breached its obligations by providing "Enhanced Authentication" in a form that did not include FiCare's preferred type of MFA. (*See* ECF No. 45, ¶¶ 28(d), 159(h)). But neither the 2018 Amendment nor the 2021 Amendment (the two relevant amendments) require that Fiserv provide any form of authentication beyond the Enhanced Authentication product itself. (Ex. 1, at 109–10, 152–60; Ex. 2, at 2–8). Both amendments refer generically to "Enhanced Authentication" as a line-item charge,

(Ex. 1, at 155; Ex. 2, at 9, Attach. 1), and neither requires "possession-based MFA" (*id.*), which is fatal to this part of FiCare's contract claim. *See Pluviose v. PHH Mortg. Corp.*, 2023 WL 4743687, at *3 (M.D. Fla. July 25, 2023).

FiCare advances a catch-22 in which it complains that Enhanced Authentication renders Virtual Branch insecure, (ECF No. 45, ¶ 100), but that Fiserv may not upgrade FiCare to the new SecureNow product (which FiCare has agreed to receive during this litigation), (*id.*, ¶ 159(h)). The Digital Online Banking Services Schedule to the 2021 Amendment authorizes Fiserv to "automatically release new version(s) of the Services that improves existing functions or performance." (Ex. 2, at 3, ¶ 2(c)). At that same time, FiCare agreed to terms governing SecureNow should FiCare later use the product, precluding any claim that FiCare has been "forced" to accept them. (*Id.*, at 6, § 3(c)). FiCare does not state a claim tied to SecureNow, *see Pluviose*, 2023 WL 4743687 at *3, which likewise precludes its requested declaratory judgment relating to that product.

### D. FiCare's "Audit" Provision Claims Fail as a Matter of Law.

Section 4(h) of the ASP Services Exhibit ties Fiserv's duty to "implement an action plan" to "material deficiencies…noted in…audit report[s]." (Ex. 1, at 11, § 4(h)). It does not obligate Fiserv to do ***anything*** in response to unsubstantiated statements in media publications or unrelated lawsuits.[6] (*See* ECF No. 45, ¶¶ 68-

---

[6] Defendants reject FiCare's inaccurate and irrelevant allegations that counsel made false

98). FiCare does not allege any audit requiring Fiserv to adopt an action plan and has not alleged a breach of Section 4(h) of the ASP Services Exhibit.

FiCare also contends Fiserv breached Sections 4(a), 4(b), and 10(b) of the Agreement and Sections 4(d), 4(h), and 6(c) of the ASP Services Exhibit by not providing FiCare allegedly required "audit" documents. (*Id.*, ¶¶ 159(e)–(f)). FiCare admits, and the SAC's exhibits make clear, that Fiserv has provided FiCare with its information security plan, (ECF No. 45, ¶ 66; ECF No. 45-10 at 4), as well as other documentation contemplated by Section 4(a) of the Agreement and Section 4(h) of the ASP Services Exhibit, (*see* ECF No. 45, ¶ 29 (describing *SOC 1 Type 2 Report*). Fiserv said it would provide additional documentation, (ECF No. 45-10 at 4), and it has now done so. Finally, FiCare has not alleged damage from the alleged timing of Fiserv's response, precluding any claim. *See Edwards*, 938 F.3d at 12.

**E. FiCare's Equitable and Declaratory Relief Claims Fail.**

FiCare alleges the Agreement "constitutes the complete and exclusive statement of the agreement between the parties" (Ex. 1, at 7, § 11(b)) and is a valid contract. (ECF No. 45, ¶¶ 156, 163).[7] "[A]n express contract governing a dispute precludes an action for unjust enrichment." *Certified Collectibles Grp., LLC v.*

representations to the court in *Bessemer* (*id.*, ¶¶ 95-97) and will not address them further.

[7] Nonetheless, the SAC states "the parties dispute whether the Master Agreement is enforceable." (*Id.*, ¶ 189). Even if FiCare pleads unjust enrichment in the alternative, it offers no plausible explanation as to how or why the Agreement (under which the parties perform every day) is entirely unenforceable.

*Globant, LLC*, 2021 WL 1214963, at *7 (M.D. Fla. Mar. 31, 2021) (citation omitted).

