UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FICARE FEDERAL CREDIT UNION,

Plaintiff, No. 8:26-cv-00231-JLB-GDP

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

Defendants.
_______________________________________/

**FICARE FEDERAL'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND SCHEDULE FOR A PRELIMINARY INJUNCTION**

FiCare Federal Credit Union ("FiCare Federal") moves under Federal Rule of Civil Procedure 65(b) and Local Rule 6.01 for a temporary restraining order against Fiserv Solutions, LLC and Fiserv, Inc. (collectively, "Fiserv"), and for a briefing schedule and evidentiary hearing for a preliminary injunction.

Fiserv committed to protect FiCare Federal and its members from unauthorized access to their financial information and accounts. FiCare Federal has recently confirmed an active security defect with a robot answering calls at Fiserv's call center that fraudsters have exploited to remove fraud restrictions from stolen debit and credit cards. The problem is ongoing. Fiserv has been notified of the problem, has acknowledged reports of the same exploit from multiple financial

institutions, and has not disabled or corrected the robot. Each day that robot remains able to reactivate stolen credit or debit cards prolongs the risk of account takeover, unauthorized transactions, disclosure or misuse of sensitive financial information, loss of cardholder trust, and injury that cannot be fully repaired through a later damages award.

FiCare Federal seeks limited immediate relief to preserve the status quo: an order prohibiting Fiserv from letting a robot at its call center lift fraud restrictions on FiCare Federal's credit and debit cards. The requested TRO does not shut down Fiserv's call center and does not prevent legitimate cardholders from obtaining assistance.

When a FiCare Federal cardholder has a card flagged for suspected fraud, the card is suspended, and Fiserv sends the cardholder a text or email with a case number and a call-back number. Whoever dials the Fiserv call center does not initially reach a person. Instead, the call is answered by a robot (an "interactive voice response" system) that can decide on its own whether the caller is the cardholder and, if the robot is satisfied, allows the caller to approve the suspicious transactions and reactivate the frozen card. (Magill Dec. ¶¶ 15–17.)

The robot's test of identity is very easy to beat. It checks just two things: whether the Caller ID matches the cardholder's phone number, and whether the caller can provide either a case number or the cardholder's Social Security number. Neither check reliably establishes that the caller is the cardholder. Caller ID can be

spoofed to display a cardholder's telephone number, and Social Security numbers and other identifying information are available to criminals through data breaches and illicit markets. A fraudster possessing a stolen card and the cardholder's identifying information can therefore satisfy both automated checks and cause the fraud restriction to be removed by the robot, without any human verification.

Social Security numbers are no secret: the 2024 National Public Data breach put most Americans' numbers in fraudsters' hands. Fiserv and its law firm both caution against using Social Security numbers for verification. So someone holding a stolen card, researching the cardholder's Social Security number, and using a spoofed phone number can call Fiserv's call center, pass both of the robot's security checks, and reactivate the stolen card without ever speaking to a human being.

FiCare Federal recently discovered at least 18 fraudulent transactions in August 2026 traceable to this exploit, and at least five other financial institutions have reported the same exploit to Fiserv. (*Id.* ¶¶ 6, 10.) Fiserv has acknowledged those reports. (*Id.* ¶ 11.) But it has neither fixed the robot nor committed to any corrective measures to prevent the robot from removing fraud restrictions from stolen credit and debit cards. (*Id.* ¶ 12.)

Every day Fiserv allows the robot to lift fraud restrictions, FiCare Federal and its cardholders face fraud, account takeovers, financial loss, data compromise, and reputational harm that money damages cannot remedy. FiCare Federal

therefore seeks narrow, practical relief: an immediate temporary restraining order ("TRO") prohibiting Fiserv from using its insecure robot to lift fraud restrictions on FiCare Federal's debit and credit cards. FiCare Federal has provided notice of this motion to Fiserv and respectfully requests a ruling on the request for a TRO by September 29, 2026.

## BACKGROUND

A detailed statement of the facts relevant to FiCare Federal's motion is set forth in the accompanying declarations of Ashley Magill and Charles Nerko.[1] For the Court's convenience, we summarize below the most salient facts.

### A. The Parties, the Contract, and the Data

Chartered in 1960, FiCare Federal is a not-for-profit financial institution serving healthcare employees. Fiserv provides online banking and other support services to FiCare Federal under a master agreement (the "Master Agreement"), which FiCare Federal executed under its former name, St. Joseph's Hospital Credit Union. (Magill Dec. ¶¶ 2–3.)

