# EXHIBIT 1

# MASTER AGREEMENT

MASTER AGREEMENT ("**Agreement**") dated as of April 29th, 2013 ("**Effective Date**") between Fiserv Solutions, Inc., a Wisconsin corporation with offices located at 255 Fiserv Drive, Brookfield, WI 53045 ("**Fiserv**"), and St. Joseph's Hospital Credit Union, a Credit Union with offices located at 3001 Dr MLK Jr. Blvd, Tampa, FL 33607 ("**Client**").

---

Fiserv and Client hereby agree as follows:

1. Deliverables.

(a) General. Fiserv, itself and through its Affiliates (as defined herein), agrees to provide to Client, and Client agrees to obtain from Fiserv, the services ("**Services**") and products ("**Products**") (collectively, "**Deliverables**") described in the attached Exhibits, subject to the terms set forth in this Agreement and in the applicable Exhibit. "**Affiliate**" means an entity that controls, is controlled by, or is under common control with a party, where "control" means the direct or indirect ownership of more than 50% of the voting securities of such entity or party. Each Exhibit will be deemed to incorporate all of the terms of this Agreement. Use of the term "Exhibit" throughout this Agreement shall include any Schedules attached to such Exhibit. Exhibits and Schedules attached as of the Effective Date are listed below.

- ASP Services Exhibit to Master Agreement
  - EFT Services Schedule to ASP Services Exhibit
  - UChoose Rewards Services Schedule to ASP Services Exhibit
  - Credit Processing Solution Services Schedule to the ASP Services Exhibit
- ACCEL/Exchange Network Membership Exhibit to Master Agreement

(b) Additional Entities and Deliverables. The parties or their Affiliates may add Deliverables to this Agreement by adding an appropriate new Exhibit or Schedule to this Agreement incorporating the added Deliverables and/or Affiliates, as applicable. When Deliverables are received by a Client Affiliate or provided by a Fiserv Affiliate under an Exhibit, then for the purposes of that Exhibit, references to "Client" or "Fiserv" in this Agreement will be deemed to include the applicable Client Affiliate or Fiserv Affiliate. An Affiliate's execution of an amendment to receive or provide Deliverables hereunder shall constitute such Affiliate's agreement to be bound by the terms of this Agreement.

2. Fees for Deliverables.

(a) General. Client agrees to pay Fiserv: (i) fees for Deliverables as specified in the Exhibits, (ii) out-of-pocket and other additional charges pursuant to Section 2(b), and (iii) Taxes as defined in Section 2(c). Fees may be increased as set forth in the Exhibits.

(b) Additional Charges. Client shall pay travel and living expenses and other out-of-pocket expenses reasonably incurred by Fiserv in connection with the Deliverables. As applicable, such out-of-pocket expenses shall be incurred in accordance with Fiserv's then-current corporate travel and expense policy. If an out-of-pocket expense is listed in an Exhibit, such expense may be changed to reflect changes issued by the applicable vendor.

(c) Taxes. Client is responsible for the payment of all sales, use, excise, value added, withholdings and other taxes and duties however designated that are levied by any taxing authority relating to the Deliverables ("**Taxes**"). All Fees and other charges under any Exhibit are exclusive of Taxes. Client shall reimburse Fiserv for those Taxes that Fiserv is required to remit on behalf of Client. In no event shall Taxes include taxes based on Fiserv's income.

(d) Payment Terms. Invoices are due and payable upon Client's receipt of such invoice. Client shall pay Fiserv through the Automated Clearing House unless otherwise set forth in the Exhibits. If any invoiced amounts remain unpaid 30 days after Client's receipt of invoice, Client shall pay a monthly late charge based on the unpaid amounts equal to the lesser of 1.5% or the highest amount allowed by law

until such invoice amount is paid in full. Client shall neither make nor assert any right of deduction or set-off from amounts invoiced.

3. Confidentiality and Ownership. The provisions of this Section 3 survive any termination or expiration of this Agreement.

(a) Definitions.

(i) "**Client Information**" means the following types of information of Client and its Affiliates obtained or accessed by Fiserv from or on behalf of Client or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information; (B) customer lists, business plans, information security plans, business continuity plans, and proprietary software programs; (C) any personally identifiable information, defined as information that can be identified to a particular person without unreasonable effort, such as the names and social security numbers of Client's individual customers ("**Client PII**"); and (D) any other information received from or on behalf of Client or its Affiliates that Fiserv could reasonably be expected to know is confidential.

(ii) "**Fiserv Information**" means the following types of information of Fiserv and its Affiliates obtained or accessed by Client from or on behalf of Fiserv or its Affiliates in connection with this Agreement or any discussions between the parties regarding new services or products to be added to this Agreement: (A) trade secrets and proprietary information (including that of any Fiserv client, supplier, or licensor); (B) client lists, information security plans, business continuity plans, all information and documentation regarding the Deliverables, all software Products (including software modifications and documentation, databases, training aids, and all data, code, techniques, algorithms, methods, logic, architecture, and designs embodied or incorporated therein), and the terms and conditions of this Agreement; (C) any personally identifiable information, defined as information that can identified to a particular person without unreasonable effort, such as the names and social security numbers of Fiserv employees; and (D) any other information and data received from or on behalf of Fiserv or its Affiliates that Client could reasonably be expected to know is confidential.

(iii) "**Information**" means Client Information and/or Fiserv Information, as applicable. No obligation of confidentiality applies to any Information that: (A) the receiving entity ("**Recipient**") already possesses without obligation of confidentiality, develops independently without reference to Information of the disclosing entity ("**Discloser**"), or rightfully receives without obligation of confidentiality from a third party; or (B) is or becomes publicly available without Recipient's breach of this Agreement.

(b) Obligations. Recipient agrees to hold as confidential all Information it receives from the Discloser. All Information shall remain the property of Discloser or its suppliers and licensors. Recipient will use the same care and discretion to avoid disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law. Recipient may only use Information for the lawful purposes contemplated by this Agreement, including in the case of Fiserv use of Client Information for fulfilling its obligations under this Agreement, performing, improving and enhancing the Deliverables, and developing data analytics models to produce analytics-based offerings. Client agrees that prior to providing Fiserv access to any Client PII, Client shall ensure that any necessary consent has been obtained that is required by law or regulation for Fiserv to access the information and to use it pursuant to the terms set forth in this Agreement. Fiserv specifically agrees not to use or disclose any "non-public personal information" about Client's customers in any manner prohibited by Title V of the Gramm-Leach-Bliley Act or the regulations issued thereunder ("**GLB**"), as applicable to Fiserv. Recipient may disclose Information to: (i) its employees and employees of permitted subcontractors and Affiliates who have a need to know; (ii) its attorneys and accountants as necessary in the ordinary course of its business; and (iii) any other person with Discloser's prior written consent. Before disclosure to any of the above

person, Recipient will have a written agreement with (or in the case of clause (ii) a professional obligation of confidentiality from) such person sufficient to require that person to treat Information in accordance with the requirements of this Agreement, and Recipient will remain responsible for any breach of this Section 3 by any of the above person. Fiserv as Recipient may also disclose Client Information to third party vendors designated by Client. Recipient may disclose Information to the extent required by law or legal process, provided that: (A) Recipient gives Discloser prompt notice, if legally permissible, so that Discloser may seek a protective order; (B) Recipient reasonably cooperates with Discloser (at Discloser's expense) in seeking such protective order; and (C) all Information shall remain subject to the terms of this Agreement in the event of such disclosure. At Recipient's option, Information will be returned to Discloser or destroyed (except as may be contained in back-up files created in the ordinary course of business that are recycled in the ordinary course of business over an approximate 30- to 90-day period or such longer period as required by applicable law) at the termination or expiration of this Agreement or the applicable Exhibit and, upon Discloser's request, Recipient will certify to Discloser in writing that it has complied with the requirements of this sentence. Recipient acknowledges that any breach of this Section 3 may cause irreparable harm to Discloser for which monetary damages alone may be insufficient, and Recipient therefore acknowledges that Discloser shall have the right to seek injunctive or other equitable relief against such breach or threatened breach, in addition to all other remedies available to it at law or otherwise.

(c) Ownership. With the exception of Client Information, all information, reports, studies, object and source code (including without limitation the Products and all modifications, enhancements, additions, upgrades, or other works based thereon or related thereto), flow charts, diagrams, specifications, and other tangible or intangible material of any nature whatsoever produced by Fiserv or jointly with Client or by any of Fiserv's or Client's employees or agents, through or as a result of or related to any of the Deliverables provided hereunder or development of any data analytics models hereunder, and all patents, copyrights, and other proprietary rights related to each of the foregoing, shall be the sole and exclusive property of Fiserv or its Affiliates. Client hereby irrevocably assigns and transfers to Fiserv all rights, title, and interest in any such works referenced in the foregoing sentence, including without limitation copyrights, patent rights, trade secrets, industrial property rights, and moral rights, and shall execute all documents reasonably requested by Fiserv to perfect such rights. Client shall be entitled to use all such work product in accordance with the applicable terms and conditions of this Agreement.

(d) Restrictions. Without limiting any other obligation set forth in this Section 3, Client shall not use, transfer, distribute, interface, integrate, or dispose of any information or content contained in Deliverables in any manner that competes with the business of Fiserv. Except as expressly authorized in an Exhibit, Client shall not: (i) use the Deliverables to provide services to third parties; or (ii) reproduce, republish or offer any part of the Deliverables (or compilations based on any part of the Deliverables) for sale or distribution in any form over or through any medium.

4. Information Security.

(a) General. Fiserv has implemented and shall maintain an information security program that is designed to meet the following objectives: (i) protect the security and confidentiality of customer information (as defined in GLB); (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and (iv) ensure the proper disposal of "consumer information" (information obtained from "consumer reports" as defined in the Fair Credit Reporting Act). Fiserv agrees to use security safeguards for all personal information pertaining to Massachusetts residents in accordance with Massachusetts Regulation 201 CMR 17.00. Upon Client's written request, Fiserv shall allow Client to review any associated audit reports, summaries of test results or equivalent measures taken by Fiserv to assess whether its information security program meets the foregoing objectives, to the extent and on the same terms such information is made generally available to Fiserv's other clients. Fiserv shall also take appropriate actions to address incidents of unauthorized access to Client's "sensitive customer information" (as defined in GLB), including notification to Client as soon as possible of any such incident. As required by an applicable industry security organization (e.g. PCI-SSC) or the applicable regulatory agency having jurisdiction over Client, Fiserv may disclose information regarding any such incident to such organization and such agency.

(b) Fiserv Plan. Within 30 days of Client's written request, Fiserv shall provide to Client a summary of Fiserv's written information security plan for the applicable Services received by Client, and thereafter upon Client's request will provide updates on the status of such information security plan.

(c) Data Encryption. As applicable to the Deliverables received by Client, Client agrees to comply with Fiserv's then-current data encryption policies and controls regarding transmission to and from Fiserv of tapes, images, and records maintained and produced by Fiserv for Client in connection with the Deliverables ("**Client Files**"), or other data transmitted to and from Fiserv in connection with the Deliverables (collectively with Client Files, "**Data**"). If Client requests or requires Fiserv to send, transmit, or otherwise deliver Data to Client or any third party in a non-compliant format or manner, or Client (or third party on Client's behalf) sends, transmits or otherwise delivers Data to Fiserv in a non-compliant format or manner, then, notwithstanding any other provision of this Agreement: (i) Client understands and accepts all risk of transmitting Data in an unencrypted or otherwise noncompliant format; and (ii) Client releases, discharges, and shall indemnify and hold harmless Fiserv and its employees, officers, directors, agents, and Affiliates from any and all liability, damage, or other loss under this Agreement or otherwise suffered by or through Client or suffered by any of the indemnified entities arising out of the transmission, destruction, or loss of such Data, including without limitation any information security or privacy breach related to such Data.

(d) Examination of Client Files. Client Files may be subject to examination by such federal, state, or other governmental regulatory agencies as may have jurisdiction over Client's business to the same extent as such records would be subject if maintained by Client on its own premises. Client agrees that Fiserv may give all reports, summaries, or information contained in or derived from the data or information in Fiserv's possession relating to Client when formally requested to do so by a regulatory or government agency. Fiserv reserves the right to charge Client at Fiserv's then-current rates for any assistance provided in response to regulatory requests, government agency requests, and legal process requests such as subpoena or search warrant, in each case to the extent related to Client, Client Files and/or Client Information, whether issued during or after the term of this Agreement.

5. Hiring and Employment.

(a) Background Checks. Neither party shall knowingly permit any of its employees to have access to the premises, records or data of the other party when such employee: (i) uses drugs illegally; or (ii) has been convicted of a crime in connection with a dishonest act or a breach of trust, as set forth in Section 19 of the Federal Deposit Insurance Act, 12 U.S.C. 1829(a) (a "Conviction"). Consistent with Fiserv's employment practices, newly hired Fiserv employees are required to pass both a pre-employment criminal background check and are required to pass a pre-employment drug screening, as permitted by law, and Fiserv periodically confirms that employees have not acquired any Convictions subsequent to hiring. Upon Client's reasonable request and at Client's expense, Fiserv may perform more frequent confirmation checks or utilize additional reasonable background checking criteria for those of Fiserv's employees who will have access to Client facilities or Client's networks and computer systems located at Client facilities. The results of all such background checks shall be retained solely by Fiserv or the third party performing such screening on behalf of Fiserv.

(b) Equal Employment. Each party agrees that it shall not discriminate against any employee or applicant for employment because of race, creed, color, age, sex, national origin, marital status, liability for service in the armed forces, disability due to veteran status, status as veteran of the Vietnam era or handicap, and each party shall comply with all applicable requirements of the Equal Opportunity Clause set forth in Executive Order 11246, as amended, and its implementing instructions, as well as the Rehabilitation Act of 1973 and the Vietnam Era Veterans' Readjustment Assistance Act of 1974.

6. Warranties.

(a) By Fiserv. Fiserv warrants that: (i) no contractual obligations exist that would prevent Fiserv from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to Fiserv's operations used in the performance of its obligations under this Agreement.

(b) By Client. Client represents and warrants that: (i) no contractual obligations exist that would prevent Client from entering into this Agreement; (ii) it has the requisite authority to execute, deliver, and perform its obligations under this Agreement; and (iii) it will comply with all regulatory requirements applicable to its receipt and use of Deliverables under this Agreement.

(c) THE WARRANTIES STATED ABOVE AND IN THE EXHIBITS, IF ANY, ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY THE PARTIES. FISERV DOES NOT REPRESENT THAT THE DELIVERABLES MEET CLIENT'S REQUIREMENTS OR THAT THE OPERATION OF THE DELIVERABLES WILL BE UNINTERRUPTED OR ERROR-FREE. CLIENT ACKNOWLEDGES THAT IT HAS INDEPENDENTLY EVALUATED THE DELIVERABLES AND THEIR APPLICATION TO CLIENT'S NEEDS. FISERV DISCLAIMS, AND CLIENT HEREBY EXPRESSLY WAIVES, ALL OTHER REPRESENTATIONS, CONDITIONS, OR WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, AND ANY ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE. CLIENT MAY NOT MAKE ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, ON BEHALF OF FISERV, ITS AFFILIATES OR THEIR RESPECTIVE THIRD PARTY PROVIDERS OR LICENSORS TO ANY AUTHORIZED USER OR ANY OTHER PARTY IN CONNECTION WITH THE DELIVERABLES WITHOUT FISERV'S EXPRESS PRIOR WRITTEN CONSENT.

7. Limitation of Liability. IN NO EVENT SHALL FISERV BE LIABLE FOR LOSS OF GOODWILL, OR FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, OR TORT DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF WHETHER SUCH CLAIM ARISES IN TORT, CONTRACT, OR OTHERWISE. EXCEPT FOR CLAIMS RELATED TO PROPRIETARY RIGHTS OR PAYMENT OBLIGATIONS, NEITHER PARTY MAY ASSERT ANY CLAIM AGAINST THE OTHER RELATED TO THIS AGREEMENT MORE THAN 2 YEARS AFTER SUCH CLAIM ACCRUED. FISERV'S AGGREGATE LIABILITY TO CLIENT AND ANY THIRD PARTY FOR ANY AND ALL CLAIMS OR OBLIGATIONS RELATING TO THIS AGREEMENT SHALL BE LIMITED TO THE TOTAL FEES PAID BY CLIENT TO FISERV UNDER THE SCHEDULE RESULTING IN SUCH LIABILITY IN THE 2 MONTH PERIOD PRECEDING THE DATE THE CLAIM ACCRUED.