FiCare's requests for equitable relief also fail. Rescission and specific performance are unavailable without a plausible contract claim. *WestLB AG v. BAC Fla. Bank*, 912 F.Supp.2d 86, 94 (S.D.N.Y. 2012); *Cherokee Owners Corp. v. DNA Contracting, LLC*, 96 A.D.3d 480, 481 (N.Y. App. Div. 2012). FiCare has not pleaded a contract claim, and its requests for rescission and specific performance also fail.

FiCare's requests for declarations that: (i) the Agreement's exculpation and liability-limitation provisions are unenforceable; and (ii) FiCare is not "obligat[ed] to pay" early termination, deconversion, and post-termination fees or liquidated damages are premature and unripe. FiCare has not pleaded a breach of contract claim, *see* Part I.A–D *supra*, and does not allege Fiserv invoked the Agreement's exculpation, limitation of liability, deconversion or early termination fee provisions. (*See generally* ECF No. 45). FiCare has not pleaded any facts giving rise to a present and concrete dispute about the accuracy or legitimacy of any previous or future invoice. (*Id.*) FiCare is seeking an improper and "hypothetical advisory opinion." *Owners Ins. Co. v. Parsons*, 610 F. App'x 895, 898 (11th Cir. 2015).

## II. THE FRAUD AND FDUTPA CLAIMS FAIL AS A MATTER OF LAW.

The handful of new allegations FiCare offers to rehabilitate its fraud and FDUTPA claims only confirm that FiCare does not (and cannot) plausibly plead fraud or a FDUTPA violation. FiCare still fails to plead an actionable

misrepresentation or reliance, and its claims fail as a result.[8]

Fraud and fraudulent inducement require "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) the consequent injury by the party acting in reliance on the representation." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022); *John Hancock Life Ins. Co. (U.S.A.) v. Soudijn*, 2015 WL 12859315, at *1 (M.D. Fla. Dec. 11, 2015). Although fraudulent concealment is "distinct" from fraud, *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2015 WL 3452517, at *3 (M.D. Fla. May 29, 2015), it requires the "material fact" and "detrimental[] reli[ance]" elements, *Asokan v. Am. Gen. Life Ins. Co.*, 302 F. Supp. 3d 1303, 1315 n.4 (M.D. Fla. 2017).

### A. FiCare Has Not Pleaded an Actionable Misrepresentation of Present Fact.

FiCare contends the "Defendants" made misrepresentations via five documents: (1) a *Fiserv Cybersecurity Fact Sheet 2025* stating Defendants' cybersecurity policies were based on regulatory and industry publications and designed to meet regulatory requirements, (*id.*, ¶¶ 29-30, 115-16); (2) a *Standard*

---

[8] The SAC now alleges in conclusory fashion that Fiserv, Inc. made fraudulent misrepresentations "independent of Fiserv Solutions" and the Agreement. (ECF No. 45, ¶ 216). These additions exacerbate FiCare's pleading woes. FiCare fails to attribute specific misrepresentations or omissions to either Defendant, imprecisely attributing them collectively to "Fiserv" or "Defendants." (*See, e.g.*, ¶ 29). Such group pleading fails under Rule 9(b) and confirms that FiCare cannot allege a misrepresentation or omission by Fiserv, Inc.

*Information Gathering Questionnaire* stating MFA is "utilized" without reference to a particular Fiserv product or service, (*id.*, ¶¶ 29, 31, 109); (3) a *SOC 1 Type 2 Report* explaining Defendants' employees access unidentified "systems" via "two-factor authentication," (*id.*, ¶¶ 29, 32, 119); (4) an *Enterprise Risk Management, Security, and Privacy Program Overview* (the "Security Overview") issued in 2018 and 2019 that says Defendants' policies were designed with the goal of meeting applicable laws, regulations, and standards, (*id.*, ¶¶ 70-73); and (5) a "Privacy Notice" on Fiserv's website stating Fiserv has "appropriate security measures," (*id.*, ¶¶ 123-25).