To provide those services, Fiserv holds extraordinarily sensitive financial information about more than 8,000 members who bank at FiCare Federal. (Magill Dec. ¶¶ 2, 4.) The Master Agreement therefore imposes concrete security duties: Fiserv must protect FiCare Federal's information with the same care and discretion

[1] FiCare Federal does not have the burden of establishing all of these facts; some facts are included for background and context.

it uses for its own similar information, and in no event less than a reasonable standard of care or less than required by law. (Magill Dec., Ex. 1 (Master Agreement), at 2–3 §§ 3(b), 4(a).) FiCare Federal performed. Fiserv did not.

**B. Fiserv's Most Recent Security Failure**

This lawsuit principally concerns security failures in Fiserv's online banking system and other portals that allowed hackers to take over online banking accounts in 2024 and 2025, resulting in several hundred thousand dollars of fraud losses. (Magill Dec. ¶ 5.) Since FiCare Federal filed its Second Amended Complaint in July 2026, it has suffered additional fraud losses through a different Fiserv platform: its call center. This motion targets that narrow, recently discovered, live security defect.

Fiserv operates FiCare Federal's 24/7 call center, which cardholders call when their debit or credit cards are flagged for suspected fraud. (Magill Dec. ¶ 4.)

On or about September 16, 2026, FiCare Federal learned that unauthorized callers were circumventing Fiserv's fraud-prevention program by calling Fiserv's call center posing as cardholders whose debit or credit cards had been restricted because of suspected fraud, defeating Fiserv's call center verification questions, and persuading Fiserv to remove fraud restrictions and reactivate stolen cards. FiCare Federal is aware of at least 18 fraudulent transactions involving FiCare Federal that arose from this scheme. (Magill Dec. ¶ 6.)

Fraudsters have also "alert bombed" at least one FiCare Federal member—flooding the member's phone with text messages so that Fiserv's fraud alert goes unnoticed—giving the fraudster cover to reactivate the card before the member realizes what has happened. (*Id.* ¶ 9.)

FiCare Federal is not alone. At least five other Fiserv client institutions have reported the same exploitation of Fiserv's call center to Fiserv. (*Id.* ¶ 10.)

On September 16, 2026, Fiserv responded to those reports. It acknowledged that they "help all of us better understand emerging threats," but it offered no solution and committed to no change in its call-center verification practices. (*Id.* ¶¶ 11–12.)

Critically, this is not a security problem that FiCare Federal can remedy from its own systems. Fiserv created the robot for its call center, an environment and process that Fiserv exclusively controls. FiCare Federal therefore cannot eliminate the continuing risk by changing its own internal procedures.

FiCare Federal served expedited discovery requests and, when Fiserv said it would respond in due course, moved on September 23 to expedite the responses. (*Id.* ¶ 13; Dkt. 63.) Fiserv declined to provide expedited discovery, but on the evening of September 24 its counsel informally described how the robot works. (*Id.* ¶ 14.) That description confirmed the problem: the robot relies on just two checks—whether the Caller ID matches the cardholder's number, and whether the

caller can supply either the case number or the cardholder's Social Security number—and, if both pass, the robot reactivates the card with no human involvement. Caller ID can be spoofed, and Social Security numbers are widely available to fraudsters after the 2024 National Public Data breach and other widespread breaches in recent years. (*Id.* ¶¶ 15–21.)

FiCare Federal cannot eliminate the risk on its own because the gatekeeper—Fiserv's robot—remains vulnerable and remains configured to allow fraudsters to remove fraud blocks on stolen debit and credit cards. The threatened injury is not hypothetical. The robot has already been used to remove fraud blocks from stolen debit and credit cards. Absent immediate relief, the same robot that has already been exploited for fraud remains available for further exploitation. Unless the Court orders Fiserv to stop using the robot now, FiCare Federal and its members face continuing, irreparable harm.

## ARGUMENT

"The standard for granting a TRO is the same as the standard for granting a preliminary injunction." *Caballero v. Fuerzas Armadas Revolucionarios de Colombia*, No. 1:18-cv-25337, 2023 WL 187685, at *5 (S.D. Fla. Jan. 15, 2023) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1306 (11th Cir. 2005)); *see also HSBC Bank USA, N.A. v. Cambria at Polos South Condominium Ass'n, Inc.*, No. 6:14-cv-1149, 2014 WL 3540766, at *2 (M.D. Fla. July 17, 2014) (same). A movant must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm if

preliminary relief is not granted; (3) the balance of equities favors it; and (4) an injunction serves the public interest. *Grayson v. Comm., Ala. Dep't of Corrs.*, 121 F.4th 894, 896 (11th Cir. 2024) (quoting *Ramirez v. Collier*, 595 U.S. 411 (2022)).