8. Term and Termination.

(a) Term. This Agreement shall be effective on the Effective Date and shall remain in effect until the term of all outstanding Exhibits has expired or such Exhibits have terminated, unless otherwise terminated as provided herein. The term for Deliverables may be set forth in the applicable Exhibit. An Exhibit that does not state a term will be effective from its last date of execution until terminated in accordance with this Agreement or the Exhibit.

(b) Termination. In addition to termination rights set forth in any Exhibit:

(i) Either party may, upon written notice to the other, terminate: (A) any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule; or (B) this Agreement if the other party materially breaches its obligations with respect to the non-breaching party's Information or other intellectual property; and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach.

(ii) If any invoice remains unpaid by Client 30 days after due, Fiserv may, upon 30 days' written notice to Client, terminate: (A) the Schedule and/or Client's access to and use of

Deliverables to which the payment failure relates; or (B) this Agreement if the unpaid amounts constitute a material portion of annual charges due under this Agreement.

(c) Remedies. Remedies contained in this Section 8 are cumulative and are in addition to the other rights and remedies available to Fiserv under this Agreement, by law or otherwise.

9. Dispute Resolution. Before initiating legal action against the other party relating to a dispute herein, the parties agree to work in good faith to resolve disputes and claims arising out of this Agreement. To this end, either party may request that each party designate an officer or other management employee with authority to bind such party to meet to resolve the dispute or claim. If the dispute is not resolved within 30 days of the commencement of informal efforts under this paragraph, either party may pursue formal legal action. This paragraph will not apply if expiration of the applicable time for bringing an action is imminent and will not prohibit a party from pursuing injunctive or other equitable relief to which it may be entitled.

10. Audit.

(a) Fiserv Operations and Security. Client acknowledges and agrees that Fiserv is subject to certain examinations by the Federal Financial Institutions Examination Council ("**FFIEC**") regulators and agencies. Client acknowledges and agrees that reports of such examination of Fiserv business units are available to Client directly from the relevant FFIEC agencies. Fiserv employs an internal auditor responsible for reviewing the integrity of its processing environments and internal controls.

(b) Billing Records. Upon Client's reasonable request in writing no more frequently than once every 12 months, Fiserv shall provide Client with documentation supporting the amounts invoiced by Fiserv hereunder for the 12-month period preceding such Client request. If such documentation reveals the amounts paid to Fiserv exceed the amounts to which Fiserv is entitled and such amounts are independently verified, Fiserv shall promptly remit or otherwise credit to Client the amount of such overpayment. Conversely, if such documentation reveals the amounts paid to Fiserv are less than the amounts owed, Client shall promptly remit the amount of such underpayment to Fiserv. Invoices dated prior to the 12-month review period hereunder shall be deemed correct. Fiserv reserves the right to charge Client for any assistance required in connection with an audit at Fiserv's then-current rates.

11. General.

(a) Binding Agreement; Assignment. This Agreement is binding upon the parties, their participating Affiliates, and their respective successors and permitted assigns. Neither this Agreement nor any part thereof or interest therein may be sold, assigned, transferred, pledged, or otherwise disposed of by Client, whether pursuant to change of control, by operation of law or otherwise, without Fiserv's prior written consent. Client agrees that Fiserv may assign all or part of this Agreement and may subcontract any obligations to be performed hereunder; provided that any such subcontractors shall be required to comply with all applicable terms and conditions of this Agreement, and Fiserv shall remain primarily liable for the performance of any such subcontractors.

(b) Entire Agreement; Amendments. This Agreement, including its Exhibits and Schedules, which are expressly incorporated herein by reference, constitutes the complete and exclusive statement of the agreement between the parties as to the subject matter hereof and supersedes all previous agreements with respect thereto and the terms of all existing or future purchase orders and acknowledgments. Each party hereby acknowledges that it has not been induced to enter into this Agreement by virtue of, and is not relying on, any representation made by the other party not embodied herein, any term sheets or other correspondence preceding the execution of this Agreement, or any prior course of dealing between the parties, including without limitation any statements concerning product or service usage or the financial condition of the parties. The protections of this Agreement shall apply to actions of the parties performed in preparation for and anticipation of the execution of this Agreement. Modifications of this Agreement must be in writing and signed by duly authorized representatives of the parties. If the terms of any Exhibit or Schedule conflict with the terms of this Agreement, this Agreement shall control unless the applicable Exhibit or Schedule expressly states that its terms control. If the terms of any Schedule conflict with the terms of the Exhibit to which such Schedule is attached, the terms of the Schedule shall control.

(c) Severability. If any provision of this Agreement is held to be unenforceable or invalid, the other provisions shall continue in full force and effect.

(d) Governing Law; Jury Trial Waiver. This Agreement will be governed by the substantive laws of the State of New York, without reference to provisions relating to conflict of laws. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. Both parties agree to waive any right to have a jury participate in the resolution of any dispute or claim between the parties or any of their respective Affiliates arising under this Agreement.

(e) Force Majeure. With the exception of Client's payment obligations, neither party shall be responsible for delays or failures in performance resulting from acts of God, acts of civil or military authority, fire, flood, strikes, war, epidemics, pandemics, shortage of power, telecommunications or Internet service interruptions or other acts or causes reasonably beyond the control of that party. The party experiencing the force majeure event agrees to give the other party notice promptly following the occurrence of a force majeure event, and to use diligent efforts to re-commence performance as promptly as commercially practicable.

(f) Notices. Any written notice required or permitted to be given hereunder shall be given by: (i) Registered or Certified Mail, Return Receipt Requested, postage prepaid; (ii) confirmed facsimile; or (iii) nationally recognized overnight courier service to the other party at the addresses listed on page 1 or to such other address or person as a party may designate in writing. All such notices shall be effective upon receipt.

(g) No Waiver. The failure of either party to insist on strict performance of any of the provisions hereunder shall not be construed as the waiver of any subsequent default of a similar nature.

(h) Prevailing Party. The prevailing party in any arbitration, suit, or action brought by one party against the other party to enforce the terms of this Agreement or any rights or obligations hereunder, shall be entitled to receive, in addition to such other relief as the arbitrators or court may award, its reasonable costs and expenses, including without limitation all attorneys' fees, expert witness fees, litigation-related expenses and arbitrator and court or other costs incurred in such proceeding or otherwise in connection with bringing such arbitration, suit, or action. For purposes of this Agreement, a party is "prevailing" if that party prevails on the central issue raised in the action or claim, regardless of the amount of damages awarded or otherwise owed, if any. A party may prevail by judgment or decision in that party's favor, consent decree, settlement agreement or voluntary dismissal with or without prejudice.

(i) Survival. All rights and obligations of the parties under this Agreement that, by their nature, do not terminate with the expiration or termination of this Agreement shall survive the expiration or termination of this Agreement.

(j) Recruitment of Employees. Client shall not, without Fiserv's prior written consent, directly or indirectly, solicit for employment or hire any Restricted Employee (as defined herein) while such person is employed by Fiserv and for the 12-month period starting on the earlier of: (i) termination of such Restricted Employee's employment with Fiserv; or (ii) termination or expiration of this Agreement. "**Restricted Employee**" means any former or current employee of Fiserv or its Affiliates that Client became aware of or came into contact with during Fiserv's performance of its obligations under this Agreement.

(k) Publicity. Client and Fiserv shall have the right to make general references about each other and the type of Deliverables being provided hereunder to third parties, such as auditors, regulators, financial analysts, and prospective customers and clients, provided that in so doing Client or Fiserv does not breach Section 3 of this Agreement. Fiserv may issue a press release regarding this Agreement, including its renewal and the addition of Deliverables, subject to Client's review and approval, which shall not be unreasonably withheld or unduly delayed. Except as authorized herein, Client will not use the name, trademark, service mark, logo or other identifying marks of Fiserv or any of its Affiliates in any sales, marketing, or publicity activities, materials, or website display without the prior written consent of Fiserv. Any such authorized or approved use shall at all times comply with Fiserv's Trademark Usage

Guidelines (or such other requirements and/or guidelines) set forth on Fiserv's corporate website and other requirements issued or otherwise made available by Fiserv.

(l) Independent Contractors. Client and Fiserv expressly agree they are acting as independent contractors and under no circumstances shall any of the employees of one party be deemed the employees of the other for any purpose. Except as expressly authorized herein or in the Exhibits, this Agreement shall not be construed as authority for either party to act for the other party in any agency or other capacity, or to make commitments of any kind for the account of or on behalf of the other.

(m) No Third Party Beneficiaries. Except as expressly set forth in any Exhibit hereto, no third party shall be deemed to be an intended or unintended third party beneficiary of this Agreement.

(n) Counterparts; Signatures. This Agreement and any Exhibits hereto may be executed in counterparts, each of which shall be deemed an original and which shall together constitute one instrument. Signatures transmitted by facsimile or electronically via PDF or similar file delivery method shall have the same effect as an original signature, provided that in no event shall the Agreement or any amendment or other document hereunder be executed by placing or inserting a digital signature file into such document.

---

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

| For Client: | For Fiserv: |
|---|---|
| St. Joseph's Hospital Credit Union | **Fiserv Solutions, Inc.** |
| By: [signature] | By: [signature] |
| Name: SCOTT B. FRAVERD | Name: **Jon Hutchins** |
| Title: CEO | Title: Authorized Signatory |

---

## ASP Services Exhibit to Master Agreement

1. ASP / Processing Services. The parties shall add individual Schedules to this ASP Services Exhibit for Fiserv's provision of ASP, processing, or other service bureau Services to Client. The terms of this ASP Services Exhibit shall apply to the Services set forth in Schedules attached to this Exhibit.

2. Additional Services.

(a) Implementation Services. Services: (i) to convert Client's existing applicable data and/or information to the Services, and/or (ii) to implement the Services (collectively, "**Implementation Services**") will be provided by Fiserv to the extent applicable to the Services, for the fees, if any, set forth in the Schedules to this Exhibit. Client agrees to provide all necessary cooperation, information and assistance in connection with Implementation Services to facilitate conversion and/or implementation.

(b) Training Services. To the extent applicable to the Services, Fiserv shall provide training, training aids, user manuals, and other documentation for Client's use as Fiserv finds necessary to enable Client personnel to become familiar with Services, for the fees, if any, set forth in the Schedules to this Exhibit. If requested by Client, classroom training in the use and operation of Services will be provided at a training facility designated by Fiserv.

(c) Optional Services. If optional services are listed on a Schedule to this Exhibit, such optional services shall become part of the Agreement upon Client's use of such optional services.

3. Fiserv System and Client Systems. Fiserv systems used in the delivery of Services (the "**Fiserv System**") and Client's networks and computer systems ("**Client Systems**") contain information and computer software that are proprietary and confidential information of the respective parties, their suppliers, and licensors. Each party agrees not to attempt to circumvent the devices employed by the other party to prevent unauthorized access thereto, including without limitation modifications, decompiling, disassembling, and reverse engineering thereof.

4. Fiserv Obligations.

(a) Client Policies. While assigned to provide Services at a Client location or otherwise visiting Client's facilities, Fiserv employees will: (i) comply with Client's reasonable safety and security procedures and other reasonable Client rules applicable to Client personnel at those facilities to the extent such procedures and rules are provided to Fiserv in writing and in advance, (ii) comply with all reasonable requests of Client personnel, as applicable, pertaining to personal and professional conduct, and (iii) otherwise conduct themselves in a professional and businesslike manner.

(b) Changes. Fiserv may make changes in its methods of delivering the Services, including but not limited to operating procedures, type of equipment or software resident at, and the location of Fiserv's service center(s). Fiserv will notify Client prior to implementing any material change that affects Client's normal operating procedures, reporting, or internal service costs.

(c) Client Systems Access. If Fiserv accesses Client Systems, Fiserv will: (i) use this access only to provide Services to Client; and (ii) ensure that the Fiserv System includes up-to-date anti-viral software designed to prevent viruses from reaching Client Systems through the Fiserv System.

(d) Security Testing. Fiserv may use a third party to provide monitoring, penetration and intrusion testing with respect to certain Services. Upon Client's written request, Fiserv agrees to provide Client with a copy of its most recent security certification, if any, for the applicable Fiserv service center providing such Services.

(e) Services Warranties. Fiserv represents and warrants that: (i) Services will conform to the specifications set forth in the Schedules to this Exhibit; (ii) Fiserv will perform Services accurately provided that Client supplies accurate data and information, and follows the procedures described in all Fiserv documentation and notices; (iii) Fiserv personnel will exercise due care in provision of Services;

and (iv) functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry in which the functionality is intended to be used.

(f) Error Correction. In the event of an error or other default caused by Fiserv personnel, systems, or equipment, Fiserv shall correct such error or default at no additional charge to Client, provided that Client supplies Fiserv with a written request for correction of the error within 7 days after Client's receipt of the work containing the error. Work reprocessed due to errors in data supplied by or through Client or by Client's failure to follow procedures set forth by Fiserv shall be billed to Client at Fiserv's then current time and material rates.

(g) Infringement Claims. Fiserv shall, at its expense, defend Client against any third party claim or action alleging that the Fiserv System infringes a United States patent, copyright, or other proprietary right of such third party ("**Infringement Claim**"), and shall pay all amounts payable by Client under any judgment, verdict, or court order entered by a court of competent jurisdiction or settlement agreed upon by Fiserv in any Infringement Claim, provided that Client: (i) notifies Fiserv promptly of such Infringement Claim, (ii) grants Fiserv the sole right to control the defense and disposition of such Infringement Claim, and (iii) provides Fiserv with reasonable cooperation and assistance in the defense and disposition of such Infringement Claim. The obligations set forth in this paragraph are Fiserv's entire liability and Client's sole and exclusive remedy for any Infringement Claim.

(h) Audit. In addition to the audit provisions set forth in Section 10 of the Agreement, Fiserv provides for periodic independent audits of its operations, which shall include an annual SSAE 16 Type II audit to the extent required by law or regulation. Fiserv shall provide Client with a copy of such independent audit report of the Fiserv service center providing Services within a reasonable time after its completion, and may charge Client a fee based on the pro rata cost of such audit apportioned among Fiserv's clients. If material deficiencies affecting the Services are noted in such audit report, Fiserv will develop and implement an action plan to address and resolve any such deficiencies within a commercially reasonable time at Fiserv's expense.

5. Client Obligations.

(a) Procedures; Processing Priority. Client agrees to comply with Fiserv's procedures and operating instructions for use of Services and the Fiserv System. Client acknowledges that Fiserv does not subscribe to any processing priority; all users receive equal processing consideration.

(b) Communication Lines, Terminals, Equipment, Software. All communication lines, terminals, equipment, computer software, and interface devices required to access the Fiserv System and to transmit and receive data and information between Client's location(s), Fiserv's service center(s), and/or other necessary location(s) (collectively, "**Client Equipment**") are subject to approval by Fiserv and shall be compatible with the Fiserv System. Client is responsible for the expense of either procuring Client Equipment from Fiserv or providing Client Equipment itself, provided that all communication lines shall be procured from Fiserv. If Client has elected to provide Client Equipment itself, Fiserv shall provide Client with a list of compatible equipment and software. Client agrees to pay Fiserv's standard fee for recertification of the Fiserv System resulting from Client's use of non-compatible Client Equipment. If Fiserv provides such items, Client agrees to pay charges relating to the installation and use of Client Equipment as set forth in the Schedules to this Exhibit.

(c) Input. Client shall be solely responsible for the input, transmission, or delivery to and from Fiserv (whether delivered to or from Client site(s) or any applicable clearinghouse, regulatory agency, or Federal Reserve Bank) of all information and data required by Fiserv to perform Services unless Client has retained Fiserv to handle such responsibilities, as specifically set forth in Schedules to this Exhibit. The information and data shall be provided in a format and manner approved by Fiserv. Client is responsible for providing all instructions requested by Fiserv as necessary to perform the Services. Client shall determine and be responsible for the authenticity, accuracy, and completeness of all information, data, and instructions submitted to Fiserv. Fiserv is not obligated to check for errors or omissions in any such information, data, or instructions and/or to correct, cancel or amend any action in connection with any

Services once Fiserv has received instructions to complete such action.