The alleged "misrepresentations" are no more than generic descriptions of information security practices and regulatory guidance, (*id.*, ¶¶ 29-30, 70-73, 115-16, 123-25), or statements that vaguely describe security practices (*id.*, ¶¶ 29, 31-32, 109, 119). None specifically relates to products and services FiCare contracted to receive and none makes a present statement of fact sufficient for an actionable misrepresentation. The fraud claim fails as a result. *See JustTech, LLC v. Kaseya US LLC*, No. 22-22454-CIV, 2023 WL 5529845, at *7 (S.D. Fla. Aug. 28, 2023) ("[v]ague and indefinite statements cannot be justifiably relied on…")

Moreover, the Agreement's provisions governing specific products and services control over generic policy descriptions. The Agreement is integrated and disclaims reliance on extracontractual statements, regardless of which Defendant allegedly made the statement. (Ex. 1, at 7, § 11(b)). "A party cannot recover in fraud

for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract." *Mac-Gray Servs., Inc. v. DeGeorge*, 913 So. 2d 630, 634 (Fla. 4th DCA 2005). FiCare's claim (if any) sounds in contract.

**B. FiCare Does Not Plausibly Plead Reliance.**

Most of FiCare's new fraud allegations purport to describe its alleged reliance. (*See e.g.,* ECF No. 45, ¶¶ 29 n.2, 75, 107-09, 115-16, 119). According to FiCare, it relied on the alleged misrepresentations when it entered into the Agreement, (*id.*, ¶ 205); and by continuing its relationship with Fiserv, (*id.*, ¶¶ 75, 108; *see also id.*, ¶¶ 107, 109, 205).

But the SAC still makes no allegation that anyone at FiCare saw or heard the claimed misrepresentations before entering into the Agreement in 2013 or any other particular time preceding any material amendment. To the contrary, FiCare alleges it reviewed the misrepresentations ***after*** it sent the demand letter purporting to terminate the Agreement and threatening to file this lawsuit. (*Compare id.*, ¶ 29 n.2 *with* ECF No. 45-9). The new allegations do not allege reliance and, in fact, plead FiCare out of court on this essential element. *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831, 838 (Fla. 2022) ("[T]here can be no reliance if the plaintiff is unaware of the defendant's misrepresentation until after the transaction is complete."); *Thurn v. Kimberly-Clark Corp.*, 2023 WL 4455630, at *5 (M.D. Fla. July 11, 2023) (dismissing a fraud claim for failure to plead reliance).

FiCare identifies only a single employee (Ashley Magill) who saw the alleged misrepresentation, accessing the supposedly offending "documents…on or about December 31, 2025." (*Id.*, ¶ 29 n.2). FiCare does not describe the documents Ms. Magill accessed or allege that they included any of the five documents upon which FiCare's fraud claim is based. (*Id.*) FiCare does not allege that Ms. Magill (or anyone else) accessed these unidentified files or documents at any time before December 31, 2025.

Those allegations preclude any claim of actual reliance. The Agreement was entered in 2013 and amended in, *e.g.*, 2016, 2018, 2021, and 2023, all years before Ms. Magill allegedly accessed the documents. (Exs. 1-3; ECF No. 45, ¶ 29, n.2). FiCare cannot have relied on documents it had not yet seen. In fact, the *Fiserv Cybersecurity Fact Sheet 2025*, both *Security Overview* documents, and the 2024 Privacy Notice are dated ***years after*** FiCare entered the Agreement and any amendment. (*Id.*, ¶¶ 29, 70, 74, 123, n.13). Aside from Ms. Magill's alleged access of unidentified documents, the SAC's allegations of reliance are entirely conclusory and fail to allege a specific FiCare employee viewed or relied upon these documents at any particular time. (*See e.g., id.*, ¶¶ 107-09, 116, 119).