The Rule 65 and Local Civil Rule 6.01(b) factors warrant immediate relief on the present record. FiCare Federal is likely to succeed on its breach-of-contract claim; the continuing security defect creates a substantial risk of irreparable injury; the balance of hardships favors temporary relief; and protecting consumers and the integrity of financial services serves the public interest.

## I. FISERV'S PRIOR FALSE ASSURANCES TO A FEDERAL COURT SHOW UNCLEAN HANDS AND WARRANT EQUITABLE RELIEF

The communications before the filing of this motion make clear that Fiserv will oppose the relief sought. This is not the first time Fiserv has opposed a financial institution's request for equitable relief. But one of the last times it did, it made a false material misrepresentation to avoid an adverse decision. *See Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019).

In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly, including by using Social Security numbers to validate the identity of people accessing another Fiserv system. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv

failed to dispossess itself of the records, the credit union filed a motion for injunctive relief compelling Fiserv to return the records. *Id.*, Dkts. 16–18.

In response, Fiserv unequivocally—and falsely—represented to the court it had fully returned the credit union's records, which was central to the court's denial of injunctive relief. Fiserv falsely represented to the Court that it had provided the credit union with "a complete set of" the requested records. *Id.* at Dkt. 24, p. 2; annexed as Ex. A to the Nerko Dec. Specifically, Fiserv's opposition to a preliminary injunction filed with the court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." *Id.*

The court denied an injunction, based on Fiserv's assurances that the credit union's records were returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26. But after the hearing, Fiserv was forced to concede that its factual representations to the Court were false. The credit union's records had *not* been fully returned. The supposed compliance was a fiction. Fiserv misled the credit union and the court.

Later, Fiserv provided the credit union with hundreds of records that Fiserv previously assured the court it had already returned—confirming that Fiserv misled the credit union's counsel and the court. *Id.* at Dkt 48, ¶¶ 192-199, annexed

as Ex. C to Nerko Dec.; *see also* Nerko Dec., Ex. B (Second Amended Complaint in the Other Fiserv Litigation), ¶¶ 192-199.

FiCare Federal understandably wants no repeat of that scenario here. It has therefore sought limited, expedited discovery so that the Court can decide the preliminary injunction motion on a full and accurate record rather than the flawed and compromised one Fiserv presented to the Court in *Bessemer*.

Equity favors that approach. "Because an injunction is a form of equitable relief, it is well-settled that principles of equity must be applied in assessing the need for injunctive relief." 13 MOORE'S FEDERAL PRACTICE - CIVIL § 65.06[5][a]. Relevant principles of equity a Court considers on a preliminary injunction motion include a non-movant's "unclean hands," including "acts of bad faith [that] were directly related to the issue sought to be adjudicated in the underlying action." *See id.*; *GEICO. v. Prushansky*, No. 12-80556-CIV, 2015 WL 11251740, at *2 (S.D. Fla. May 22, 2015) ("false statements in court filings [in another action] that [defendant] knew to be false is probative of [defendant's] character for truthfulness"). Those principles support a sensible step here.

The Court should grant a limited TRO now and set a preliminary injunction briefing schedule and evidentiary hearing, under which FiCare Federal's motion comes due after Fiserv completes expedited discovery. That discovery will supply

the factual record the parties and the Court will need to decide the motion on a fair and equitable basis.

The Court can and should decide this motion and the forthcoming preliminary injunction motion on verifiable facts, which are responsive to the narrow emergency discovery requests served by FiCare Federal on this subject on September 17, 2026. (*See* Dkt. 63-4.)

## II. FICARE FEDERAL IS LIKELY TO PREVAIL ON ITS BREACH-OF-CONTRACT CLAIM

FiCare Federal is likely to prevail on its claims against Fiserv.[2] FiCare Federal need not prove it will win; it "need only show 'likely or probable' . . . success." *Foundever Operating Corp. v. Hahn*, No. 8:23-cv-1495, 2023 WL 7496150, at *5 (M.D. Fla. Nov. 13, 2023) (quoting *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1381 (M.D. Fla. 2005), *aff'd*, 403 F.3d 1223 (11th Cir. 2005)).