(d) Client Personnel. Client shall designate appropriate Client personnel for training in the use of the Services, shall supply Fiserv with reasonable access to Client's site during normal business hours for Implementation Services, and shall cooperate with Fiserv personnel in their performance of Services.

(e) Client Review; Responsibility for Accounts. Client shall review all reports furnished by Fiserv for accuracy, and shall work with Fiserv to reconcile any out of balance conditions or discrepancies. As applicable, Client shall be responsible for balancing its accounts each business day and notifying Fiserv promptly of any errors or discrepancies. If Client so notifies Fiserv, Fiserv shall, at its expense, promptly recompute accounts affected by discrepancies solely caused by the Fiserv System or provide for another mutually agreeable resolution. Fiserv will use commercially reasonable efforts to correct errors attributable to Client or Client's other third party servicers. Reconstruction of error conditions attributable to Client or to third parties acting on Client's behalf will be done at Fiserv's then-current professional services rates.

(f) Client Systems. Client shall ensure that Client Systems: (i) are capable of passing and/or accepting data from and/or to the Fiserv System, and (ii) include up-to-date anti-viral software designed to prevent viruses from reaching the Fiserv System through Client Systems.

(g) Client Notification. Client agrees that it shall notify Fiserv as soon as possible upon becoming aware of any incident of unauthorized access to any Information or the Fiserv System.

(h) Indemnity. Client shall indemnify and hold harmless Fiserv, its officers, directors, employees, and affiliates against: (i) any and all claims or actions arising out of (A) the use by Client of the Fiserv System in a manner other than that provided in the Agreement, and (B) access by Client's customers, through a voice response system or through such customers' personal computers or mobile devices, to Client Files or any Fiserv files (including the files of other Fiserv clients) or the Fiserv System or other Fiserv systems; and (ii) any and all claims by third parties through Client arising out of the performance and non-performance of Services by Fiserv, provided that such indemnity shall not preclude Client's recovery of damages from Fiserv pursuant to the terms and subject to the limitations of the Agreement.

(i) Regulatory Requirements. As applicable to Client's receipt of Services and as required by regulatory authorities having jurisdiction over Client, Client agrees to: (i) submit a copy of the Agreement to the appropriate regulatory agencies prior to the date Services commence, (ii) provide adequate notice to the appropriate regulatory agencies of the termination of the Agreement or any material changes in Services, (iii) retain records of its accounts, and (iv) obtain and maintain at its own expense any required Fidelity Bond and casualty and business interruption insurance coverage for loss of records from fire, disaster, or other causes.

6. Business Continuity / Disaster Recovery.

(a) General. Fiserv maintains a business continuity plan ("**Business Continuity Plan**") for each Service that describes measures it will implement to recover from a Disaster. A "**Disaster**" shall mean any unplanned impairment or interruption of those systems, resources or processes that enable standard performance of the applicable Service's functionality. Each Business Continuity Plan shall include a plan for the recovery of critical technology systems (a "**Disaster Recovery Plan**"), as well as procedures for restoring business operations at the primary location or at a designated recovery site, if necessary. Fiserv shall work with Client to establish a plan for alternative communications in the event of a Disaster.

(b) Disaster Occurrence. Fiserv shall notify Client as soon as possible after the occurrence of a Disaster and shall comply with the Business Continuity Plan. Fiserv shall move the processing of Client's standard services to the recovery site as expeditiously as possible if operations cannot be satisfactorily restored (in Fiserv's sole discretion) at the primary location. If a recovery site is used, Fiserv shall coordinate the cut-over to back-up telecommunication facilities with the appropriate carriers. Client shall maintain adequate records of all transactions under the reasonable control of Client during the period of service interruption and shall have personnel available to assist Fiserv in implementing the switchover to the recovery site. During a Disaster, optional or on-request services shall be provided by Fiserv only to

the extent adequate capacity exists at the recovery site and only after stabilizing the provision of base services.

(c) Disaster Recovery Test. Fiserv shall test the Disaster Recovery Plan periodically. Client agrees to participate in and assist Fiserv with such test, if requested by Fiserv. Upon Client's request, test results will be made available to Client's management, regulators, auditors, and insurance underwriters.

(d) No Warranty. Client understands and agrees that the Business Continuity Plan is designed to minimize, but not eliminate, risks associated with a Disaster affecting Fiserv's service center(s). No performance standards shall be applicable for the duration of a Disaster. Client maintains responsibility for adopting a disaster recovery plan relating to disasters affecting Client's facilities and for securing business interruption insurance or other insurance necessary for Client's protection. Fiserv agrees to release information necessary to allow Client's development of a disaster recovery plan that operates in concert with the Business Continuity Plan.

7. Lost Records. Notwithstanding Section 7 of the Master Agreement, if Client's records or other data submitted for processing are lost or damaged as a result of any failure by Fiserv, its employees, or agents to exercise reasonable care to prevent such loss or damage, Fiserv's liability on account of such loss or damages shall not exceed the reasonable cost of reproducing such records or data from Fiserv's back-up data or from exact duplicates thereof in Client's possession.

8. Term and Termination; Deconversion.

(a) Term. Unless otherwise set forth in an applicable Schedule to this Exhibit, the initial term of Services provided hereunder shall end 120 months following the date Services are first used by Client in live production. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, the Services shall automatically renew for additional term(s) of 60 mnths.

(b) Convenience; Early Termination. If Client terminates the Agreement or reduces (other than as a result of account attrition or volume fluctuation in the ordinary course of business) or terminates Services for any reason other than pursuant to Section 8(b)(i) of the Agreement, Client shall pay a termination fee based on the remaining unused term of the Services. Such fee shall be determined by multiplying the average of the monthly invoices for each Service received by Client during the 6-month period preceding the effective date of termination (or if no monthly invoice has been received, the estimated monthly billing for each Service to be received hereunder) by 80% times the remaining months of the term, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination.

(c) Defaults. If Client: (i) fails to cure its material breach or fails to pay amounts due, each as set forth in Section 8(b) of the Agreement; (ii) deconverts any data or information from the Fiserv System either without Fiserv's prior written consent or in violation of the Agreement; or (iii) commits an act of bankruptcy or becomes the subject of any proceeding under the Bankruptcy Code or becomes insolvent or if any substantial part of Client's property becomes subject to any levy, seizure, assignment, application, or sale for or by any creditor or governmental agency; then, in any such event, Fiserv may, upon written notice, terminate the Agreement in whole or in part and be entitled to recover from Client as liquidated damages for such early termination an amount equal to the present value of all payments remaining to be made for the remaining unused term of the Agreement or the applicable Exhibit, plus any unamortized conversion fees or third party costs existing on Fiserv's books on the date of termination. For purposes of the preceding sentence, present value shall be computed using the "prime" rate (as published in *The Wall Street Journal*) in effect at the date of termination and "all payments remaining to be made" shall be calculated by multiplying the average monthly invoices for the 6 months immediately preceding the date of termination by the remaining months of the term.

(d) Liquidated Damages. Client understands and agrees that Fiserv losses incurred as a result of early termination of the Agreement, this Exhibit, or any Schedule would be difficult or impossible to calculate as of the effective date of termination since they will vary based on, among other things, the

number of clients using the Fiserv System on the date the Agreement (or applicable part thereof) terminates. Accordingly, the amounts set forth in Sections 8(b) and 8(c) above and Section 10(e) below represent Client's agreement to pay and Fiserv's agreement to accept as liquidated damages (and not as a penalty) such amount for any such termination.

(e) Return of Client Files. Upon expiration or termination of the Agreement or any Schedule to this Exhibit, Fiserv shall furnish to Client such copies of Client Files as Client may request in a Fiserv standard format, and shall provide such information and assistance as is reasonable and customary to enable Client to deconvert from the Fiserv System; provided, however, that Client authorizes Fiserv to retain Client Files until: (i) Fiserv is paid in full for all amounts due for all Services provided through the date such Client Files are returned to Client; (ii) Fiserv is paid its then standard rates for the services necessary to return such Client Files; (iii) if the Agreement or applicable Schedule is being terminated, Fiserv is paid any applicable termination fee pursuant to Section 8(b) or (c) above; and (iv) Client has returned or destroyed all Fiserv Information in accordance with Section 3(b) of the Agreement. Fiserv shall be permitted to destroy Client Files any time after 30 days from the final use of Client Files for processing, unless: (A) Fiserv is directed by Client in writing to retain such files for a longer period, provided that Client may not require Fiserv to retain Client Files for longer than 90 days unless Fiserv agrees to such longer retention period, or (B) otherwise specified in a Schedule.

(f) Miscellaneous. Client is responsible for the deinstallation and return shipping of any Fiserv-owned equipment located on Client's premises.

9. Exclusivity. Client agrees that Fiserv shall be the sole and exclusive provider of the services that are the subject matter of the Schedules to this Exhibit. Client agrees not to enter into an agreement with any other entity to provide these services (or similar services), and not to perform these services (or similar services) for itself, during the term of this Exhibit without Fiserv's prior written consent. If Client acquires another entity, the exclusivity provided to Fiserv hereunder shall take effect with respect to such acquired entity as soon as practicable after expiration or earlier termination of such acquired entity's previously existing arrangement for these services. If Client is acquired by another entity, the exclusivity provided to Fiserv hereunder shall apply with respect to the level or volume of services provided immediately prior to the signing of the definitive acquisition agreement relating to such acquisition and shall continue with respect to the level or volume of such services until any termination or expiration of this Exhibit.

10. Additional Fee Provisions.

(a) Annual Adjustment. Fiserv's fees for Services may be increased annually effective each January 1 upon 30 days' notice to Client. Each increase shall be limited to the increase in the U.S. Department of Labor, Consumer Price Index for All Urban Consumers ("CPI") for the most recently available 12-month period preceding such 30-day notice period, or 5%, whichever is greater.

(b) Holdover. Upon any termination or expiration of the Agreement or an Exhibit, Services provided after the applicable termination date, expiration date, or final processing date specified by Client will be provided subject to Fiserv's capacity and will be invoiced at then current fees under the applicable Schedule plus a holdover premium of 25%, unless such holdover is due to Fiserv's action or inaction.

(c) Deconversion Charges. Client agrees to pay Fiserv's then current deconversion charges in connection with Client's deconversion from the Fiserv System.

(d) Regulatory and Compliance Charge. Fiserv reserves the right to charge Client for Client's share of direct Fiserv costs of maintaining regulatory compliance as required by Section 4(e)(iv) of this Exhibit and/or meeting relevant third party standards (such as PCI-SSC's Payment Card Industry Data Security Standard).

(e) Assumptions. Fees set forth in the Schedules to this Exhibit are based on completion of the initial term of all Services. If Services are reduced or terminated pursuant to Section 8(b) or (c) above, or if Client renegotiates pricing before expiration of the initial term, Client shall reimburse Fiserv for all credits, rebates, discounts, and incentives granted on all Services. Any such credits, rebates, discounts, and incentives will no longer be granted through the remainder of the term for any continuing Services.

11. Residuals. Nothing contained in the Agreement shall restrict Fiserv from the use in its business of any ideas, concepts, know-how, or techniques contained in Client Information accessed by Fiserv in connection with the Services that are related to Fiserv's business activities and retained in the unaided memory of Fiserv's employees.

**EFT Services Schedule to ASP Services Exhibit**
**St. Joseph's Hospital Credit Union**

1. Description of Services. Fiserv agrees to provide to Client the Services, as may be more fully described in this Section or Schedule below, which are set forth in the fee schedule contained in this Schedule or, for Services selected by Client after the Effective Date, which are set forth in a service request form ("EFT Service Request") provided by Fiserv and signed and returned by Client ("EFT Services"):

   a. On-Line Host Interface. The operational environment that allows an electronic transaction to be processed against a cardholder's account.

   b. ATM Driving/Monitoring. The process of providing an ATM with the on-line instructions necessary to process transactions and verifying equipment and telephone operability.

   c. Networks. Those regional or national ATM associations who provide electronic access to financial transactions for cardholders of member financial institutions. Networks are as set forth in the fee section below.

   d. Web Connectivity. Links Client's IBM compatible PC to the Fiserv System, allowing Client to retrieve reports, retrieve transaction history, and perform network adjustments.

   e. Card Management. An automated system for plastic card ordering, pin ordering, card re-issue tracking and "Hot Carding", accessible to Client via On-Line Terminal Dial-Up PC or Batch Processing.

   f. Transmissions. Transactions reports and settlement information transmitted to Client's host data processing system.

   g. Business Continuity. Fiserv's disaster recovery program.

   h. Telecommunications and Equipment. ATM phone line and modems relevant to driving and monitoring Client's ATMs.

   i. Conversion Date. On mutually agreed upon date by Client and Fiserv.

2. Fees:

   a. Client agrees to pay Fiserv the fees set forth below for EFT Services. Such fees will be invoiced to Client on a monthly basis unless otherwise indicated. Notwithstanding Section 10(a) of the ASP Services Exhibit, Fiserv shall have the right to bill Client the full amount of any increases in third-party telecommunications costs or network pass-through fees incurred on behalf of Client as of the same effective date such increases are billed to Fiserv.

   b. Fiserv will, within forty-five (45) days of Fiserv receiving payment for the first invoice for EFT Services, pay Client a Conversion Assistance Payment ("CAP") in the amount of $20,000 to assist with Client's costs to transition to EFT Services under this EFT Services Schedule. If the Agreement or the ASP Services Exhibit is terminated or the EFT Services are reduced or terminated, in each case prior to the expiration of the initial term of this EFT Services Schedule and for any reason other than by Client pursuant to Section 8(b)(i) of the Agreement, then Client shall reimburse Fiserv the aggregate amount of the CAP within thirty (30) days. Reimbursement of the CAP shall be in addition to any other termination fees or liquidated damages owed by Client in connection with such early termination.

c. As consideration for Client's commitment to obtain EFT Services from Fiserv for the duration of the initial term of this EFT Services Schedule, Fiserv will provide Client with a credit in the amount of $7,500 ("EFT Credit") which EFT Credit may be applied by Client to offset amounts payable by Client to Fiserv under invoices for EFT Services, including any future products or services provided under this EFT Services Schedule, provided that no portion of the EFT Credit may be applied to third-party telecommunications costs, network pass-through fees, Taxes, or out-of-pocket expenses. If the Agreement or the ASP Services Exhibit is terminated or the EFT Services are reduced or terminated, in each case prior to the expiration of the initial term of the ASP Services Exhibit and for any reason other than by Client pursuant to Section 8(b)(i) of the Agreement, then Client shall reimburse Fiserv the applied amount of the EFT Credit within thirty (30) days. Reimbursement of EFT Credit shall be in addition to any other termination fees or liquidated damages owed by Client in connection with such early termination. For the purpose of clarity, Fiserv shall have no payment obligation to Client in connection with the EFT Credit, and the EFT Credit is solely provided by Fiserv in accordance with the terms hereof as a credit against fees that would otherwise be due from Client under this EFT Services Schedule.

| PRODUCT | | | DESCRIPTION | | AMOUNT |
|---|---|---|---|---|---|
| **Consumer and Commercial Debit** | | | | | |
| *Debit Processing* | | | | | |
| **Consumer and Commercial Debit: PIN** | | | | | |
| **Combined ATM+POS Transactions** | | | | ATM + POS Transaction Volume | $0.0412 |
| **Consumer and Commercial Debit: Signature** | | | | | |
| Per Signature Debit Transaction (including Business cards) | | | | | |
| **Authorization Request** | | | | Authorization Transaction Volume: | $0.0412 |
| **Transactions Posted** | | | | Posted Transaction Volume: | $0.0412 |
| **Other Transaction Services** | | | | | |
| Business Continuity | | | Per transaction (PIN + Signature) | | $0.00697 |
| **Authorization Support** | | | | | |
| **Auth Support** | | | | | |
| Host Monthly Fee | | | Online Interface Support | | $250.00 |
| Institution Authorization File | | | Card Account File - Per BIN | | $100.00 |
| File Auth Record Fees | | | Record Storage - Debit | | $0.042 |
| **Inst. D.B. Support** | | | | | |
| Institution Database Monthly Fee | | | Per Institution | | $100.00 |
| **Client Central** | | | | | |
| ***Client WorkStation Internet*** | | | | | |
| CWSi Monthly Support | | | Flat | | $150.00 |
| CWSi Monthly User Fee | | | | Number of Users | Qty Break |
| | Tiers | Min | Max | | |
| | 1 | 1 | 50 | | $42.50 |
| | 2 | 51 | or Greater | | $11.00 |
| ***ClientView Internet*** | | | | | |
| CVi Access | | | | | |
| | CVi - 12 Month Access | | | | $50.00 |