This same fatal flaw precludes FiCare's claim that it relied on these documents in continuing to perform under the Agreement. (*Id.*, ¶¶ 207, 213-15). FiCare provided notice of termination of the Agreement for material breach on

July 3, 2025. (*Id.*, ¶ 64, ECF No. 45-9). This was ***five months before Ms. Magill's alleged access***. FiCare's own allegations establish that it did not receive the claimed misrepresentations until after it concluded (and notified Fiserv) that Fiserv's products were purportedly insecure. (*Id.*, ¶ 64, ECF No. 45-9). FiCare cannot have reasonably relied on documents that contained representations it already believed to be false. *See e.g.*, *Prentice*, 338 So.3d at 838 (if recipient "for any reason does not believe the misrepresentation, he cannot be found to rely on it"); *Zarrella v. Pac. Life Ins. Co.*, 755 F. Supp. 2d 1218, 1225 (S.D. Fla. 2010) (dismissing fraud claim where plaintiff had no basis to rely upon alleged statement).[9]

### C. FiCare Does Not Plausibly Plead a FDUTPA Claim.

The "factual" allegations underpinning FiCare's FDUTPA claim are indistinguishable from those supporting its contract claims. (*Compare* ECF No. 45, ¶ 159 *with id.*, ¶¶ 220-23). Although Florida law does not prohibit a separate FDUTPA claim related to an alleged breach, not every breach constitutes an FDUTPA claim. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 n.2 (Fla. 2003). Rather, a plaintiff must show "the *acts underlying* the breach of contract are, by themselves, unfair and deceptive." *Rebman v. Follett Higher Educ. Group, Inc.*, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008). The only such act FiCare alleges is

[9] FiCare's descriptions of statements made by unnamed Fiserv representatives during a February 12, 2026, SecureNow webinar fare no better. (ECF No. 45, ¶ 104). FiCare does not plausibly plead it relied on the alleged February 2026 statements regarding SecureNow, which occurred years after the most-recent amendment. (*See id.*, ¶¶ 104-06).

fraud. But FiCare does not plausibly plead its fraud claim, and FiCare's FDUTPA claim also fails. *See Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1293 (11th Cir. 2025).

## III. FICARE DOES NOT PLAUSIBLY PLEAD "TRADE SECRETS" OR "MISAPPROPRIATION."

To plausibly plead a DTSA claim, a plaintiff must allege, *inter alia*, that it "owns a valid trade secret" and that the defendant "misappropriated that trade secret." *KOVA Com. of Naples, LLC v. Sabin*, 2024 WL 2019872, at *2 (M.D. Fla. May 7, 2024). To be a trade secret, FiCare "must tie the value of the information at issue to its secrecy." *WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1320 (N.D. Fla. 2024); 18 U.S.C. § 1839(3)(B). FiCare also must plausibly allege the measures it takes to maintain the secrecy of the alleged trade secrets. *Rotor Blade, LLC v. Signature Util. Servs., LLC*, 545 F. Supp. 3d 1202, 1222 (N.D. Ala. 2021). And, to "misappropriate," a party must disclose or use a trade secret without consent, or acquire it through "improper means." 18 U.S.C. § 1839(5). FiCare does not plausibly plead these elements.

FiCare contends its "trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information." (ECF No. 45, ¶ 191). A mere list of names and contact information is not a trade secret. *See Nationwide Equip. Co. v. Allen*, 2005 WL 1228360, at *5 (M.D. Fla. May 24, 2005). To avoid this troublesome fact, FiCare

alleges that compilations of this information permit it to "assess loan risk more accurately than competitors lacking th[e] information and, in turn, … offer its members loans and savings products at highly competitive rates." (*Id.*, ¶ 195).[10]

But FiCare does not control this information and cannot maintain its secrecy. FiCare's ***members*** control the dissemination of their names, addresses, account numbers, credit information, and financial and transaction histories. FiCare's members obviously know their names and addresses and the details of transactions they themselves make. They receive "compilations" of that same information in account statements and online. FiCare cannot stop its members from sharing this information so that a competitor also can offer "loans and savings products at highly competitive rates." Indeed, ***members*** derive value from sharing that information to conduct transactions or (to borrow FiCare's hypothetical) secure loans from financial institutions. The members' information derives independent economic value not from being kept secret, but ***because*** it can be shared to establish, for example, that the member is not a credit risk or to facilitate transactions. That is not a "trade secret." *Cf. Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F.Supp.3d 1070, 1087 (D. Colo. 2018).