Under New York law,[3] a breach-of-contract claim requires (1) an agreement, (2) plaintiff's adequate performance, (3) defendant's breach, and (4) damages. *See Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 176 (S.D.N.Y. 2022). Each element is satisfied here.

---

[2] FiCare Federal requests a temporary restraining order on its claim for breach of contract. FiCare Federal has also sued Fiserv for other claims and reserves the right to seek an injunction and relief at trial based on all claims.

[3] Section 11(d) of the Master Agreement provides that it "will be governed by the substantive laws of the State of New York." (Magill Dec., Ex. 1 (Master Agreement), at 7.)

### A. Fiserv has violated the Master Agreement's security commitments and the implied covenant of good faith and fair dealing.

The Master Agreement sets a clear security baseline. Fiserv must "use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (Magill Dec., Ex. 1 (Master Agreement), at 2 § 3(b).) The Master Agreement also requires an information security program designed to "protect the security and confidentiality of customer information"; "protect against any anticipated threats or hazards to the security or integrity of such information"; [and] "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer." *Id.* at 3 § 4(a). Fiserv's robot fails to protect the security and confidentiality of cardholders, fails to address anticipated threats and hazards, and allows unauthorized access that results in substantial harm and inconvenience to FiCare Federal's cardholders.

In addition to these express terms, under New York law, every contract contains an implied covenant of good faith and fair dealing, which "requires the parties to perform under the contract in a reasonable way." *See 111 W. 57th Inv. LLC v. 111 W57 Mezz Inv. LLC*, No. 41, 2026 WL 1502410, at *3 (N.Y. May 28, 2026). Under the implied covenant, "the Court will infer that contracts include any promises which a reasonable person in the position of the promisee would be

justified in understanding were included at the time the contract was made." *Id.* at *3 (cleaned up).

The implied covenant bars Fiserv from conduct that deprives FiCare Federal of the benefit of its bargain. Fiserv's use of the robot to remove fraud blocks on stolen credit and debit cards—after notice that fraudsters are actively exploiting it—is unreasonable. It strips FiCare Federal of a basic benefit of that bargain: verification of callers before a fraud block is removed from their cards.

**B. Federal regulatory guidance rejects the caller verification checks Fiserv's robot performs.**

The Federal Financial Institutions Examination Council ("FFIEC") has recognized that call centers are targets for fraud and that the risk requires effective mitigation:

> Threat actors frequently have used social engineering and other techniques to deceive customer call center and IT help desk representatives into resetting passwords and other credentials, thereby granting threat actors access to information systems, user and customer accounts, or confidential information. A comprehensive risk assessment supports mitigation of this risk by identifying emerging threats, setting secure processes, employee training, and establishing effective controls for the customer call center and IT help desk operations. [4]

(Magill Dec. ¶ 22.)

---

[4] FFIEC, "Authentication and Access to Financial Institution Services and Systems; Interagency Guidance" (issued Aug. 11, 2021), https://www.federalreserve.gov/frrs/guidance/authentication-and-access-to-financial-institution-services-and-systems-interagency-guidance.htm (last accessed Sept. 28, 2026).

The FFIEC thus calls for far stronger authentication than Fiserv's robot uses. Call centers should apply "[e]nhanced authentication controls . . . to customer and user credential resets, such as sending an OTP [one-time password] to a pre-established communication device; using an authenticator application to provide an OTP; biometric voice recognition; enabling secure video chat features to confirm identity; and call-backs to a pre-established phone number."[5] (Magill Dec. ¶ 23.) Fiserv's robot uses none of these controls. It relies on Caller ID—which the Federal Trade Commission has warned for decades cannot be trusted because it is easily spoofed—and on a case number or Social Security number, information that fraudsters can obtain or already hold. (*Id.* ¶¶ 18, 20–21.)

**Caller ID.** Federal guidance does not authorize Caller ID to verify identity because it proves nothing about who is actually calling. Fraudsters can easily "spoof" Caller ID and make a call appear to originate from any number they choose, including the cardholder's own number. This has been known for decades. Nearly thirty years ago, the Federal Trade Commission ("FTC") obtained an injunction barring companies from using Caller ID or Automatic Number Identification to verify customers' consent to transactions.[6] That federal agency

---

[5] *Id.*

[6] *See* FTC, "FTC Obtains Stipulated Preliminary Injunction in Cramming Case," https://www.ftc.gov/news-events/news/press-releases/1998/06/ftc-obtains-stipulated-preliminary-injunction-cramming-case (last accessed Sept. 28, 2026).

continues to warn businesses that "[s]ince scammers often fake their phone numbers, don't trust caller ID."[7]

Caller ID spoofing services are commercially available because federal regulators recognize some lawful uses for spoofing. Legitimate uses include "when a doctor calls a patient from her personal mobile phone and displays the office number," or when a "business displays its toll-free call-back number" when placing outgoing calls.[8] In sum, because Caller ID can be easily spoofed with commercially available tools, it cannot reliably establish a caller's identity.