*ATM Solutions*

**ATM Device Driving and Monitoring**

| | | |
|---|---|---|
| ATM Driving and Monitoring* | Per ATM | $30.00 |
| ATM Surcharge Monthly Fee | Per ATM | $20.00 |
| Voice Guidance Maintenance Fee | Per ATM | $30.00 |

*(*) Subject to additional dial-up fees if applicable*

*Payment Network*

**ATM & POS Network Access**

| | | |
|---|---|---|
| Network Package* | National Access Package: Plus, Visa CK (On Card and ATM) Cirrus/MasterCard, Amex, Discover (On ATM) | $125.00 |
| The Card Alert Service Fee | Per ACCEL/Exchange PIN or POS transaction | $0.0027 |

*(*) Network Pass-through fees may apply*

*Risk and Dispute Solutions*

**EnFact Real Time - Debit**

| | | |
|---|---|---|
| EnFact - Neural Call Center | | |
| EnFact Real-Time Scoring Environment Access | | $50.00 |
| EnFact Real Time | Per Transaction | $0.0133 |

**EnFact Case Management - Debit**

| | | |
|---|---|---|
| EnFact Case Management | Per Scored Transaction | $0.011 |
| EnFact Case fees | Per Case | $5.00 |

**Verified by Visa® or MasterCard® SecureCode**

| | |
|---|---|
| VBV or MSC Monthly Fee | $50.00 |
| VBV or MSC Transactions Authenticated | $0.0032 |
| VBV or MSC Enrolled Acct Storage Fee | $0.005 |

**Additional Fraud Risk Solutions**

| | | | |
|---|---|---|---|
| Case Tracker - User Access Fee | Per User (Minimum $51.50) | | $26.75 |
| Card Tracker Monthly Support | | | $26.75 |
| Card Tracker Per Card | | Card Volume: | Qty Break |

| Tiers | Min | Max | |
|---|---|---|---|
| 1 | 0 | 10,000 | $51.50 |
| 2 | 10,001 | or Greater | $154.00 |

| | | |
|---|---|---|
| TranBlocker Monthly Fee per BIN | Per BIN | $35.00 |

**Chargeback Processing**

| | | |
|---|---|---|
| Enhanced Chargeback per card fee (required) | Card Volume: | Tiered |

| Tiers | Min | Max | |
|---|---|---|---|
| 1 | 0 | 10,000 | $0.054 |
| 2 | 10,001 | or Greater | $0.042 |

*Additional Services*
**Telecommunication and Equipment***

| | | |
|---|---|---|
| **Other Services** | | |
| Lost & Stolen Card Report | Other #2 | $9.55 |
| **Training** | | |
| Initial Training at Fiserv Learning Center | $450 per participant (2 participants max) | $450.00 |

*Notice and Disclaimers:*

*Client is subject to Network Operating Rules, Fees and Settlement Funding Requirements.*

*Client shall be responsible for payment to Fiserv of network pass-through fees and expenses. If client's volume qualifies for volume discounts from network, Fiserv will pass such adjusted fees to Client.*

*Client may be subject to additional charges, including one-time costs associated with network related expenses and the production and inventory of plastic cards.*

3. Performance Standards. Performance standards applicable to EFT Services are as follows:

   The Fiserv System used to provide EFT Services shall be available 99% of the time during any full calendar month (exclusive of planned downtime).

4. Hours of Operation. Hours of operation for EFT Services are as follows:

   a. Fiserv will provide access to its EFT Services 24 hours a day, 365 days per year, except for planned downtime that shall be reserved for scheduled maintenance. Client will be notified in advance of such downtime.

   b. Client support assistance will be available during normal business hours, Monday through Friday, with the exception of the following holidays; New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day. When a holiday falls on Saturday, Fiserv will observe the preceding Friday, when a holiday falls on Sunday, Fiserv will observe the following Monday.

5. Additional Terms. The following additional terms apply to EFT Services:

a. Network Support Services. Fiserv will provide network support services (monitoring, service, and maintenance for equipment) in accordance with instructions supplied by Client. If any or all of the communication network should fail, Fiserv or its designated agents will locate the problem and correct any malfunction not associated with equipment or circuits provided by common carriers. If the problem is located in the equipment or circuits of the common carriers, Fiserv will contact the common carriers and request that the problem be corrected. Maintenance fees incurred by Fiserv for repairs caused by faulty electrical power, inadequate physical facilities, physical abuse, or other Client-supplied or controlled factors will be reimbursed by Client.

b. Reports. Fiserv will provide output reports to Client for daily, weekly, monthly, and annual transactions.

c. Backup Records. Fiserv currently retains historical files at a location separate from the data center sufficient to recreate files for the most recent week and month-end. A daily transaction log of all Client transactions for the most recent ten business days will also be maintained at this location.

d. Software Modifications.

(i) Custom Programming. Fiserv will develop a preliminary estimate of the anticipated hours and costs plus or minus fifty (50) percent associated with the implementation of said change. This estimate will be returned to Client within four weeks. Written acceptance by Client to proceed with the project will be required prior to beginning final specifications. Fiserv will assign a projected completion date to the project, provided no additional changes or modifications to the original specifications occur once the project is in development.

(ii) Regulatory Software Changes. Software changes required by government bodies will be quoted in accordance with subsection (i) above and such costs will be distributed to all clients on an equitable basis.

(iii) Major Software Enhancements. All major software enhancements will be subject to additional charges for processing and development. Fiserv is under no obligation to upgrade its software during the term of this Schedule.

e. Hardware. Client will obtain written approval from Fiserv prior to connecting any equipment to the data communication equipment provided by Fiserv. Equipment, if any connected to the Fiserv System must be configured in a manner acceptable to Fiserv. Client agrees to pay Fiserv for the testing and acceptance of such equipment by Fiserv at its then current rates. Client shall at all reasonable times permit the authorized personnel of Fiserv and the equipment manufacturers to have access to any Fiserv owned or leased equipment provided under this Schedule, and shall permit removal of such equipment upon termination of this Schedule.

f. Protection of Data. Fiserv has developed an operations backup center for which Client has agreed to pay the charges indicated above. Fiserv tests the procedure periodically to ensure compliance. Copies of transactions files are maintained by Fiserv off premises in secured vaults.

g. On-Line Security. Fiserv will provide access to Client, after execution of appropriate "on-line" security measures, to allow Client to perform Cardholder maintenance on Client's EFT data files in the Fiserv System.

h. Network Agreement. Fiserv provides access to electronic fund transfer networks for the purpose of participating in the exchange of transactions on an inter-network basis. Client may participate in such networks subject to the following terms and conditions: (i) Client will enter into an agreement with each such network in which Client elects to participate, and will operate within and abide by the operating rules established by each such network, and pay any associated fees imposed by each such network; and (ii) the clearing of transactions and reconciliation of payments will be in accordance with settlement procedures established between Fiserv and each such network.

i. Settlement Accounts.

(i) Client shall establish a demand deposit account at Client's institution, which is accessible by Fiserv (the "Settlement Account"), and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv to perform the settlement procedures set forth herein. Client authorizes Fiserv, at Client's expense, to access the Settlement Account through the Automated Clearing House ("ACH") or by wire transfer in order to maintain Client's required Settlement Deposit (defined below), or for any purpose described in below, and, similarly, for the transfer of funds owing to Client in the Settlement

Account. Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv for the above-referenced purposes and shall ensure that Fiserv shall be able to make withdrawals and transfers required under this Schedule by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv.

(ii) Client shall maintain on deposit with Fiserv, in an account controlled by Fiserv, an amount of funds (the "Settlement Deposit") equal to the average daily "Net Settlement Position" of Client multiplied by 2 days. The average daily Net Settlement Position is equal to the net sum of all Network settlement entries debited or credited to Client's Settlement Account during the month, divided by 30 days. If the Net Settlement Position is a credit balance, then no Settlement Deposit shall be required. The initial Settlement Deposit will be estimated by Fiserv prior to live date based on anticipated transaction volumes supplied by Client. Fiserv may adjust the Settlement Deposit from time to time upon prior written notice to Client, based on actual transaction volume history and seasonal factors.

(iii) Fiserv may use Client's Settlement Account or, if applicable, Client's Settlement Deposit for the following purposes:

(A) daily settlement of all incoming network transactions;
(B) daily settlement of all fees and assessments charged by the network (or network sponsor) to Client as a participating member institution;
(C) settlement of all outgoing network transactions not more than 3 business days following receipt by Fiserv of such outgoing transactions from Client;
(D) settlement of any transaction activity post-termination of this Schedule, including transaction adjustments or chargebacks; and
(E) settlement of all fees and assessments billed by Fiserv to Client for use of EFT Services, and recovery of any incentives due to be paid back to Fiserv under this Agreement.

6. WC3. If applicable to the EFT Services provided hereunder, Client shall, during the term of this Schedule, have the non-exclusive right to use and access WC3 (Web Client Control Center, a card order and inventory reporting portal). Client agrees that WC3 access shall be given only to Client's employees on a need to know basis, and only after informing such employees of the terms and conditions of the Agreement relative to use, disclosure and ownership as set forth in Section 3. Client shall cause all parties to whom Client gives WC3 access to adhere to all applicable provisions of the Agreement, the ASP Services Exhibit and this EFT Services Schedule. Client shall be responsible for any breach thereof by any party to whom Client provides access to WC3.

7. Section 4(e)(iv) of the ASP Services Exhibit does not apply to the Services provided hereunder.

8. Risk Management. The following terms and conditions apply to the Fiserv Services offered by Fiserv to assist Client in detecting and mitigating fraudulent transactions processed under this Agreement, including, without limitation, EnFact, RuleManager, CardTracker, CaseTracker, TranBlocker, Risk Office, and similar Services, however named (collectively, the "Risk Management Services"):

a. Fiserv will provide the Risk Management Services in accordance with industry standards and, with respect to the EnFact product, the material product descriptions contained in the then current EnFact Reference Guide (the "Guide"), but Client acknowledges and agrees that no fraud detection tool is 100% accurate. Should Client elect to have Fiserv provide case management as part of the Risk Management Services, Fiserv will maintain a call center as set forth in the Guide, and when potential fraud is detected, Fiserv will use commercially reasonable efforts to contact via phone (by a voice response system or a live representative) either the applicable cardholder or Client, according to Client's chosen Risk Management Services strategy.

b. Fiserv's provision of the Risk Management Services is subject to downtime as necessary to implement system/software enhancements, modifications, and updates, to perform scheduled or preventative maintenance, or as a result of factors beyond Fiserv's reasonable control. Fiserv will use commercially reasonable efforts to minimize the amount of such downtime.

c. Client agrees to review Fiserv reports related to the Risk Management Services within a commercially reasonable time period after receipt to confirm appropriate action has been taken by Fiserv. Client acknowledges that any delay in reviewing Fiserv reports and confirming appropriate Fiserv action, or in taking corrective action recommended by Fiserv, may diminish the effectiveness of the Risk Management Services.

d. Client is expressly prohibited from extending any warranty on behalf of Fiserv or related to the Risk Management Services to any third party.

e. Fiserv shall not be liable for the actual or alleged fraudulent activity of third parties. With respect to the Risk Management Services, Client shall be solely responsible for the consequences of any instructions it may give to Fiserv and for any Client failure to supply accurate information or to fulfill its obligations in the manner prescribed by Fiserv.

f. Upon termination of Risk Management Services in accordance with the applicable provisions of this Agreement, Client will assume sole responsibility for pending Risk Management Services activities, such as case research and actual cardholder verification, based on Fiserv reports.

9. EFT Service Request. If an EFT Service Request is accepted by Fiserv in accordance with this Agreement and the applicable terms and conditions set forth in such EFT Service Request, then such EFT Service Request shall be deemed to incorporate the terms and conditions of this Agreement, which shall govern all Services provided in connection with such EFT Service Request. To the extent an EFT Service Request contains additional terms and conditions applicable to the EFT Services provided by Fiserv in connection therewith, such additional terms and conditions shall apply solely with respect to the EFT Services provided in connection with such Service Request and shall remain subject to the terms of this Agreement. If the terms of an EFT Service Request conflict with the terms of this Agreement, this Agreement shall control unless the applicable EFT Service Request expressly states that its terms control. For the purpose of clarity, all products and services provided by Fiserv to Client in connection with an EFT Service Request shall be deemed to be "Services," as such term is used throughout this Agreement.

10. Deconversion/Termination Notice. Notwithstanding anything to the contrary in the Agreement, Client notice of deconversion or termination of any of the EFT Services must be received by Fiserv at the following address; notices sent by Client to any other address will be ineffective: 4550 SW Macadam Avenue, Portland, OR 97239.

## UChoose Rewards Services Schedule to ASP Services Exhibit

Client agrees with Fiserv as follows:

1. Services. Fiserv, itself and through its affiliates and third party service providers, will provide Client the UChoose Rewards Services set forth in this Schedule ("UChoose Rewards Services").

2. Fees. Client shall pay Fiserv the fees and other charges for UChoose Rewards Services specified herein.

3. Equipment and Supplies. Client shall obtain and maintain at its own expense such equipment, including without limitation, telecommunication connections, as may be necessary or appropriate to facilitate the proper use and receipt of UChoose Rewards Services. Client shall be responsible for paying for all supplies to be used in connection with UChoose Rewards Services.

4. Service Modifications. In connection with Fiserv's provision of UChoose Rewards Services, either party may terminate UChoose Rewards Services, or any part thereof, immediately upon notice to the other party of any legislative, regulatory, or judicial (i) impairment of the provision thereof; and/or (ii) restrictions or conditions that would materially affect the integrity thereof.

5. Effect of Termination. Notwithstanding anything in the Agreement to the contrary, upon notice to Client Fiserv may terminate this Schedule in the event its agreement with any or all of its service providers terminates; provided, however, Fiserv agrees to use commercially reasonable efforts to enter into an agreement with another service provider before terminating this Schedule; provided, further, that Fiserv agrees to use commercially reasonable efforts to continue to provide the UChoose Rewards Services until the earlier of (i) termination of this Schedule in accordance with its terms, or (ii) expiration or any transition period provided by Fiserv's service providers which period shall be set forth in Fiserv's notice to Client. Upon any termination or expiration of this Schedule, Client shall continue to be responsible for fees related to UChoose Rewards Services until all such UChoose Rewards Services are no longer provided to Client and its customers.

6. Trademark and Content License. Client hereby grants to Fiserv and its affiliates and third party service providers a non-exclusive, non-assignable right to use Client's trademarks, trade names, service marks, service names (collectively, "Trademarks"), and Content (as defined below) in connection with Fiserv's provision of UChoose Rewards Services. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of Fiserv's and its third party service provider's use of Trademarks and/or Content.

7. Regulatory Compliance. Client shall use UChoose Rewards Services only in conjunction with lawful purposes. Client agrees not to use UChoose Rewards Services for any activities in violation of any laws or regulations, including, but not limited to, wrongful transmission of copyrighted material, sending of threatening or obscene materials, or misappropriation of exportation of trade or national secrets.

8. Client Warranties. Client represents and warrants that (a) any work, content, or information ("Content") provided to Fiserv is either original or that Client has the legal right to provide such Content; and (b) Content doesn't impair or violate any intellectual property or other rights of Fiserv or any third party. Client will indemnify and hold harmless Fiserv, its officers, directors, employees, designated suppliers, and affiliates against any claims or actions arising out of any breaches of the foregoing; or any improper use of information gathered through any co-branded site as part of UChoose Rewards Services. Client acknowledges that neither Fiserv nor its third party service providers shall monitor, review, or approve any Content. Client acknowledges that access to UChoose Rewards Services shall be across public and private lines and that Fiserv has no control over such lines or the information available from non-Fiserv sources.