FiCare also cannot credibly claim that the members' names, addresses, and

[10] This is FiCare's third attempt to plead its claims, but the first time FiCare has alleged a nexus between the loan-origination process and the purported trade secrets. (*See generally* ECF Nos. 1, 33). This alone raises questions about the plausibility of these allegations.

financial histories belong to FiCare. FiCare cannot claim as a trade secret information it does not control and cannot keep secret. *Medike Int'l Corp. v. Giller*, 2024 WL 139575, at *4 (S.D.N.Y. Jan. 12, 2024) (information that can be freely shared by customers or obtained from customers themselves is not a trade secret).

With respect to secrecy, FiCare offers only boilerplate and conclusory allegations that it "has taken reasonable measures to maintain the secrecy…including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and other Fiserv commitments regarding data security." (ECF No. 45, ¶ 194). Parroting back the applicable legal standard is insufficient to state a claim. *Rotor Blade, LLC*, 545 F. Supp. 3d at 1222 (dismissing DTSA claim with conclusory allegations of reasonable efforts to maintain secrecy). FiCare fails to allege any facts describing security mechanisms FiCare uses to maintain secrecy, such as requiring its employees to sign confidentiality agreements, utilize passwords, and lock physical records. FiCare's conclusory allegations do not plead a DTSA claim.

Finally, FiCare fails to plausibly allege misappropriation. FiCare alleges only that its member and transaction information is "stored and accessible on Fiserv's insecure systems." (ECF No. 45, ¶ 197). FiCare has been a Fiserv client for years, and the parties share information as part of their commercial relationship. FiCare alleges only that Fiserv possesses FiCare's information to perform under

the Agreement. (*Id.*, ¶¶ 191–99). If Fiserv did not store this information, FiCare could not run its credit union (and would presumably sue for that, too). Ordinary course acquisition in a contractual relationship is not misappropriation. *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 230 (4th Cir. 2025).

Finally, FiCare alleges Fiserv misappropriated the alleged trade secrets by "disclosing them to hackers." (*Id.*, ¶ 198). But FiCare alleges no facts showing the "security incidents" involved the theft, copying, or removal of any member's information, much less that Fiserv "disclosed" that information to anyone. (*See id.*, ¶¶ 54-61). It has not pleaded misappropriation, and its DTSA claim fails.

## CONCLUSION

For the foregoing reasons, the Court should dismiss all claims in the SAC with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATE

Defendants file this motion pursuant to the Court's June 8, 2026, Order. This motion is Defendants' third motion to dismiss FiCare's operative pleadings, all of which alleged nearly identical claims for relief. On July 23, 2026, Defendants' counsel corresponded via email with FiCare's counsel regarding Defendants' filing of this motion, and Defendants' counsel offered to further discuss the motion by telephone. FiCare's counsel objected to the manner and timing of Defendants' conferral email while confirming FiCare intended to oppose the motion. In doing

so, FiCare's counsel suggested that the denial of Defendants' motion to dismiss a similar complaint in *Polam Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:26-cv-02352-JFW-DRM (C.D. Cal.) bears on Defendants' motion here. In response, Defendants articulated their position that the *Polam* decision has no bearing here because it includes no substantive analysis of the arguments Defendants assert in this motion.

Dated this 23rd day of July, 2026.

*/s/ Timothy J. Patterson*
Joseph W. Swanson (Lead Counsel)
(FBN 0029618)
Primary email: joe.swanson@foley.com
Secondary email: dmills@foley.com
Ashley C. Grabowski (FBN 1049290)
Primary email: agrabowski@foley.com
Secondary email: dguillen@foley.com
**Foley & Lardner LLP**
100 North Tampa Street
Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

Bryan B. House (*pro hac vice*)
Timothy J. Patterson (*pro hac vice*)
**Foley & Lardner LLP**
777 E. Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414)271-2400
Facsimile: (414)297-4900
bhouse@foley.com
tjpatterson@foley.com

Elysia A. Lampert (*pro hac vice*)
**Foley & Lardner LLP**
321 N. Clark St., Suite 3000
Chicago, IL 60654-4762
Telephone: (312)832-4500
Facsimile: (312)832-4700
elampert@foley.com

*Attorneys for Defendants Fiserv Solutions, LLC and Fiserv, Inc.*