**Social Security numbers.** According to federal authentication guidance, "[k]nowledge of an SSN is not sufficient to act as evidence of identity."[9] Most Social Security numbers are readily available to fraudsters through past data breaches and illicit marketplaces.

Fiserv itself acknowledges this. A Fiserv web page—taken offline after it was cited against Fiserv in prior data-security litigation over its use of Social Security numbers to authenticate online banking accounts—explained:

> Fraudsters look for ways to take over customers' and members' accounts.... If I call my bank to reset my password and they ask my mother's maiden

---

[7] *See* FTC, "Scams and Your Small Business: A Guide for Business," https://www.ftc.gov/business-guidance/resources/scams-your-small-business-guide-business (last accessed Sept. 28, 2026).
[8] *See* FCC, "Caller ID Spoofing," https://www.fcc.gov/consumers/guides/spoofing (last accessed Sept. 28, 2026).
[9] *See Nat'l Inst. of Standards & Tech., Special Publication 800-63A, Digital Identity Guidelines: Identity Proofing and Enrollment*, https://pages.nist.gov/800-63-4/sp800-63a.html (last accessed Sept. 28, 2026).

> name or last four digits of my Social Security number, that's not enough…. Fraudsters already have that information.[10]

Fiserv's law firm acknowledges that as a result of the 2024 data breach at the background-check company National Public Data, "everyone with a Social Security Number was impacted," and "Social Security numbers and other sensitive personal data are appearing on the dark web, ready for potential identity theft and other exploitation."[11] Like Caller ID, a Social Security number cannot reliably verify a caller.

**C. FiCare Federal performed, and Fiserv's contract breaches caused concrete harm.**

FiCare Federal has performed under the Master Agreement, and Fiserv has identified no deficiency in that performance. Fiserv, by contrast, failed to provide the promised safeguards. Its robot verifies callers using only Caller ID and a case number or Social Security number—no multifactor authentication controls—and Fiserv has kept the robot running after learning that fraudsters had beaten it. (Magill Dec. ¶¶ 12, 16–19, 25.) Those breaches have caused concrete harm: thefts facilitated by the authentication failures, a heightened risk of identity theft and

---

[10] *See Fiserv, Managing P2P Payment Risk in a Real-Time Environment,* archived at https://web.archive.org/web/20220929195830/https://www.fiserv.com/en/about-fiserv/the-point/managing-p2p-payment-risk-real-time-environment.html (last accessed Sept. 28, 2026), cited in Nerko Dec. Ex. B at 17 from the *Bessemer* Complaint and also in the Complaint filed by the federal judiciary's credit union in *U.S. Court House SDNY Federal Credit Union v. Fiserv Solutions, LLC,* No. 1:22-cv-09329 (S.D.N.Y.), Dkt. 1 at 11 (Nerko Dec. Ex. D).

[11] *See* Foley & Lardner LLP, *National Public Data Hack Exposes Millions: Essential Steps to Safeguard Your Identity and Combat Fraud* (Aug. 23, 2024), https://www.foley.com/insights/publications/2024/08/national-public-data-hack-safeguard-identity-combat-fraud/ (last accessed Sept. 28, 2026).

fraud, privacy compromise, reputational injury, and an impaired ability for FiCare Federal to discharge its regulatory oversight obligations.

FiCare Federal is therefore likely to succeed on its breach-of-contract claim. *See In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1184 (N.D. Ga. 2019) (finding financial institutions plausibly stated entitlement to injunction where defendant's "cybersecurity systems remain inadequate, and another breach is imminent").

The requested TRO also tracks the contractual duty FiCare Federal seeks to enforce. FiCare Federal does not ask the Court at this stage to prescribe Fiserv's permanent security architecture. It asks only that Fiserv stop allowing the robot to remove fraud restrictions until the caller can be authenticated through a secure method.