9. UChoose Rewards Services Indemnification Notification and Process. Notwithstanding anything in the Agreement to the contrary, Client agrees to immediately notify Fiserv in the event it receives notice from a third party or otherwise becomes aware of any claim that the use of the UChoose Rewards

Services or the Fiserv System or other systems used to provide the UChoose Rewards Services infringes any patent, copyright or other intellectual property right of such third party (a "UChoose Rewards Infringement Claim"). Client agrees that Fiserv or its third party service provider shall unconditionally control the defense and disposition of all UChoose Rewards Infringement Claims. Client will have the opportunity to participate in the defense of any UChoose Rewards Infringement Claims at its own expense. Client further agrees that it will not settle any such UChoose Rewards Infringement Claims in which they are named as a party without the prior written consent of Fiserv's third party service provider.

## UChoose Rewards Services Schedule

**Fiserv Responsibilities:**

1. Fiserv will provide Client access to UChoose Rewards Services via a browser-based solution to communicate with the Fiserv System or the systems of Fiserv's third party service provider. Client's customers may access and conduct certain business transactions to their enabled accounts from these access solution(s).

2. Fiserv shall configure the UChoose Rewards Services to enable customers to accrue Client-funded points, merchant-funded points, and/or relationship enterprise rewards points (all of the foregoing are "Points") as directed by Client and agreed by Fiserv and its third party service provider. The UChoose Rewards Services shall enable end user customers to redeem Points for rewards designated by Client and agreed to by Fiserv and its third party service provider.

3. Fiserv shall provide UChoose Rewards Services that Fiserv controls in a 24 x 7 environment, subject to reasonable downtime for maintenance. Fiserv will attempt to limit its downtime to those hours of operation least impacted by customer usage, when such options are available.

4. Client acknowledges and understands that UChoose Rewards Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties.

5. Fiserv agrees that Fiserv or its third party service provider shall provide Client's customers with email first level support in the event a customer is unable to adequately resolve customer support issues related to the normal operation of the UChoose Rewards Services during normal business hours. Fiserv or its third party service provider shall provide Client's customers with call center first level support upon payment of additional fees. Fiserv's and its third party service provider's sole obligation to any customer is to provide a response for requests for support. As used herein, "first level support" shall mean responding to and answering general inquires to Client's customers related to the normal operation of the UChoose Rewards Services, and customer account and Point balances. In no event shall Fiserv's first level support obligations include the performance of Point redemptions.

6. Fiserv shall provide Client with first level support in the event Client is unable to resolve a customer support issue related to the normal operation of the UChoose Rewards Services adequately during normal business hours. Fiserv's and its third party service provider's sole obligation to Client is to provide a response for requests for support. As used herein, "first level support" shall mean responding to and answering general inquires to Client related to the normal operation of the UChoose Rewards Services, and customer account and Point balances. In no event shall Fiserv's first level support obligations include the performance of Point redemptions.

7. Fiserv will provide Client with 1 Fiserv standard training session which shall not exceed 1 business day, which training shall be comprised of a general system overview, administration, and end user training in the use of UChoose Rewards Services. Client acknowledges and agrees to reimburse Fiserv for reasonable travel, boarding, and meal expenses incurred for such on-site training. Client further acknowledges that additional training, project management, and consulting may be obtained from Fiserv at the current rates for such services.

8. Upon request, Fiserv will brand the UChoose Rewards Services web site with the Client's logo and corporate colors.

9. Fiserv shall not be liable for (i) any delays caused by any of Fiserv's third party service providers or (ii) any delay or failure on the part of any merchant, including without limitation, the failure of any merchant to reimburse Client for any merchant funded points.

10. Fiserv shall provide to Client daily redemption and settlement reports and monthly UChoose.

**Client Responsibilities:**

1. Client acknowledges and agrees that Fiserv may use one or more third party service providers to provide the UChoose Rewards Services. Client hereby consents to the delivery of transaction and account information of Client and its customers to such providers. Client hereby further consents to the processing of transactions and account information, and the creation and retention of transaction and account history by such providers.

2. Client hereby consents to Fiserv collecting and providing to applicable third party service providers approximately 6 months of Client customers' cardholder history for the purpose of merchant recruitment and as otherwise needed by Fiserv or such third party service provider hereunder.

3. Client will designate the transactions that will qualify for Points, the Point valuation for each transaction, and the rebates and/or benefits that can be provided when a customer redeems Points.

4. Client will obtain from each Client customer all information needed to enable the Client customer to enroll in the UChoose Rewards Services and to enable Fiserv or its third party service provider to authenticate each customer when he or she accesses the UChoose Rewards Services.

5. Client will provide Fiserv with all information needed by Fiserv to enable Fiserv to customize the UChoose Rewards Services for Client and its customers.

6. Client is, and shall remain, solely and exclusively responsible for any and all financial risks, including, without limitation, insufficient funds, associated with each Client customer accessing UChoose Rewards Services.

7. Client will use, and will instruct its customers to use, UChoose Rewards Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

8. Client assumes exclusive responsibility for the consequences (i) of any instructions it may give to Fiserv, (ii) for Client's or its customers' failures to access UChoose Rewards Services properly in a manner prescribed by Fiserv, and (iii) for any information required for registration of a Client customer or related to authentication of such customer.

9. Client will develop and maintain a privacy policy on Client's website describing the UChoose Rewards Services as required by applicable law, rule and regulation and Client will comply with all laws, rules, and regulations applicable to Client's receipt of the UChoose Rewards Services.

10. Client agrees that Fiserv or its third party service provider shall at least once each calendar quarter during the term of this Schedule market and promote the UChoose Rewards Services to its customers, unless such customer has expressly opted out of such marketing. Such marketing distribution shall, at a minimum, consist of one email communication to all customers with a valid email address and for Clients that select a program other than a Client only funded program, a statement insert to all card customers promoting merchants offering products through the UChoose Rewards Services. Any such marketing distribution shall occur in accordance with Client's then current marketing policies. Client further agrees to provide additional marketing distributions to its customers, which may also include (in the Client's discretion) various communications, including, but not limited to, direct mail dedicated to the UChoose Rewards Services, additional monthly statements, promotions on the UChoose Rewards Services website, additional e-mails to customers, communications in Client's branches, and/or in other communications that Client sends to its customers generally. Client further agrees that upon delivery of its written consent, Fiserv or its third party service provider shall be permitted to send direct mail on behalf of merchants offering products through the UChoose Rewards Services at the expense of such merchant or Fiserv's third party service provider.

11. Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide UChoose Rewards Services.

12. Client is expressly prohibited from extending any warranty or warranties on Fiserv's behalf to any person.

13. Client acknowledges and understands its responsibility and liability as they relate to Client's access to the Internet. Fiserv assumes no liability or control over the Internet access of Client's on-site systems and remote employee or affiliate access.

14. In the event Client creates or uses any marketing materials that reference Fiserv or any third party in connection with the UChoose Rewards Services, Client shall obtain the prior written approval of Fiserv before using such materials and any such use shall only be in the form approved by Fiserv.

15. Client shall obtain from Fiserv a template welcome brochure which shall welcome Client's customers to the UChoose Rewards Services. Client shall add its logo and colors to the brochure and distribute the brochure to all Client customers participating in the UChoose Rewards Services. Fiserv may perform the foregoing obligations for Client upon the request of Client and provided that Client pays Fiserv its then current rates for such services.

16. Client shall provide to Fiserv its logo and corporate colors for customization of the UChoose Rewards Services promptly, following the effective date of this Schedule. Client acknowledges and agrees that any receipt by Fiserv of the logo and corporate colors more than 5 days following execution of this Schedule may result in a delay in implementation of the UChoose Rewards Services.

In the event Client wishes to delay implementation or modify the UChoose Rewards Services at anytime, Client shall notify Fiserv in writing. Client acknowledges that any delays or changes may be subject to payment by Client of additional Fees.

## Credit Processing Solution Services Schedule

## to the ASP Services Exhibit

**1. SERVICES**

(a) Description of Services. Fiserv agrees to provide Client the Services described in the attachments selected from the list below (each, an "Attachment") (collectively, the "**Credit Processing Services**"). Attachments 1 and 2 are required for all Credit Processing Services; other Attachments included as of the Effective Date are marked with an "X". Client and Fiserv may add Attachments to this Schedule at any later date by including in the table below initials and date next to the newly-added Attachment.

| Attachment | Description | Included |
|---|---|---|
| 1 | Base Services | X (Required) |
| 2 | Contact Center Services | X (Required) |
| 3 | Automated Clearing House Services | X |
| 4 | Lockbox Services | X |
| 5 | Online Access Services | X |

(b) Implementation and Related Services.

(i) Fiserv will provide certain Implementation Services, including Implementation Services for the credit management, account services management, letters tracking, financial authorization, interchange tracking and security subsystems (the "**CPS Systems**"), and Fiserv will establish an interface to the issuer's clearing house. Fiserv will also provide certain conversion-related Implementation Services, including, as necessary, conversion of base segment records, plan segment records, name/address records, embosser records and account number cross-reference files.

(ii) Fiserv will provide access to Fiserv's standard training sessions and materials for each of the CPS Systems, as further described in the Attachments to this Schedule. All training will be at Fiserv's designated facility or online. No on-site training-related Services are anticipated by this Schedule, and any on-site Training Services will be charged at Fiserv's then current rates.

(iii) Fiserv will also provide certain network configuration Services, insurance file establishment Services and/or, collection output file establishment Services, as necessary. Such Services may be detailed in a work order, statement of work or similar document and shall be charged at Fiserv's then current rates.

(iv) Fiserv will also provide other Implementation and training-related Services as set forth in the various Attachments to this Schedule.

(c) Client Obligations and Responsibilities.

(i) Client will notify Fiserv of any special events, holiday related programs or any other situation or project (such as the acquisition of an existing portfolio of accounts or conversions of accounts from another processor) that may cause abrupt volume growth or increased demand outside the forecasted normal growth pattern as far in advance as reasonably practicable. The notice will include: (A) the number of accounts reasonably expected to be added, deleted or otherwise affected as a result of such activity; (B) foreseeable factors that may cause a material change in the volume of the respective Credit Processing Services; and (C) expected timing of the foregoing. Client will also provide Fiserv copies of any marketing or promotional materials prior to Client implementing such projects. Fiserv shall provide Client with an estimate of the time necessary to support such changes within fifteen (15) days after receipt of Client's notice of expected material volume change. If Client chooses to implement such changes in a shorter time period than set forth in Fiserv's estimate, Client shall pay Fiserv for any incremental

expenses incurred by Fiserv as a direct result of expedited implementation of such changes, including without limitation expenses relating to operations, overhead, implementation requirements, and compliance with laws, regulation, Fiserv policy, technical requirements or any other such standards.

(ii) Prior to and during the provision of the Credit Processing Services, Client will provide to Fiserv a postage advance equal to the anticipated amount of 45 days postage (the "**Advance**"). Fiserv reserves the right to suspend the performance of the Credit Processing Services if the Advance is, at any time, insufficient to cover the actual postage to be incurred by Fiserv in connection with the performance of the Credit Processing Services in a given month, and Fiserv reserves the right to increase the amount of the Advance as necessary to cover anticipated postage if volumes are anticipated to exceed the standard daily volumes contemplated herein. Client will be invoiced on a monthly basis for the actual postage incurred by Fiserv in the performance of the Credit Processing Services, which shall be used to replenish the Advance. If Client fails to pay an Advance for a 45-day period, Fiserv reserves the right to charge interest on the postage amount in accordance with the following calculation, up to the maximum rate allowed by law: the postage amount for the given month times 10% times 45 divided by 365. Upon termination of this Schedule, any amounts in the Advance will be credited against the final invoice. If the amount in the Advance exceeds the final invoice, Fiserv will remit to Client a check for the difference.

(iii) Client will facilitate timely cooperation between any necessary third parties in order for Fiserv to provide the Credit Processing Services.

(iv) Client shall establish a demand deposit account at Client's institution, which is accessible by Fiserv (the "**Settlement Account**"), and shall maintain at all times in the Settlement Account funds in the amount sufficient to enable Fiserv to perform the settlement procedures set forth herein. Client shall also maintain on deposit with Fiserv, in an account controlled by Fiserv, an amount of funds (the "**Settlement Deposit**") equal to the average daily "Net Settlement Position" of Client multiplied by 2 days.

(v) At least 60 days prior to implementation of the respective Credit Processing Services, Client will establish proprietary licensing arrangements with either MasterCard International and Visa USA or Visa International (as defined in published operating regulations) respectively (collectively the "**Bankcard Member Systems**"), and for notifying the Bankcard Member Systems that Fiserv will be Client's selected processing end point. If Client elects to have Fiserv provide sponsorship into the Bankcard Member Systems, Client will execute all necessary sponsorship documents for such sponsorship, as provided by Fiserv.

(vi) Client will settle bankcard processing monetary transactions on a daily basis as required under the methodology defined in the Bankcard Member Services' published operating regulations and/or otherwise specified by Fiserv.

(vii) Client agrees to notify Fiserv at least 90 days prior to Client's participation in any specialized bankcard service programs. Any additional hardware, software, or other system upgrades required to be made to Client's existing processing environment in connection with such specialized programs will be handled pursuant to the Professional Services Exhibit.

(d) Term. Notwithstanding Section 8(a) of the ASP Services Exhibit, the initial term of this Schedule shall be 120 months following the date the Credit Processing Services are first used by Client in live production, provided, however, that such date shall not be later than 12 months from the effective date of this Schedule.

## 2. FEES

(a) Fees for Services. The fees for the Credit Processing Services are set forth in the fees table attached as Appendix 1 to this Schedule.

(b) Minimum Amounts. Client agrees to pay Fiserv a minimum amount for these fees for each 12-month period of the term of this Schedule, which minimum amounts Fiserv shall invoice monthly, to be calculated as follows. For months 1 through 12 of the Agreement term ("**Year 1 Minimum**"), in the amount of $3,000 monthly, (based on per account charges, excluding pass-through charges, taxes, and indirect charges, and for avoidance of doubt, excluding optional services).

Thereafter, for the periods specified, Client agrees to pay Fiserv the greater of either: (i) the amount specified in the table below (based on per account charges, excluding pass-through charges, taxes, and indirect charges, and for avoidance of doubt, excluding optional services); and (ii) 70% of the previous 12-month period's fees (based on per account charges, excluding pass-through charges, taxes, and indirect charges, and for avoidance of doubt, excluding optional services).

| Period | Monthly Fee Amount |
|---|---|
| Months 13-24 (of the term of this Schedule) | $3,000 |
| Months 25-36 | $3,000 |
| Months 37-48 | $3,000 |
| Months 49-60 | $3,000 |
| Months 61-72 | $3,000 |
| Months 73-84 | $3,000 |
| Months 85-120 (and any subsequent renewal term of this Schedule) | $3,000 |

(c) Waived Fees. Fiserv agrees to waive up the following fees in exchange for the 120 month term of this Schedule; provided, however, that if Client terminates this Agreement before the end of such term, Client shall pay such amounts upon termination.

| Services | Amount Waived |
|---|---|
| Implementation Fees | $26,425* |

*Fiserv will pay for the one-time reissue of the Client card base*. This offer includes standard generic card mailers, PIN mailers, and the Client's selection of card graphics from the Card Collection. Client may choose to utilize custom plastic designs and apply the cost of the Card Collection plastics against their custom card stock.

## 3. PERFORMANCE

(a) Hours of Operation. Unless otherwise specified in the applicable Attachment for a given Service, Fiserv shall provide the Credit Processing Services that Fiserv controls in a 7x24 environment, subject to reasonable downtime for scheduled maintenance. Fiserv will attempt to limit its downtime to those hours of operation least impacted by customer usage, when such options are available.

(b) Technical Support. Technical support is provided on an as available basis. Fiserv shall have no obligation to provide on-site support. Any on-site support requested shall be at Fiserv's then current rates.

## 4. ADDITIONAL TERMS AND CONDITIONS

(a) For purposes of this Schedule, an account is "**Inactive**" if it: (i) has been designated with an "I" status prior to the date Client's monthly invoice is rendered, (ii) has a zero balance; (iii) is not in collections and has no collections reason code(s); (iv) has no insurance in effect; (v) has no plan segments; (vi) has no

outstanding authorizations; and (vii) has had no transactions (monetary or non-monetary). Otherwise, the account is "**Active**".

(b) Fiserv will process all chargebacks in accordance with procedures contained in the then current and applicable rules and protocols set forth by Visa and/or MasterCard and any other such bankcard rules.

(c) Regardless of any assistance Fiserv may have provided in connection therewith, all accounts and all right, title and interest therein shall be the property of Client, and Client shall be solely responsible for determining all features, credit standards, credit decisions and other terms and conditions applicable to the card accounts.