## III. FISERV'S ROBOT LIFTING FRAUD RESTRICTIONS ON STOLEN DEBIT AND CREDIT CARDS CAUSES IRREPARABLE HARM

The risk of irreparable injury is immediate, continuing, and supported by events that have already occurred. Fraudsters have already exploited the robot; the robot remains active; Fiserv controls whether it remains active; and FiCare Federal cannot independently eliminate the vulnerability. Each additional successful exploit can expose member information, permit fraudulent use of a card or account, dissipate funds, interrupt a member's access to money, and further damage FiCare Federal's goodwill.

### A. Fiserv admits irreparable harm.

Fiserv already conceded the key point in its own Master Agreement. It agreed that a breach of the confidentiality provision affecting FiCare Federal's information "may cause ***irreparable harm*** to [FiCare Federal] for which monetary damages alone may be insufficient, and ***[Fiserv] therefore acknowledges that [FiCare Federal] shall have the right to seek injunctive or other equitable relief against such breach or threatened breach***." (Magill Dec., Ex. 1 (Master Agreement), at 2 § 3(b) (emphasis added).)

While this sort of clause, standing alone, may not conclusively establish irreparable harm, it remains probative. And it is especially probative because this is Fiserv's own standard language, drafted to protect Fiserv when the roles reverse.

FiCare Federal does not rest on contract language alone. The record independently establishes irreparable harm.

### B. Reputational injury, dissipation of stolen funds, and members' loss of access to their own money are each irreparable.

The robot's deficiencies have already let fraudsters reactivate stolen cards and drain members' accounts at FiCare Federal and other financial institutions. (Magill Dec. ¶¶ 6–7, 10, 19.) The resulting injuries—lost member trust, reputational damage, privacy compromise, heightened regulatory scrutiny, and the risk of further compromise—cannot be fully compensated by money. Each day the robot

remains active increases the likelihood of additional breaches and compounds harms that cannot be unwound after the fact.

**Reputational Harms.** *First*, customer fraud inflicts a distinct irreparable harm on the financial institution itself: damage to its reputation and goodwill that money cannot measure or repair. *See Bank of Am., N.A. v. United Cities Grp., Inc.*, No. 08-21917-CIV, 2008 WL 11466083, at *4 (S.D. Fla. July 25, 2008) (finding financial institution suffered irreparable harm based on fraud scheme because it "might result in the loss of goodwill by Bank of America or the loss of its customers, and this possible injury satisfies the first requirement for a preliminary injunction"); *Montenegro v. City Nat'l Bank*, No. 2:18-CV-1619-GMN-PAL, 2018 WL 11444059, at *4 (D. Nev. Dec. 6, 2018) (granting TRO because in "the context of banking, lost customer goodwill and damage to reputation are recognized forms of irreparable injuries for which there is generally no adequate remedy at law").

**Dissipation of Fraudulently Obtained Funds.** *Second*, the dissipation of fraudulently obtained funds constitutes irreparable harm. *See Hudson Nat'l Bank v. Shapiro*, 695 F. Supp. 544, 549 (S.D. Fla. 1988) (granting injunction where financial institution showed "a likelihood that the funds would be dissipated"). Fraudsters can use stolen credit and debit cards for ATM withdrawals and purchases, including abroad, placing the dissipated funds beyond this Court's jurisdiction. *See Katz Durell, LLC v. Alfred*, No. 1:23-CV-04167-WMR, 2023 WL 8351610, at *3

(N.D. Ga. Oct. 24, 2023) (granting injunction because funds "obtained under false pretenses could be or could become beyond the reach of Plaintiff and/or the Court absent immediate Court intervention," including by ATM withdrawals).

**Cardholders' Inability to Meet Basic Needs.** *Third*, although financial harm is ordinarily not irreparable, this case falls within a recognized exception. Just as a company shows irreparable harm when a loss threatens to put it out of business, fraudulent debit-card use is irreparable because it immediately strips funds from a consumer's account, barring the consumer from making other payments. Unauthorized depletion or restriction of a consumer's account can have immediate consequences beyond the amount ultimately reimbursed. Cardholders may lose access, even temporarily, to funds needed for critical, time-sensitive needs. A court-ordered fine goes unpaid. A rent check bounces. A debit card fails at the supermarket or emergency room. Utility bills go unpaid. The consequences—arrest, eviction, hunger, denied medical care, electricity shut-off—cannot be undone after the fact. Because the fraud here cuts consumers off from a resource they need to meet basic needs, the harm is irreparable. *See Yick v. Bank of Am., N.A.*, 539 F. Supp. 3d 1023, 1026 (N.D. Cal. 2021) (irreparable harm when financial institution cannot block unauthorized charges, since consumers "will likely … be evicted, go hungry, or be denied necessary medical care"); *First Premier Bank v. U.S. Consumer Fin. Prot. Bureau*, 819 F. Supp. 2d 906, 922 (D.S.D. 2011) ("Consumers need readily available credit from credit cards to make car rentals,

hotel reservations, and everyday purchases for entertainment, medical expenses, prescriptions, travel, and online shopping.“).