(d) Client is expressly prohibited from extending any warranty or guarantee on behalf of Fiserv or its third party providers without Fiserv's express prior written consent.

(e) Client remains solely responsible for storing and maintaining the original copies of all cardholder applications and cardholder file maintenance written documentation. Client will furnish to Fiserv photocopies or facsimile copies of any such original documents necessary for Fiserv to make data entries on behalf of Client in connection with the Credit Processing Services. Fiserv shall have no obligation to retain photocopies or facsimile copies of such data entry documents in any form for more than 6 months following the data entry date, and Fiserv will, upon at least 30 days prior notice to Client, destroy any such photocopies or facsimile copies. If original documents are required for data entry, Fiserv will, at Fiserv's option, either store such documents on behalf of Client or securely ship such documents to Client; provided, however, that Client may, upon written notice, request Fiserv return such documents to Client.

(f) In addition to its representations and warranties set forth in Section 6(b) of the Agreement, Client represents and warrants that Client: (i) is: (A) the creditor on all accounts established under the card programs serviced hereunder; and (B) the issuer of all cards; (ii) shall supply all funds required for operation of the card programs, including without limitation those borrowed by cardholders; (iii) will use the Credit Processing Services and any facilities relating thereto only for its own internal business purposes; and (iv) will not sell, resell, lease or otherwise provide or make available, directly or indirectly, any of the Credit Processing Services or related facilities to any unaffiliated third parties.

(g) Client's Settlement Account and the Settlement Deposit are subject to the following terms and conditions:

(i) Client authorizes Fiserv, at Client's expense, to access the Settlement Account through the Automated Clearing House ("**ACH**") or by wire transfer in order to maintain Client's required Settlement Deposit, or for any purpose described in below, and, similarly, for the transfer of funds owing to Client in the Settlement Account. Client guarantees that the funds in the Settlement Account shall at all times be accessible to Fiserv for the above-referenced purposes and shall ensure that Fiserv shall be able to make withdrawals and transfers required under this Schedule by providing overdraft protection for the Settlement Account in an amount reasonably required by Fiserv.

(ii) The average daily Net Settlement Position is equal to the net sum of all Network settlement entries debited or credited to Client's Settlement Account during the month, divided by 30 days. If the Net Settlement Position is a credit balance, then no Settlement Deposit shall be required. The initial Settlement Deposit will be estimated by Fiserv prior to live date based on anticipated transaction volumes supplied by Client. Fiserv may adjust the Settlement Deposit from time to time upon prior written notice to Client, based on actual transaction volume history and seasonal factors.

(iii) Fiserv may use Client's Settlement Account or, if applicable, Client's Settlement Deposit for the following purposes: (A) daily settlement of all incoming network transactions; (B) daily settlement

of all fees and assessments charged by the network (or network sponsor) to Client as a participating member institution; (C) settlement of all outgoing network transactions not more than 3 business days following receipt by Fiserv of such outgoing transactions from Client; (D) settlement of any transaction activity post-termination of this Schedule, including transaction adjustments or chargebacks; and (E) settlement of all fees and assessments billed by Fiserv to Client for use of any Credit Processing Services, and recovery of any incentives due to be paid back to Fiserv under this Agreement.

(h) In addition to Clients other indemnity obligations set forth in Section 5(h) of the ASP Services Exhibit, Client's indemnity obligations shall cover any claims relating to Fiserv's use of the service marks, products or services of the Bankcard Member Systems.

(i) Notwithstanding Section 4(b) of the ASP Services Exhibit, given the nature of the Credit Processing Services and regulations surrounding such Services, Fiserv reserves the right to change the methods and procedures of delivering the Credit Processing Services immediately and without notice to Client if such change is required by law, including without limitation the use of Fiserv's (and not the Client's) name when contacting the cardholder in connection with the Collection Services (as further described in the Attachments to this Schedule).

(j) Fiserv will remove Client's input data history from the Fiserv System within 7 days after final use for processing. Upon request from Client in an emergency, Fiserv will use reasonable efforts to reconstruct Client Files from input data history, provided that Client has maintained for a period of at least 48 hours, magnetic tape, backup media, input data and information sufficient for file reconstruction.

(k) Client acknowledges and agrees that it is responsible for providing all requested instructions and guidance necessary to perform the Services contemplated by this Schedule and that Fiserv will rely upon and act in accordance with all such instructions as provided, and Client assumes all risk for the consequences of any such instructions Client gives (or fails to give) and Fiserv's reliance thereon. Fiserv shall have no obligation to check for any errors or omissions in any such instructions and/or to correct, cancel or amend any action pursuant to any Service(s) provided under this Schedule once Fiserv has received instructions to complete such action.

(l) If the terms of this Schedule conflict with any other terms of the Agreement, this Schedule shall govern in relation to the Credit Processing Services and any other Deliverables provided under this Schedule. Furthermore, any additional terms and conditions, if any, specified in the Attachments shall also govern the applicable Credit Processing Service(s).

Base Services Attachment
to the Credit Processing Services Schedule

1. Base Credit Processing Services: The Credit Processing Services described in this Attachment are required to support Credit Processing Services provided under all other Attachments. Fiserv will process and maintain all Active and Inactive accounts and transactions relating thereto, as further described in Appendix 1 to this Schedule. Based on Client's requirements, Fiserv may prepare certain standard files and reports (inbound and outbound) on a pre-determined basis and schedule (i.e. daily, weekly, monthly). Fiserv will provide certain functionalities to assist Client in detecting and mitigating fraudulent transactions processed under this Agreement ("**Risk Management Services**").

2. Additional Client Responsibilities: In addition to all other review requirements set forth in the ASP Services Exhibit, Client agrees to review Fiserv reports related to the Risk Management Services within a commercially reasonable time period after receipt to confirm appropriate action has been taken by Fiserv. Client acknowledges that any delay in reviewing Fiserv reports and confirming appropriate Fiserv action, or in taking corrective action recommended by Fiserv, may diminish the effectiveness of the Risk Management Services.

3. Fees: As set forth in Appendix 1 to this Schedule.

4. Performance Standards: Notwithstanding anything to the foregoing in this Schedule, the Services set forth in this Base Services Attachment shall be governed by the performance standards set forth below. If Fiserv fails to meet any of these standards, Client shall be entitled to a service level credit, calculated as the average monthly fees for the given Credit Processing Services times the percent set forth below. This amount will be applied as a credit for Client's future invoices. If Fiserv exceeds any of these standards, Client agrees to pay a service level royalty, calculated as the average monthly fees for the given Credit Processing Services times the percent set forth below. Fiserv will invoice Client for this amount, payable within 30 days. This service level credit shall be Client's sole remedy in the event any performance standard is not met, and in no way will the failure to meet a service letter be deemed a material breach of the Agreement. For the avoidance of doubt, no scheduled downtime shall be included in the calculation of any performance standards.

| | | | |
|---|---|---|---|
| **Critical Processing Time (8:00 a.m. – 1:00 a.m. (US Eastern Time Zone))** | | | |
| Performance Criteria | Useable availability of On-Line Services | | |
| Performance Standard | Target | Credit | Royalty |
| | > 99.50% | None | 1.0% |
| | 98.50% - 99.50% | None | None |
| | < 98.50% | 1.0% | None |
| Measurement | Monthly Availability | | |
| Measurement Criteria | Total minutes down/ available in a month, excluding maintenance periods. | | |
| **Average Response Time** | | | |
| Performance Criteria | Response Time for Processing Transactions | | |
| Performance Standard | Target | Credit | Royalty |
| | *For Authorization Transactions* | | |
| | within 1.000 second | None | None |
| | more than 1.000 second | 1.0% | None |
| | *For All Other Transactions* | | |
| | within 0.500 seconds | None | None |
| | more than 0.500 seconds | 1.0% | None |
| Measurement | Seconds to complete service | | |

| | | | |
|---|---|---|---|
| Measurement Criteria | Monthly average of the respective type of transactions[1] | | |
| **Critical Reports and Files** | | | |
| Performance Criteria | Timely delivery of reports | | |
| Performance Standard | Target | Credit | Royalty |
| | 3 or fewer late deliveries per month | None | None |
| | 4 or more late deliveries per month | 1.0% | None |
| Measurement | Timing of Delivery | | |
| Measurement Criteria | Number of deliveries past the promised due date, except due to force majeure or other such causes outside of Fiserv's control | | |

5. Additional Terms and Conditions: The following terms and conditions apply to the Credit Services offered by Fiserv to assist Client in detecting and mitigating fraudulent Transactions processed under this Schedule, including, without limitation, EnFact, Case Management, Risk Office, or similar Services, however named (collectively, the "**Risk Management Services**"):

(a) The Risk Management Services will comply in all material respects with the documentation/manuals provided to Client that describe the Risk Management Services, but Client acknowledges and agrees that no fraud detection tool is 100% accurate and that Fiserv makes no representations or warranties that the Risk Management Services will detect or prevent any particular type or amount of fraudulent activity. Should Client elect to have Fiserv provide case management as part of the Risk Management Services, Fiserv will maintain a call center, and when potential fraud is detected, Fiserv will use commercially reasonable efforts to contact via phone (by a voice response system or a live representative) either the applicable cardholder or Client, according to Client's chosen Risk Management Services strategy.

(b) Fiserv's provision of the Risk Management Services is subject to downtime as necessary to implement system/software enhancements, modifications, and updates, to perform scheduled or preventative maintenance, or as a result of factors beyond Fiserv's reasonable control. Fiserv will use commercially reasonable efforts to minimize the amount of such downtime.

(c) Client agrees to review Fiserv reports related to the risk Management Services within a commercially reasonable time period after receipt to confirm appropriate action has been taken by Fiserv. Client acknowledges that any delay in reviewing Fiserv reports and confirming appropriate Fiserv action, or in taking corrective action recommended by Fiserv, may diminish the effectiveness of the Risk Management Services.

(d) Client is expressly prohibited from extending any warranty on behalf of Fiserv or related to the Risk Management Services to any third party.

(e) Fiserv shall not be liable for any actual or alleged fraudulent activity of third parties or for any unauthorized or erroneous transactions caused by third parties or Client or its officers, directors, or agents. With respect to the Risk Management Services, Client shall be solely responsible and liable for the consequences of any instructions it may give to Fiserv, for any Client failure to supply accurate information or to fulfill its obligations in the manner prescribed by Fiserv, and for any unauthorized or erroneous transactions.

(f) Upon termination of the Risk Management Services in accordance with the applicable provisions of the Agreement, Client will assume sole responsibility for pending Risk Management Services activities, such as case research and actual cardholder verification, based on Fiserv reports.

[1] For the avoidance of doubt, authorization transactions are not included in the calculation for the monthly average time for all other transactions.

Contact Center Services Attachment
to the Credit Processing Services Schedule

1. Contact Center Cardholder Services: Fiserv will receive and return cardholder telephone and mail inquiries that can be answered from available on-line data, providing such answers, and providing reasonable research on inquiries requesting research, as well as other functions offered by Fiserv to service cardholder accounts, each as further defined below (collectively, "**Cardholder Services**"):

(a) Primary Services: The following services may be performed for cardholders to service their accounts:

(i) Receiving inbound telephone calls and answering questions from data available through on-line system access;

(ii) Cardholder inquiry research and reply;

(iii) Credit balance refunds data processing (refund checks are disbursed by Fiserv unless arranged otherwise between the parties);

(iv) On-line monetary adjustments resulting from cardholder contacts (phone and mail and otherwise), such as adjustments for annual fees, finance charges, late fees, and overlimit fees;

(v) File maintenance data entry resulting from cardholder contacts, such as address changes, name changes, closing accounts, adding additional names and cards to cardholder accounts, and cardholder credit life insurance or debt cancellation agreement commencement and/or cancellation;

(vi) Monetary data entry of cardholders' monthly exception payments received by Fiserv from statement forms generated by the Fiserv system; and

(vii) Providing reasonable assistance to the Lock Box Bank in identifying the cardholder from whom an unidentified payment has been sent.

(b) Cardholder Initiated Chargebacks Services: Fiserv will process potentially invalid transactions that posted to a cardholder's account and for which a cardholder has contacted Fiserv or disputes of cardholder transactions according to the applicable bankcard association rules, and processing of reasonable requests for retrieval of transaction card ticket copies. Such services also include the following: receiving and responding to cardholder disputes; adjusting interest as appropriate on disputed items, if required; processing retrieval requests and charging the account for retrieval request, if applicable; processing chargebacks when possible, according to procedures contained in the applicable bankcard association rules.

(c) Fraud Management Services: Fiserv will assist Client in attempting to prevent fraudulent activity, and to the extent losses from fraudulent activity are incurred, attempting to recover such losses, by using certain available data processing tools or systems and by investigating the sources of fraud that may have occurred. Such services include the following: investigating fraudulent activity (may include contacting cardholders and/or merchants where fraud may have occurred) and attempting to charge back transactions not properly authorized on accounts blocked as lost or stolen, communicating and documenting fraud transactions with cardholders, transferring balances and current transactions from lost or stolen accounts to new accounts.

(d) Plastics Special Handling Services: Fiserv will expedite the issuance of a credit card on behalf of a cardholder whereby Fiserv is required to submit special embossing instructions in addition to normal on-line request transmissions.

(e) Monetary Transactions Services: Fiserv will post Fiserv-initiated cardholder adjustments from service inquiries to credit or debit account activity and/or related fees and finance charges onto the Fiserv

System, excluding tape transmissions as well as transactions associated with accounts converted from another processor.

(f) CDV Processing Services: Fiserv will track Consumer Dispute Verification ("**CDV**") items processed by Fiserv from cardholders each month through the E-Oscar accounting system for which Client has authorized and granted Fiserv access to act as an agent processing such requests on their behalf. Fiserv will provide a copy of the E-Oscar accounting system report for the applicable month to Client along with an invoice for the CDV Processing charges for the month.

(g) Balance Transfer Request Services: Cardholders may request, and Fiserv will initiate, funds to be transferred from one creditor to Client's card account processed on the Fiserv System, including the issuance of balance transfer check(s) and posting on the Fiserv System.

(h) Convenience Check Processing Services: Fiserv will allow for the authorization and posting of monetary transactions onto the cardholder's account through the Fiserv System from a convenience check authorized and initiated by a cardholder and issued by or on behalf of Client and includes authorizing, clearing and posting on the Fiserv System.

(i) Lost or Stolen Processing Services: Fiserv will receive cardholders' written or telephoned information concerning lost or stolen cards or account information and, if applicable, enter a lost or stolen status code into the Fiserv System for accounts called in lost or stolen on a 7x24 basis. Also, if applicable, Fiserv will transfer balances and current transactions from lost or stolen accounts to new accounts.

(j) Disclosure Form Services: Fiserv will provide commonly used disclosure materials associated with a Client's card programs and will assist Client in versions of: (i) cardholder agreements, (ii) account opening disclosures, (iii) balance transfer check disclosures, (iv) cardholder statement disclosures, and/or (v) privacy policy disclosures.

(k) Consumer Credit Counseling Services: Fiserv will provide a cardholder with information regarding the location of consumer credit counseling and debt management services available in the cardholder's geographic area.

(l) Manual New Account Entry Services: Fiserv will provide manual account entry in a Fiserv-approved format, excluding converted accounts.

(m) Card Activation Services: Fiserv will provide IVR card activation and manual card activation for previously issued bank cards. Manual card activation also includes live operator authentication and block code removal.

(n) 24x7 Services: Fiserv will provide 24x7 live agent and IVR access for the Cardholder Services.

2. Additional Client Responsibilities:

(a) Client authorizes and grants Fiserv access to act as an agent processing CDV items and requests on Client's behalf through the E-Oscar accounting system.

(b) Client will provide to Fiserv Client's pricing and applicable processing parameter information related to Client's card programs as well as formulas for the calculation of data and placement of data contained in cardholder account statements.

(c) Client will provide to Fiserv all information necessary to prepare and complete any communications, documents or other materials to be provided to cardholders, including without limitation information in marketing materials, computer letters, forms, cardholder account statements and other such written materials.

(d) In complying with Section 5(a) of the ASP Services Exhibit, Client agrees to submit any requests, inquiries, data or other documentation only on forms provided or previously approved by Fiserv.

(e) Client will respond timely to direct cardholder inquiries or Fiserv referrals of such inquiries to Client and give Fiserv direction or decision on such inquiries.