*In sum*, the relevant irreparable injury is not the dollar amount of a fraudulent transaction. Once a fraudster steals a card and defeats Fiserv’s robot, sensitive information may be exposed or misused, funds may be transferred beyond practical recovery, and a cardholder may lose access to money needed for emergency expenses. Meanwhile, FiCare Federal’s members lose confidence in their financial institution’s ability to protect against fraud. A later damages award cannot reliably restore confidentiality, reverse the consequences of interrupted access to funds, or engender lost consumer trust.

## IV. THE BALANCE OF EQUITIES FAVORS A NARROW TRO BARRING FISERV’S ROBOT FROM LIFTING FRAUD RESTRICTIONS ON CREDIT AND DEBIT CARDS

The balance of equities strongly favors the requested limited TRO. FiCare Federal asks the Court to stop only the robot from removing fraud blocks; it does not seek to close Fiserv’s call center or prevent legitimate cardholders from obtaining assistance. Fiserv’s call center may continue servicing FiCare Federal’s cardholders through live agents or another secure method. The operational burden of that temporary measure is limited. The harm on the other side—continued exploitation of a known authentication weakness affecting financial accounts and sensitive information—is potentially severe and irreparable.

Denying relief exposes FiCare Federal and its members to ongoing fraud and data compromise. Whatever burden Fiserv bears from turning off the robot is slight next to the irreparable harm FiCare Federal and the public will suffer if the robot continues to substantially alter the status quo by removing fraud restrictions from stolen debit and credit cards. The requested TRO preserves the legally relevant status quo: FiCare Federal cardholders whose cards have been restricted for suspected fraud remain protected by that restriction unless their identities are securely verified. It is the challenged robot—not the requested TRO—that changes that status quo by reactivating debit and credit cards that have been frozen due to fraud.

An injunction barring Fiserv from using its robot would neither alter the parties' bargain nor impose any new obligation. It would require Fiserv only to honor the commitments it voluntarily assumed.

Once the robot is off, Fiserv's call-center agents can properly verify callers' identities. Fiserv alone created the extraordinary circumstances here by letting a robot remove fraud restrictions on stolen credit and debit cards.

The requested relief does not disturb the status quo; Fiserv's robot, by lifting a fraud restriction on a stolen debit or credit card, is altering the status quo. Moreover, the relevant status quo is not inaction; it is the contractual relationship the parties negotiated—under which Fiserv accepted payment for agreed-upon

services sufficient to protect a financial institution. In these circumstances, inaction would itself inflict irreparable harm. *See Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1299 (11th Cir. 2024) (affirming injunction "tailored to the parties' business arrangement"); *E. Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 432 (S.D. Fla. 1975) (court granted "preliminary injunction preserving the status quo . . . requiring [defendant] to perform its contract"). Indeed, a district court has ordered Fiserv to take comparable affirmative steps before. In prior preliminary injunction proceedings, a court ordered Fiserv to "continue to provide those core processing services and support that platform as they have promised to do so." *TruStone Fin. Fed. Credit Union v. Fiserv, Inc.*, 2014 WL 12603061, at *1 (D. Minn. Feb. 24, 2014).

Compliance does not require the Court to select Fiserv's permanent security solution. During the limited TRO period, Fiserv can stop its robot from independently removing fraud restrictions and have callers' identities checked through a live agent or another reasonably secure method before the restriction is lifted.