3. Fees: As set forth in Appendix 1 to this Schedule.

4. Performance Standards: No additional terms or standards.

5. Additional Terms and Conditions:

(a) Client acknowledges and agrees that: (i) Fiserv is providing the Disclosure Materials to help Client in following best practices toward industry standard format and language used in common card program disclosures; (ii) the Disclosure Materials are provided "as is"; (iii) Fiserv does not warrant Disclosure Form Services materials or advice comply with any requirements of any law, regulation, rule or other such requirement or industry standard; and (iv) Fiserv recommends that all Disclosure Materials be reviewed by the Client's attorney prior to use in the market. Fiserv does not provide any legal services in connection with the Disclosure Materials, and Client maintains all risk, responsibility and obligation to seek any and all legal advice relating to the Disclosure Materials or the laws, rules, regulations and requirements relating thereto or to similar documentation.

(b) Prior to providing any of the Credit Processing Services contemplated by this Contact Center Services Attachment, Client and Fiserv will execute a Customer Service Empowerment Policy Agreement in a form provided by Fiserv, the terms of which are hereby incorporated by reference. If Client requests changes or additional options or terms which are not part of Fiserv's standard customer service empowerment policy, Fiserv reserves the right to adjust the fees set forth in the Fees section above.

Automated Clearing House Services Attachment
to the Credit Processing Services Schedule

1. ACH Services: Fiserv will act as the originating depository institution and/or receiving depository institution for the ACH entries created by Client. Fiserv will also provide to Client statements and reports of ACH transfers.

2. Additional Client Responsibilities:

(a) Client agrees to review or cause to be reviewed statements and reports within a reasonable time after receipt (not longer than 5 business days after receipt) and to give or cause to be given to Fiserv immediate telephonic notice, thereafter confirmed in writing, of any unauthorized, erroneous, or improperly executed ACH transfers.

(b) Client will be solely responsible for assuring that sufficient balances in available funds are on deposit to cover all transactions initiated by its customers and all returns in respect thereof. Client acknowledges and agrees that Fiserv may decline to forward transactions if sufficient balances are not available. Client will immediately reimburse Fiserv or, as applicable, Fiserv's third party service provider, for any overdrafts created.

(c) Client agrees to establish and monitor internal procedures and otherwise ensure that all passwords and other credentials are not shared.

3. Fees: As set forth in Appendix 1 to this Schedule.

4. Performance Standards: No additional terms or standards.

5. Additional Terms and Conditions:

(a) Fiserv shall have no obligation to cancel or amend any ACH entry once sent, dishonor returns or refuse notifications of change.

(b) In addition to all other obligations under Section 6(b)(iii) of the Agreement, Client represents and warrants that neither it nor its employees, agents or customers will engage in any business that would result in the creation of transactions related but not limited to payday lending, Internet gambling, sexually-oriented products or services, or any activities that may be considered illegal based on local, state, or federal regulations.

(c) All IDs and passwords will be considered Fiserv Information pursuant to the Agreement.

(d) The parties acknowledge and agree that any credit given by Fiserv or its third party service providers with respect to an ACH credit entry is provisional until Fiserv or its third party service provider receives final settlement for such entry through a Federal Reserve Bank. If Fiserv or its third party service provider does not receive such final settlement, Fiserv or its third party service provider is entitled to a refund from Client of the amount credited in connection with such entry, and the party making payment via such entry (i.e. the originator of entry) shall not be deemed to have paid the amount of such entry.

6. Third Party Terms: The ACH Services are subject to certain additional terms and conditions required by Fiserv's third party provider. Client agrees to execute those agreements and documents as required by Fiserv's third party service provider(s). Client acknowledges and agrees that Fiserv's provision of the ACH Services is expressly conditioned upon execution by both Client and the third party service provider of such agreements. Should either Client or any third party provider fail to execute any such agreement, the ACH Services and any sections of the Credit Processing Services Schedule relating thereto shall immediately terminate, and Fiserv shall have no liability to Client whatsoever in connection with such termination. Client further agrees that Fiserv shall have no liability to Client whatsoever for the failure of any third party service provider or Client to execute such agreements.

Lockbox Processing Services Attachment
to the Credit Processing Services Schedule

1. Lockbox Processing Services: Fiserv and its agents (collectively, "**Lockbox Providers**") will collect and take custody of the contents of Lockbox Providers' post office box(es) or suite number(s) or other designated post office box(es) or suite number(s) assigned to Client and open and remove the contents from all the envelopes collected. Fiserv will also provide the following:

(a) Batching Services: Lockbox Providers will batch all bankable checks or other items Lockbox Providers find acceptable for deposit after items are opened and enclosures removed.

(b) Encoding Services: Lockbox Providers will encode all batched items with the dollar amount of the item and endorse the item for deposit into the account identified in the Lockbox Implementation and Processing Instructions (as defined below). Lockbox Providers will then image each bankable item and create a printout of the information contained in such imaged items, and Lockbox Providers will deliver the printouts to Client. Lockbox Providers will retain a retrievable electronic copy of all automated batch listings, images of bankable items and summary recap reports for 90 days from the date the image is created, and Fiserv will provide copies of such images during that period, upon Client's request, at Fiserv's then current rates.

(c) Endorsement Services: Lockbox Providers will apply an endorsement to each bankable item (if appropriate) indicating that the item was credited to the payee's account and identifying the bank of first deposit.

(d) Bankable Items Delivery Services: Lockbox Providers will deliver the bankable items to Client's bank or item processor as directed in the Lockbox Implementation and Processing Instructions (as defined below).

(e) Batch Reporting Services: Lockbox Providers will provide to Client reports for each day items are processed indicating the total dollar amount of any bankable items delivered to Client's identified bank or item processor and the volume of items and total remittances for such day, including a daily transaction report for each lockbox.

(f) Lockbox Setup and Activation Services: Lockbox Providers will provide certain setup and activation fees regarding the various lockbox-related Services described in the Lockbox Processing Services Attachment.

2. Additional Client Responsibilities:

(a) Client will provide to Fiserv a business assumptions list setting forth all necessary information concerning the requirements of Client for the Lockbox Processing Services (the "**Lockbox Implementation and Processing Instructions**") prior to the provision of any Lockbox Processing Services.

(b) Client will provide Lockbox Providers with access to a sufficiently funded bank account on which Client is identified as the customer, not requiring any signature, to and from which daily lockbox fund transfers will be transmitted ("**Client's Account**"). Client authorizes Lockbox Providers to transact upon Client's Account electronically via automated clearing house system ("**ACH**"), including the right to originate payment orders on behalf of Client. Lockbox Providers shall provide Client notice from time-to-time of the minimum required amount to be on deposit in Client's Account at all times. Client shall notify Lockbox Providers of any changes to Client's Account.

3. Fees: As set forth in Appendix 1 to this Schedule.

4. Performance Standards: Notwithstanding the terms set forth in the Schedule, items received by the Lockbox Providers will be deposited that banking day, or the next banking day for items received: (a) after

the cut-off time specified in the Lockbox Implementation and Processing Instructions on a banking day; or (b) on a non-banking day.

5. Additional Terms and Conditions:

(a) Any item that is found not to be a bankable item will be returned to Client, unless otherwise provided in the Lockbox Implementation and Processing Instructions. Items must comply with the following to be a "bankable" item, unless these requirements are specifically and expressly amended in the Lockbox Implementation and Processing Instructions:

(i) The payee must match (one of) the name(s) identified in the Lockbox Implementation and Processing Instructions or a reasonable variation thereof.

(ii) The item must be dated with a date that is no more than 6 months old. If undated, Lockbox Providers will insert the current processing date.

(iii) The item's written and numeric amounts must match; provided, however, that if the item's written and numeric amounts differ, the Lockbox Providers will process the item using the written amount.

(iv) A drawer's signature must be present on the item; provided, however, that the Lockbox Providers will affix a stamp impression requesting the drawee to contact the drawer for authority to pay if (A) no drawer's signature exists; (B) the item is a traveler's check, money order or other universal item; and (C) the item indicates the drawer.

(b) For purposes of the Lockbox Processing Services, the following payment items are generally considered bankable: (i) single payment request – match pay and partial pay; (ii) multiple payments – match pay and unbalanced, single accounts; (iii) check and list payments for balanced account; (iv) checks with only an account number; and (v) foreign draws on US funds.

(c) Lockbox Providers will also consider the following items as exceptions and place them in suspense to process upon confirmation of information: (i) multiple payments – unbalanced, multiple accounts; (ii) check and list payments for unbalanced accounts; and (iii) checks without account numbers (but all other required information).

(d) All materials included in a remittance, including correspondence, invoices, and other documents, shall be processed in accordance with the Lockbox Implementation and Processing Instructions. General materials to be returned, the receiving address, the method of delivery, and any additional reporting services (such as same-day deposit notifications, or detailed payment information provided on magnetic tape or by data transmission), if any, will be identified in the Lockbox Implementation and Processing Instructions.

(e) Notwithstanding the termination of the Lockbox Processing Services with respect to a post office suite number, during the 2 month period following the effective date of such termination (and subject to any other rights and duties of Lockbox Providers with respect to property of Client in Lockbox Providers' possession), Lockbox Providers will forward, at Client's expense and to a location specified by Client, any mail received by Lockbox Providers that is directed to such suite at Client's expense, as set forth in this Lockbox Processing Services Attachment.

(f) The parties acknowledge and agree that acceptable payees using optical character recognition lines are not considered within the processing instructions due to the high-speed automated lockbox processing associated with such payees.

(g) Client acknowledges and agrees that returned payments will be processed via file transmissions between Lockbox Providers. Fiserv shall have no obligation to provide hard copies of any returned payments, and any requests for copies of returned payments will be directed to Fiserv's third party agent(s) acting as a Lockbox Providers and handled solely at their discretion.

(h) Neither Fiserv nor Lockbox Providers shall have any obligation or any liability to Client with regard to the treatment or handling of bankable item(s) once Lockbox Providers have presented the same for deposit, including without limitation, any obligation to ensure that bankable item(s) are correctly deposited or any liability arising out of or in connection with any bankable item(s) that are incorrectly deposited.

(i) Neither Fiserv nor Lockbox Providers shall have any obligation for reviewing or abiding by any restrictive legends (e.g. "Paid-in-full") and will not liable for any loss if an item with any such restrictions is delivered to the designated recipient.

(j) If the Lockbox Providers are directed to deliver batched bankable items to a designated recipient that is a bank or other financial institution accepting items for deposit, Client, on its behalf, authorizes the Lockbox Providers to deposit such items to the account designated by Client.

(k) Fiserv shall perform the Lockbox Processing Services solely as agent of Client. Nothing in this Lockbox Payment Services Attachment shall establish or imply on the part of Fiserv or any of its Affiliates or third party subcontractors or providers any fiduciary relationship with or any fiduciary duty to Client or its customers.

(l) No Lockbox Providers assume any liability for any item lost, destroyed, or misplaced while in transit before the item physically arrives at the premises of Lockbox Providers and is received by Lockbox Providers. In the event Lockbox Providers loses, destroys, or misplaces items as a result of gross negligence or intentional misconduct after acceptance of them, Lockbox Providers shall be liable only for reasonable reconstruction costs of any bankable check within the item. Reasonable reconstruction costs shall be only those costs that arise from reconstruction of an imaged bankable check if then stored by Lockbox Providers. No Lockbox Provider shall be liable for reconstruction costs associated with a bankable check for which Lockbox Providers did not make an image. Lockbox Providers shall have no obligation to image any items in a remittance package. In no event shall any Lockbox Provider be liable for: (i) the face or other value of any lost, destroyed, or missing item(s); or (ii) cash, whether or not received by any Lockbox Provider.

(m) The parties agree to execute and deliver any agreements, documents or other forms required by the Federal Reserve Board, Federal Reserve Banks (the "**FRBs**") or Federal Housing Finance Board, including without limitation agreements to establish the Lockbox Providers as Client's agent for purposes of delivery of items processed hereunder from or to the Federal Reserve Banks. For the avoidance of doubt, Client data and records shall be subject to regulation and examination by government supervisory agencies to the same extent as if such information were on Client's premises.

(n) Client acknowledges and agrees that Client has authorized Lockbox Providers to act as Client's agent for remittance services, including with the FRBs and their associated agencies and boards, and Client acknowledges and agrees that Lockbox Provider will establish one or more accounts with, and submit items on Client's behalf to, First National Bank of Omaha.

(o) In consideration of Lockbox Providers' agreement to serve as the depository institution, notwithstanding anything to the contrary elsewhere, each of Fiserv's third party agents acting as a Lockbox Provider shall be considered an intended beneficiary of the Agreement and entitled to enforce its terms; provided, however, that Client is not a third party beneficiary of any agreements directly between Fiserv and any third party Lockbox Provider or any other third party executed in connection with the Lockbox Processing Services.

(p) Client acknowledges and agrees the Lockbox Providers may commingle Client's funds with the funds of other Lockbox Processing Services subscribers; provided, however, that Client retains all risk, responsibility and liability for any violation of any agreement, regulation or law caused by such comingling unless Client provides Fiserv specific notice of such potential violation.

6. <u>Third Party Terms</u>: The Lockbox Processing Services are subject to certain additional terms and conditions required by Fiserv's third party provider. Client agrees to execute those agreements and documents as required by Fiserv's third party service provider(s) prior to the use of any such services in live production. Client acknowledges and agrees that Fiserv's provision of the Lockbox Processing Services is expressly conditioned upon execution by both Client and the third party service provider of such agreements. Client further agrees Fiserv shall have no liability to Client whatsoever for any failure of any third party provider or Client to execute such agreements. Should either Client or any third party provider fail to execute any such agreement, the Lockbox Processing Services Attachment and any other Attachments to the Credit Processing Services Schedule relating thereto shall immediately terminate, and Fiserv shall have no liability to Client whatsoever in connection with such termination.

---

Online Access Services Attachment
to the Credit Processing Services Schedule

1. Online Access Services: Fiserv will provide Client and Client's customers access to a browser-based solution which Client's customers may use to initiate certain business transactions to their enabled accounts with the Fiserv System or the systems of Fiserv's third party service provider(s). Client's customers may also import their open financial exchange ("**OFX**")-compatible information into their profiles. Fiserv will also provide daily file transmission of authentication information on each account, retention of demand deposit account and/or routing and transit information for pre-filling fields, generation of automated clearing house ("**ACH**") payment transactions, outclearing of ACH payment transactions through the Federal Reserve system and posting payments in host system(s). Upon request, Fiserv will also brand the website for the Online Access Services with Client's logo and designated colors and will include links to Client's customer care websites and information, if applicable.

2. Additional Client Responsibilities:

(a) Client will instruct its users to use the Online Access Services in accordance with any reasonable rules as may be established by Fiserv from time to time, including without limitation providing any instruction materials furnished by Fiserv from time to time to such customers.

(b) Client will obtain from each Client customer all information needed to enable the Client customer to enroll in the Online Access Services and to enable Fiserv or its third party service provider to authenticate each customer when he or she accesses the Online Access Services. Client will instruct its customers to use the Online Access Services in accordance with such reasonable rules as may be established by Fiserv from time to time as set forth in any materials furnished by Fiserv to Client.

(c) Client shall provide to Fiserv its logo and corporate colors for customization of the Online Access Services, as well as any other content Client desires Fiserv to incorporate (collectively, the "**Website Content**") promptly, following the effective date of this Schedule. Client shall obtain, at its own expense and prior to posting to Client's website (the "**Website**") or delivery to Fiserv, all rights, permissions and licenses necessary for posting and transmission of the Website Content on the Website.

3. Fees: As set forth in Appendix 1 to this Schedule.

4. Performance Standards: No additional terms or standards.

5. Additional Terms and Conditions:

(a) Fiserv reserves the right to remove the Active Statement OFX Download for Microsoft Money capabilities from OFX compatibility if Fiserv's third party provider begins charging for such capabilities or connectivity.

(b) Client hereby consents to the delivery of transaction and account information of Client and its customers to such providers. Client hereby further consents to the processing of transactions and account information, and the creation and retention of transaction and account history by such providers.

(c) In the event Client creates or uses any marketing materials that reference Fiserv or any third party in connection with the Online Access Services, Client shall obtain the prior written approval of Fiserv before using such materials and any such use shall only be in the form approved by Fiserv. Unless otherwise agreed to in writing, Client will not use Fiserv's or any of its third party provider's name, trademark or other such identifier(s) in any marketing materials without the prior written approval of Fiserv or such third party provider(s).