## V. A TRO SERVES THE PUBLIC INTEREST IN SECURE FINANCIAL SERVICES

The public has a strong interest in preventing consumer fraud, protecting sensitive financial information, and maintaining confidence in the security of financial services. That interest is especially strong where the requested relief

concerns the process used to determine whether a fraud restriction protecting a consumer financial account should be removed. The public interest favors both continued access to legitimate financial services and reasonable safeguards against unauthorized access. The requested TRO accommodates both interests because it leaves Fiserv's call center operational while temporarily preventing the robot from independently lifting fraud restrictions. Courts routinely recognize that protecting customer deposits serves that interest. *See Katz Durell, LLC v. Alfred*, No. 1:23-CV-04167-WMR, 2023 WL 8351610, at *3 (N.D. Ga. Oct. 24, 2023) (granting injunction because "public policy disfavors allowing perpetrators of fraud to obtain or retain funds under false pretenses"); *Bank of Am., N.A. v. United Cities Grp., Inc.*, No. 08-21917-CIV, 2008 WL 11466083, at *5 (S.D. Fla. July 25, 2008) (granting injunction because the "public's confidence in the private financial market depends, in part, on the ability of banks to protect its assets, including customer deposits").

## VI. FICARE FEDERAL SHOULD NOT BE REQUIRED TO POST A BOND

FiCare Federal should not have to post a bond. It "is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court," and "the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Trans Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005). Courts waive a bond where the enjoined party faces only remote harm, *Navarro v. Florida Inst. of Tech., Inc.*, No. 6:22-cv-1950, 2023 WL 2078264, at *8 (M.D.

Fla. Feb. 17, 2023) (citing *Lepper v. Franks,* No.5:18-cv-644, 2019 WL 175276, at *2 (M.D. Fla. Jan. 11, 2019)), or where the case implicates the public interest, *id.* (citing *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). A bond can also be waived when the defendant "has no legitimate claim" against the plaintiff, has not been damaged by it, and the plaintiff has substantial assets. *See Bank of Am., N.A. v. United Cities Grp., Inc.*, No. 08-21917-CIV, 2008 WL 11466083, at *5 (S.D. Fla. July 25, 2008) (waiving bond for financial institution seeking injunction against fraud scheme).

Each ground applies. Fiserv has no legitimate economic interest in letting fraudsters reach FiCare Federal's debit and credit cards. The injunction would require only what the Master Agreement and federal regulations already require: that Fiserv secure FiCare Federal's information. That imposes no meaningful extra cost on Fiserv and no cognizable injury.

A bond, by contrast, would penalize a not-for-profit, consumer-owned credit union that is trying to protect its members and that has already lost hundreds of thousands of dollars in 2024 and 2025 to hacks of Fiserv's online banking system. Further, a bond is unnecessary because FiCare Federal has substantial assets and its obligations are insured by the National Credit Union Administration, a federal government agency. (Magill Dec. ¶ 2.) The Court should waive a bond.

## CONCLUSION

FiCare Federal respectfully requests that the Court:

1. Issue a temporary restraining order enjoining Fiserv from using its automated interactive voice response system to verify the identity of, or to lift fraud restrictions for, any caller concerning a FiCare Federal debit or credit card;

2. Set a briefing schedule and an evidentiary hearing on FiCare Federal's planned motion for a preliminary injunction, with FiCare Federal's moving papers due after Fiserv completes expedited discovery;

3. Order Fiserv to provide expedited discovery concerning (a) the authentication methods used by the interactive voice response system to remove fraud restrictions at Fiserv's call center; (b) the design, configuration, and operation of that process; (c) reports, complaints, or notices concerning unauthorized persons defeating that authentication process; (d) Fiserv's investigation of those reports and any remedial measures considered or implemented; and (e) logs or records sufficient to identify instances in which the automated process removed fraud restrictions from FiCare Federal cards; and

4. Grant such other relief as the Court deems just and proper.

Without this relief, FiCare Federal and its cardholders will remain exposed to irreparable harm.

Dated: September 28, 2026

Respectfully submitted,

*/s/ Charles J. Nerko*

Charles J. Nerko (Lead Counsel)*
John C. Cleary*
Walter E. Swearingen*
NERKO PLLC
1178 Broadway, 3rd Floor
New York, New York 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

David L. Hecht**
Lori G. Feldman*
Kathryn (Lee) Boyd**
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
212.851.6821
dhecht@hechtpartners.com
lfeldman@hechtpartners.com
lboyd@hechtpartners.com

Darrin J. Quam (Florida Bar No. 995551)
Primary: dquam@stearnsweaver.com
Secondary:
mbumoskey@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Post Office Box 3299
401 E. Jackson St., Suite 2100
Tampa, Florida 33601
813.223.4800

*Attorneys for Plaintiff*
*FiCare Federal Credit Union*

* Admitted *pro hac vice*
** *Pro hac vice* forthcoming