(d) Client assumes exclusive responsibility for the consequences (i) of any instructions it may give to Fiserv, (ii) for Client's or its customers' failures to access Online Access Services properly in a manner

prescribed by Fiserv, and (iii) for any information required for registration of a Client customer or related to authentication of such customer.

(e) Client acknowledges and understands that: (i) the Online Access Services may be subject to unavailability due to congestion or overload on public circuits supplied by third parties or due to downtime by such third parties; and (ii) it is solely responsible for any requirements and risks as they relate to Client's and Client's customers access to the Internet. Fiserv assumes no liability or control over the Internet access.

(f) During the Term of this Schedule, and solely for the purpose of providing the Services, Client hereby grants to Fiserv a non-exclusive, worldwide, royalty-free right and license to copy and use all the elements of the Website Content. Client retains all risk and responsibilities regarding its products and services, including without limitation the content of its Website and for the content, nature and implementation of its advertising and marketing efforts relating to its products and services. In addition to any other warranties made pursuant to the Agreement, Client hereby represents and warrants that Client hereby acknowledges and agrees that represents and warrants to Fiserv as follows: (i) Client is the owner or valid licensee of each element of the content to be posted on its website, and has secured all necessary licenses, consents, permissions, and releases for the use by Fiserv and the end user of each element of such website content without any obligation by Fiserv to pay any compensation of any kind to any third party; and (ii) the use of such website content as contemplated by the Online Access Services does not infringe, misappropriate or violate any proprietary rights of any person or entity, or constitute a defamation, invasion of privacy or violation of any right of publicity or any other right of any person or entity.

---

Appendix 1
to the Credit Processing Services Schedule

Schedule of Fees

**ST. JOSEPH'S HOSPITAL CREDIT UNION**
**CREDIT ESSENTIALS PROPOSAL: 0-1000 Accounts**
**120 MONTH TERM**
***Fiserv Credit Card - Full Service***
***PROPOSAL EXPIRES September 30, 2013***

| | |
|---|---|
| **Account and Statement Processing:** | Included |
| Active Accounts | |
| Inactive Accounts | |
| Standard Statement Production | |
| Standard Statement Holds/Reprints/Letters/Notices | |
| **Reporting, BIN Sponsorship and Settlement:** | Included |
| Optical Report Storage and Retrieval System(one seat) | |
| Integration Files Transmitted | |
| BIN Sponsorship(1 BIN) | |
| Association Settlement Fee | |
| Visa Quarterly Reporting | |
| Mastercard Quarterly Reporting | |
| **Plastics and Card Production:** | Included |
| Card Collection Card Production(embossing, encoding,card carrier, envelope, one insert) | |
| Activation Labels (includes label and print) | |
| Card Collection Card Stock (Classic) | |
| Card Collection Card Stock (Gold/Platinum) | |
| Priority Issuance | |
| PIN Mailer (includes PIN generation and ultragraphed mailer) | |
| **Transactions:** | Included |
| Visa/Mastercard Transaction: | |
| Transaction Authorization Requests | |
| Transaction Posted | |
| **Lockbox Processing:** | Included |
| Lockbox Payments | |
| Returned Item Processing | |
| Funds Transfer Fee (once per week) | |
| **ACH - Bill Payment Processing (Fiserv Originated)** | Included |
| ACH Transactions | |
| Returned ACH Transactions | |
| **Cardholder Call Center Support:** | Included |
| Call Center Per Active Account Charge (24*7) | |
| Card Activation VRU | |
| Card Activation - Call Center Referrals | |
| Auto PIN Changes - IVR | |
| Chargebacks | |

Lost/Stolen Handling (includes association reporting, card replacement order)

| | |
|---|---|
| **Risk Management:** | Included |
| eNFACT Real Time Scoring | |
| Fraud Alerts and Investigations | |
| | |
| **Verified by Visa/MasterCard Secure Code** | |
| Activation Transactions | Included |
| Enrolled Card Transactions | |
| | |
| **U Choose Rewards:** | Included |
| Blended Rewards Program | |
| Rewards Program Administrative Tool | |
| | |
| **Internet Cardholder Servicing Web Site:** | Included |
| eStatements | |
| Bill Payment | |

**Pricing Fees:**

| | | | |
|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] |

| | | | |
|---|---|---|---|
| **Add On Services:** | | | |
| Convenience Checks (Letter Check Packages, 3-up checks and a letter) | 0 | 1.25 | 0.00 |
| Convenience Checks (Call Center Monthly Paticipation Fee) | 0 | 25.00 | 0.00 |
| Convenience Checks (Call Center cleared and processed) | 0 | 2.03 | 0.00 |
| Balance Transfer Requests (Call Center Monthly Participation Fee) | 0 | 25.00 | 0.00 |
| Balance Transfer Requests | 0 | 4.73 | 0.00 |
| Risk Office (Current per tran fee for debit; tiered rate) | 0 | | 0.00 |
| **Communications** | | | |
| CWSi Monthly User Access Fee | 2 | 10.00 | 20.00 |
| Token Fee (per user) | 2 | 5.00 | 10.00 |
| System Access (VPN) (Quoted on Request) | 1 | 300.00 | 300.00 |

**TOTAL ESTIMATED MONTHLY FEES** **$ 3,330.00**

**Note - Postage and Mastercard and Visa assessment fees are considered pass through fees and are additional.**

**ST. JOSEPH'S HOSPITAL CREDIT UNION**
**CREDIT ESSENTIALS PROPOSAL: 0-1000 Accounts**
**120 MONTH TERM**
***Fiserv will waive $25,500.00 implementation fees for a 120 month Agreement***

**PRODUCT DESCRIPTION**

| | Quantity | Amount | Total |
|---|---|---|---|
| **Start-Up Fees** | 1 | 6,000.00 | 6,000.00 |
| Set-up and configuration | | | |

Authorization System
Credit Card Receivables System (interest, payment calc, statements, etc.)
Customer Service System
Letters System
Chargeback System
Issuer Clearing House Connection
System Training
System Documentation
Credit Bureau Reporting

| | | | |
|---|---|---|---|
| **Call Center Setup:** | | | |
| Configure IVR and Development Call Center Empowerment | 1 | 1,350.00 | 1,350.00 |
| **Optical Reporting/COLD Storage:** | | | |
| Fee Per Additional Concurrent Seat (beyond the seat included in the license fee) | 1 | 1,350.00 | 1,350.00 |
| **Set-up System Access Connectivity; Configure VPN** | 0 | 750.00 | 0.00 |
| **BIN Sponsorship Set-up Fee per BIN** | 1 | 500.00 | 500.00 |
| **eNFACT Neural Network** | | | |
| Base eNFACT Implementation | 1 | 1,300.00 | 1,300.00 |
| *e*NFACT (per account) | 0 | 0.025 | 0.00 |
| **Verified by Visa/MasterCard SecureCode Setup (Optional)** | | | |
| VbV/SecureCode Configuration | 1 | 750.00 | 750.00 |
| **UChoose Rewards (Optional)** | | | |
| Setup Initial BIN | 1 | 2,000.00 | 2,000.00 |
| Welcome PDF (can be combined with Debit if one PDF used) | 1 | 500.00 | 500.00 |
| **Internet Cardholder Servicing Web Site (Optional)** | | | |
| Web Site Setup w/ eStatements | 1 | 6,500.00 | 6,500.00 |
| Bill Payment Setup | 1 | 5,000.00 | 5,000.00 |
| **ACH File Setup** | | | |
| ACH Setup | 1 | 250.00 | 250.00 |
| **Sub-Total One Time Charges** | | | **$ 25,500.00** |
| **Waived One Time Charges (120 month agreement)** | | | $ (25,500.00) |
| **Total One Time Charges** | | | **$0.00** |

## ACCEL/Exchange Network Membership Exhibit to Master Agreement

1. Network Services. Fiserv, through the ACCEL/Exchange® Network (the "Network"), operates an electronic funds transfer ("EFT") system that enables Member Financial Institutions to offer consumers or merchants shared Automated Teller Machine ("ATM") and Point of Sale ("POS") EFT services. Client wishes to participate in the Network on the terms and conditions set forth herein and in the Agreement to which this ACCEL/Exchange Network Membership Exhibit (this "Exhibit") is attached and forms a part. Capitalized terms used but not defined herein shall have the meanings given to them in the ACCEL/Exchange Network Operating Rules and the Appendices thereto (the "Rules") and the Agreement, as applicable. For purposes of this Exhibit and the Rules, Client shall be hereinafter referred to as "Member". This Exhibit shall be effective ______________________ ("Effective Date").

2. Compliance with Rules and Law.

(a) Member acknowledges (i) receipt of the Rules and (ii) that it has fully reviewed the Rules and understands the duties and responsibilities of a Member in the Network.

(b) Member hereby agrees to be bound by and perform all obligations and requirements imposed on it by this Exhibit and the Rules as the same may be amended or supplemented from the date hereof and thereafter from time to time.

(c) Member agrees, and will cause any other entity that Member sponsors into or causes to participate in the Network, pursuant to the Rules, to be bound by, comply with, and perform all the requirements of membership as may, from time to time, be set forth in the Rules and all applicable laws, rules, and regulations, as all the foregoing may be amended from time to time. The parties acknowledge that certain provisions of this Exhibit may be subject to Federal Reserve Board Regulation II, Debit Card Interchange Fees and Routing (the "Final Rule"), 12 CFR Part 235, as amended ("Regulation II"). The parties further acknowledge that an essential inducement for each party to enter into this Exhibit is their collective understanding that none of the economic provisions contained in this Exhibit are inconsistent with Regulation II or its implementing regulations. Accordingly, if Regulation II's restrictions on interchange transaction fees, including the provisions thereof addressing evasion or circumvention of such restrictions, (a) are interpreted by rule, regulation, order, regulatory guidance, judicial decision or other action to apply to any economic provisions contained in this Exhibit or (b) become applicable due to a change in the circumstances of Member, then the party that discovers such interpretation or change of circumstances shall provide written notice thereof to the other party no later than thirty (30) days of the discovery of such interpretation or change in circumstances, and the parties shall meet promptly thereafter to discuss in good faith a mutually agreeable solution to the situation, which may include repayment by Member of amounts paid by Network. In the event that a payment is owed by Member to Network in order to be in compliance with Regulation II, such payment shall be made no later than forty-five (45) days after such request is received by Member. If no mutually agreeable resolution is reached within thirty (30) days of the first meeting, then Network shall not be required to make any future payments of any amounts, provide any economic concessions or perform any other obligation hereunder that would conflict with or violate any such law or regulation.

(d) The parties understand that this Exhibit and the operation of ATMs and POS devices are governed by and subject to applicable law and to the laws, rules, and regulations now or hereafter in force of any governmental official, commission, board, or agency having supervisory control over the parties. Neither Fiserv nor the Network shall be responsible for obtaining any necessary regulatory approval for or on behalf of Member, its Merchants, sponsored Service Providers, or Affiliated Groups.

(e) The parties acknowledge and agree that the interchange transaction fees and other amounts that Fiserv pays to Member pursuant to this Exhibit and the Rules for transactions performed at Terminals for the purchase of goods and services, except for those transactions that are exempt under the Final Rule, will be limited to the amounts permissible under the Final Rule.

3. Fees. The Membership fees and pricing are set forth in Network Fee Schedule of the Rules and may be changed by the Network in accordance with the procedures set forth in the Rules.

4. License of Trademark; Advertising and Graphics. Fiserv hereby licenses to Member a non-transferable, non-exclusive license, with no right of sublicense, to use all trademarks, service marks, and registered symbols of the Network. Such use shall be strictly in accordance with the requirements of the Rules and the ACCEL/Exchange Network Graphic Standards contained therein, as they now exist or may hereafter be amended. Notwithstanding the foregoing sentence, any provisions in the ACCEL/Exchange Network Graphics Standards that allow the brand, mark, or logo of the Network to be displayed on a particular debit card or that otherwise limit the ability of brands, marks, or logos of other EFT Networks to appear on a debit card shall not apply to Member.

5. Term and Termination.

(a) The initial term of this Exhibit shall be for 120 months from the date the Effective Date. Unless written notice of non-renewal is provided by either party at least 180 days prior to expiration of the initial term or any renewal term, this Exhibit shall automatically renew for additional term(s) of 60 months. This Exhibit may be terminated prior to the expiration of the initial term or any renewal term either (i) pursuant to the applicable provisions of the Rules, or (ii) as expressly provided in Section 5(b) below.

(b) If Member or Fiserv breaches this Exhibit, the non-breaching party may give notice in writing to the breaching party of the violation. If the breach is material, and the notice so states, the breaching party shall, within three days, initiate action to correct or eliminate the breach, and shall complete such action as soon as is reasonably possible, but no later than thirty (30) days following receipt of notice. Other breaches shall be corrected within thirty (30) days, or otherwise as soon as is reasonably possible and as agreed to by Fiserv and Member. If the breaching party does not comply within such prescribed times, the non-breaching party may terminate this Exhibit upon written notice.

(c) No termination of this Exhibit shall relieve Member from the responsibility of paying delinquent charges or fees nor shall it relieve Fiserv or Member from such other damages or remedies as may result from a breach (including those provided in the Network Operating Rules). Upon expiration or termination of this Exhibit for any reason, Member shall be responsible for all costs of disconnection from the Network.

6. Network Participation.

(a) As of the Effective Date of this Exhibit and for the remainder of its term, Member shall cause all eligible cards previously issued by Member ("Existing Cards") and all eligible cards hereafter issued by Member, including but not limited to those eligible cards hereafter acquired by Member ("New Cards") through merger, acquisition, or otherwise (an "Acquisition") to participate in the Network (Existing Cards and New Cards collectively referred to as "Cards" or "Member's Cards"). Member shall take all necessary actions to ensure, including without limitation by providing notice to other ATM or POS networks ("EFT Networks"), their processors, and other parties as may be applicable, that all transactions performed (i) by Member's Cards, which for purposes of this Exhibit shall include RFID and/or NFC PIN enabled devices and other related card technology, and (ii) by cards other than Member's Cards ("Not-On-Us Cards") at Member owned or operated ATMs, cash dispensers, POS devices, and other terminal equipment ("Terminals") (transactions performed by all Cards and at all Terminals collectively referred to herein as "Network Transactions"), are priority routed through the ACCEL/Exchange Network ahead of all other EFT Networks in the following order of priority, but the routing priority defined in subsection (i) below is only a default rule in the event the merchant, or its acquirer or processor, does not designate a routing preference:

(i) as a POS (PIN) Card issuer:
1st ACCEL/Exchange
2nd Star
3rd Visa VPIN

(ii) as an ATM Card issuer:
1st ACCEL/Exchange
2nd Star
3rd Visa Plus and/or MasterCard Cirrus

(iii) as a Not-On-Us Card acquirer (*i.e.*, Member acquires a Not-On-Us Card through such Not-On-Us Card's use at a Terminal):
1st ACCEL/Exchange
2nd Star
3rd Visa Plus and/or MasterCard Cirrus

(b) Notwithstanding anything to the contrary, the parties acknowledge and agree that merchant routing instructions will take precedence over any conflicting routing instructions required by this Exhibit with respect to Network Transactions performed at Terminals for the purchase of goods or services.

(c) Member shall ensure that all Cards contain the brand and logo of the Network. In addition, Member shall ensure that all Terminal signage will display the brand and logo of the Network and will not display the brands or logos of any ATM network other than the EFT Networks listed in Section 6(a)(iii) above. With respect to Terminals acquired by Member as part of an Acquisition, Member shall ensure compliance with the immediately preceding sentence within six (6) months of the Acquisition.

7. Conflict. If this Exhibit and the Agreement conflict, the terms of this Exhibit shall control. If this Exhibit or the Agreement and the Rules conflict, the terms of the Rules shall control.

8. Network Name Change. If the name of the Network changes, whether through re-branding, consolidation with another network, or otherwise, during the term of this Exhibit, then all references to the Network in this Exhibit shall thereafter be deemed to refer to any such subsequent brand of the Network.

9. Survival Beyond Term of Agreement. This Exhibit's term may survive the earlier expiration or termination of the Agreement, in which case this Exhibit will continue to be governed by the terms and conditions of the Agreement as if still in effect.