**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

FICARE FEDERAL CREDIT UNION,

Plaintiff,

Case No. 8:26-cv-00231-JLB-GDP

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

Defendants.
_______________________________ /

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND SCHEDULE FOR A PRELIMINARY INJUNCTION**

Defendants Fiserv Solutions, LLC ("Fiserv") and Fiserv, Inc. (collectively "Defendants") submit this response in opposition to Plaintiff FiCare Federal Credit Union's ("FiCare") Emergency Motion for a Temporary Restraining Order and Schedule for a Preliminary Injunction (ECF No. 66, the "Motion").

## INTRODUCTION

A temporary restraining order is an extraordinary remedy that should be granted sparingly. Its sole purpose is to *preserve the status quo* to avoid an imminent risk of irreparable injury, not to *change it* through mandatory, affirmative relief. FiCare eschews these principles. FiCare does not treat the Motion as an extraordinary one. It has repeatedly threatened to seek emergency injunctive relief

in this case. This Motion is best understood as a complaint about Fiserv's contractual performance repackaged as an emergency. Having filed three complaints in this matter but not a single discovery request targeted at the claims FiCare has attempted to plead, FiCare has no desire to get to the merits. (The SAC makes no allegations about the call center services or fraud verification for debit and credit cards that are the sole subject of the Motion.) Rather, the Motion is an unfortunate tactic to generate settlement leverage (TRO threats began anew shortly after the parties' unsuccessful mediation) by publicly impugning Fiserv and imposing unnecessary expense and burden through serial filings. That is not the purpose of a TRO; it is an abuse of Rule 65.

FiCare cannot satisfy any of the necessary elements for a TRO. First, the relief FiCare demands is plainly mandatory and affirmative; it would alter, not preserve, the status quo. FiCare does not ask that Fiserv cease any conduct, but that Fiserv overhaul its call center processes—substantially the same processes used during the parties' 13-year course of dealing without (until this litigation) objection by FiCare. No change to this longstanding contractual performance—to the status quo—has occurred or been threatened.

Second, FiCare cannot establish a likelihood of success on the merits. The Motion's entire factual basis—that the "robot" can authenticate callers and lift fraud holds with only a phone number and social security number—is incorrect.

As Fiserv has explained to FiCare (including with a sworn declaration), the alleged security deficiency does not exist. And, when this dispute arose, Fiserv reminded FiCare that it has chosen not to use an additional security feature (one-time passcodes) Fiserv makes available. FiCare then asked Fiserv to enable that feature, which occurred on Friday (October 2).

But even if authentication worked like FiCare says, that could not establish a breach of contract. FiCare relies on an interpretation of Sections 3 and 4 of the Agreement that, as Defendants demonstrated in their motion to dismiss, is demonstrably and textually flawed. (*See* ECF No. 47.) Contrary to FiCare's view, the Agreement is not an insurance policy guaranteeing that FiCare will never experience fraud. FiCare understood that when the parties contracted. The Agreement's Contact Center Services Attachment—the schedule that explicitly governs the Fiserv service at issue (but is not mentioned in the Motion)—expressly contemplates potential losses from fraudulent activity even if both parties fully perform. (ECF No. 47-1, at 35, § 1(c)) ("Fiserv will assist Client ***in attempting to prevent fraudulent activity, and to the extent losses from fraudulent activity are incurred***, attempting to recover such losses.") (emphasis added). After 13 years of performance, FiCare cannot renegotiate the Agreement through a TRO.

Third, FiCare cannot show an imminent threat of irreparable injury. Since the alleged security deficiency does not exist, there is no threat of *any* injury. Any

theoretical fraud losses to FiCare, however, would be compensable by money damages. FiCare speculates about the impact of card fraud on its members, but they are not parties to the Agreement, and their injuries are not injuries to FiCare.[1]

The Court should reject FiCare's newfound claims that the authentication process FiCare has accepted for years now constitutes a breach and justifies an extraordinary TRO and deny the Motion in its entirety.

## BACKGROUND

### I. Fiserv Has Provided FiCare with Call Center Services Under the Master Agreement for Over a Decade.

Fiserv and FiCare have been parties to the Master Agreement since 2013 (as amended, the "Agreement"), pursuant to which Fiserv provides FiCare with account processing and related products and services.[2] (*See* ECF Nos. 47-1, 47-2, 47-3.) The Agreement is fully integrated and governed by New York law. (ECF No. 47-1 at 7–8, §§ 11(b), (d).) The Agreement defines via schedules and exhibits Fiserv's obligations concerning the performance, functionality, and security of the products and services. (*See generally* ECF Nos. 47-1, 47-2, 47-3.) The SAC alleges

[1] In any event, consumers are generally not responsible for losses from credit or debit card fraud. *See, e.g.*, Dee Pridgen & Jolina C. Cuaresma, CONSUMER CREDIT AND THE LAW §§ 11:5, 11:8 (Nov. 2025). Federal law sharply limits consumer liability for unauthorized card transactions, *see, e.g.*, 15 U.S.C. §§ 1643, 1693g; 12 C.F.R. §§ 1005.6, 1026.12, so responsibility typically lies with the issuing financial institution, the merchant, or someone else in the payment chain.

[2] The Agreement was amended in 2018 and 2021 to provide new online and mobile banking products (*see* ECF Nos. 47-2, 47-3); these products are not at issue in the Motion.

claims of breach of contract, fraud, and trade secret misappropriation arising from Fiserv's alleged failure to provide FiCare with specific security features it wants, but for which it did not contract, on particular products provided under the Agreement. (*See* ECF No. 45.)

FiCare's Motion does not pertain to those products. Instead, the Motion centers on Fiserv's call center, which the SAC does not address. (*Id.*) Fiserv has provided call center services to FiCare since 2013 under the Contact Center Services Attachment to the Credit Processing Services Schedule (ECF No. 47-1, at 35–37), which include assisting in resolving potentially fraudulent transactions attempted on members' debit and credit cards. (Declaration of Charlene Benn ("Benn Dec.") ¶ 4.) When a suspicious transaction on a FiCare member's card is identified, that transaction may be temporarily blocked. (Declaration of Andrew Soltis ("Soltis Dec.") ¶ 6.) The cardholder receives an "EnFact alert" notifying the cardholder of the suspicious transaction and providing a phone number that the cardholder may call to confirm if the transaction is genuine or fraudulent. (*Id.* ¶¶ 6–7.) The Motion concerns the authentication procedure used during this call.

A cardholder that calls the number provided in an EnFact alert may confront two systems during that call. First, the caller will confront the EnFact Integrated

Voice Response System (the "EnFact IVR").[3] (*Id.* ¶ 8.) Second, if the EnFact IVR either cannot authenticate the caller, or the caller does not validate the transaction as genuine, the caller is routed to the second system: the Contact Center. (*Id.* ¶ 13; Benn Dec. ¶ 6.)

The authentication procedures that a caller faces within these two systems are technical and detailed in the accompanying Declarations of Andrew Soltis and Charlene Benn. For purposes of the Motion, there are two key takeaways. First, the factual premise of FiCare's Motion is incorrect: there is no circumstance in which a caller may resolve a potentially fraudulent card transaction through the EnFact IVR by calling from the phone number associated with the cardholder's account ("ANI") and providing only the cardholder's social security number. (Soltis Dec. ¶ 14.) Second, if FiCare wanted the Contact Center to employ a different authentication procedure—authentication through one-time passcodes ("OTP")—that has been available to FiCare for years. (Benn Dec. ¶¶ 16, 25.) FiCare chose not to request that OTP be enabled until days before it filed the Motion. (*Id.* ¶¶ 16–17, 25–26; Declaration of Timothy Patterson ("Patterson Dec.") ¶ 3 & Ex. 1.) Pursuant to that request, Fiserv enabled this feature on October 2. (Benn Dec.

[3] The EnFact IVR is what Defendants understand FiCare to refer to as "the robot." (*See generally* Motion.) An integrated voice response system is automated technology that lets callers interact with a company's phone system without (or before) speaking to a live agent. Callers respond to recorded or computer-generated voice prompts by pressing keys on their phone or by speaking. This technology has been widely used in call centers for years.

¶¶ 17, 26.)

## II. Despite Using These Services for 13 Years, FiCare Raised No Concerns Until September 2026.

On September 17, 2026, FiCare's counsel served "emergency" discovery requests (the "Requests") and claimed FiCare "recently learned that fraudsters are bypassing Fiserv's call center verification procedures to remove fraud restrictions and reactivate stolen cards," and that "[a]t least 18 fraudulent transactions have occurred in August at FiCare." (Patterson Dec. ¶ 3 & Ex. 1; ECF No. 63-4.)[4] Defendants confirmed receipt the next day and confirmed Fiserv was "in the process of gathering more information," would "share [the] findings…once finalized," and would likely have questions for FiCare. (Patterson Dec. ¶ 3 & Ex. 1.) Defendants did not agree to expedited discovery but agreed to provide information informally and as soon as practicable. (*Id.*) FiCare filed its emergency motion to expedite responses to the Discovery anyway. (ECF No. 63.)

On September 24, 2026, Fiserv's counsel provided its initial findings, noting that they were "preliminary and based on our review to date" given FiCare's "communications regarding the apparent exigency of the situation." (Patterson Dec. ¶ 3 & Ex. 1.) The email described the authentication procedures a caller

[4] FiCare issued these Requests based on an email list serv, titled "Portico Talk," where a few other credit unions raised questions about Fiserv's Contact Center's authentication procedures. Ashley Magill referenced and attached communications from this email list serv in her recent supporting declarations. (ECF No. 63-1 ¶¶ 9–12; ECF No. 66-2 ¶¶ 10–12; ECF No. 66-5.)

confronts after dialing into the call center and before the caller may lift a fraud hold, including the procedures employed at both the EnFact stage (the subject of this Motion) and the Contact Center stage. (*Id*.) Fiserv's counsel noted that FiCare could employ authentication through OTP at the Contact Center stage, but FiCare had chosen not to enable that feature. (*Id*.) Fiserv's counsel also requested information regarding the "18 fraudulent transactions" to allow Fiserv to conduct additional inquiry, which FiCare has declined to provide. (*Id*.) FiCare did request OTP but asserted, in conclusory fashion, that "[e]ven with OTP enabled, however, the IVR itself appears to remain insecure and requires attention." (*Id*.) Rather than identify the purported deficiency or engage with Fiserv business personnel to resolve any remaining issue, FiCare filed the Motion.

The Motion was the first time FiCare explained the basis for the claimed emergency or the relief sought. It focuses on the possibility that a caller could be authenticated by the EnFact IVR and lift a fraud hold only through a phone number (ANI) and a social security number. (Motion at 2–4, 6–7, 13–16.) After FiCare filed the Motion, Fiserv and its counsel identified a statement in the September 24 email—that there were circumstances in which the EnFact IVR would authenticate a caller using the phone number the caller called from (ANI), the phone number the caller called through, and a social security number—that required correction. (Patterson Dec. ¶ 3 & Ex. 1.) Fiserv provided the corrected

information—that there are no circumstances in which the EnFact IVR will authenticate a caller using only a phone number and a social security number—to FiCare's counsel by email on September 30. (*Id.*) Fiserv's counsel offered availability for a call and again suggested a business-to-business discussion should concerns remain. (*Id.*) FiCare did not request a call, ask follow-up questions, or agree to a business meeting.[5] (*Id.*) On October 2, Fiserv provided the Soltis Declaration to give FiCare an opportunity to reevaluate its Motion and confirmed that OTP was enabled at the Contact Center.[6] (Patterson Dec. ¶ 5 & Ex. 3.) FiCare did not withdraw the Motion. When pressed on the remaining factual basis for the Motion, FiCare has asserted only that it "suffered fraud when Fiserv's call center removed a fraud restriction on a stolen card" and needs "expedited

---

[5] Instead, FiCare's counsel made baseless accusations about Fiserv and its counsel, demanded that Fiserv withdraw its opposition to FiCare's motion for expedited discovery (Patterson Dec. ¶¶ 3–4 & Exs. 1–2), and filed an "objection" to the September 28, 2026, Declaration of Mr. Patterson (ECF No. 60). FiCare does not explain why Fiserv would intentionally "mislead" FiCare about the authentication process in a manner suggesting that the process is ***less secure*** than it is. Fiserv's counsel simply incorrectly described a single point as to how a highly technical authentication process works in a good faith attempt to provide FiCare with information in the face of FiCare's threats, arbitrary and unreasonable deadlines, and refusal to let the parties' technical personnel speak directly. Fiserv's counsel acknowledged and corrected the inaccuracy promptly. (Patterson Dec. ¶ 3 & Ex. 1.) The insinuation by FiCare's counsel that this was intentional or calculated is unwarranted and unfortunate. And FiCare's counsel is flat-out wrong in asserting that this "has happened before" in the *Bessemer* case. If the Court would like a fulsome explanation of what did (and did not) happen in that case, Fiserv's counsel would be more than happy to provide one.

[6] FiCare again responded with more accusations, another demand that Fiserv withdraw its opposition to FiCare's motion for expedited discovery, and a demand that Fiserv "efile this and an additional declaration with the full factual account without further delay." (Patterson Dec. ¶ 5 & Ex. 3.) *FiCare* then inexplicably filed the Andrew Soltis declaration—in a manner suggesting the declaration was filed *in support of its* motion for expedited discovery. (ECF No. 70.)

discovery." (*Id.*)

## ARGUMENT

Interim injunctive relief, whether a TRO or preliminary injunction, is already an extraordinary remedy never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Benson v. Hernando Cnty. Sch. Dist. Bd.*, 2021 WL 4050952, at *2 (M.D. Fla. Aug. 27, 2021) (a TRO should only be granted under "exceptional circumstances"). *Mandatory* preliminary relief that goes beyond maintaining the status quo is particularly disfavored. *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017); *Gayle v. Meade*, 2020 WL 1949737, at *22 (S.D. Fla. Apr. 22, 2020) (noting Eleventh Circuit applies a heightened standard for mandatory injunctions requiring a clear showing on the four elements). The Motion should be denied because FiCare improperly seeks mandatory relief and cannot satisfy the required elements for interim injunctive relief.

This is not a typical "TRO" case in which a sudden and unexpected event imminently threatens serious and irreparable injury to a party, leaving it no option but to seek emergency relief. FiCare has threatened emergency injunctive relief or demanded that Fiserv agree to a "consent injunction" repeatedly over the past 15 months, as further detailed in response to FiCare's expedited discovery motion. (ECF No. 65 at 4–7; ECF No. 65-2, ¶¶ 4–7, 9–17 & Exs. 1–8.) Fiserv has devoted substantial time and resources in an attempt to resolve these issues, responding

promptly and asking that technical issues be addressed by business personnel. (*Id.*) FiCare has consistently declined to engage with Fiserv, provide requested information, or attempt to resolve issues. (*Id.*) Instead, FiCare manufactures new ones, and this is the latest.

The Motion also closely resembles the tactics utilized by FiCare's counsel in two other credit union lawsuits referred to in the SAC and the expedited discovery motion. In each, FiCare's counsel demanded emergency relief based on alleged "security" concerns and, like here, sought mandatory relief that would require Fiserv to make sweeping changes to its products. *Self-Help Credit Union v. Fiserv Solutions, LLC, et. al.*, ECF No. 5, Case No. 1:25-cv-01112-TDS-LPA (M.D.N.C.); *Cencap Federal Credit Union v. Fiserv Solutions, LLC, et. al.*, ECF No. 3, Case No. 3:25-cv-00913-VDO (D. Conn.). Both TRO motions were summarily denied. *Cencap Federal Credit Union*, ECF No. 56; *Self-Help Credit Union*, Jan. 20, 2026 Text Order.[7] After Self-Help was compelled to produce documents (including communications with FiCare) and ordered to pay Defendants' attorneys' fees, Self-Help withdrew its preliminary injunction motion after weeks of "expedited" discovery. *Self-Help Credit Union*, April 30, 2026 Text Order; *id.*, ECF No. 100. The Motion here has no more merit or factual basis than those and should be denied.

[7] FiCare's CEO submitted a declaration in support of Self-Help's TRO motion and was identified on Self-Help's witness list for preliminary injunction proceedings. *Self-Help Credit Union*, ECF No. 17 & Jan. 20, 2026, Text Order.

## I. The Motion Seeks Mandatory Relief That Would Change, Not Preserve, the Status Quo.

The purpose of a TRO is to "protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005). "One inherent characteristic of a temporary restraining order is that it has the effect of merely preserving the status quo rather than granting most or all of the substantive relief requested in the complaint." *Fernandez-Roque v. Smith*, 671 F.2d 426, 429 (11th Cir. 1982); *see also Maldonado v. Cnty. of Duval*, 2017 WL 6611326, at *2 (M.D. Fla. Oct. 24, 2017) (denying TRO where plaintiff sought to modify the status quo and obtain affirmative relief); *U.S. Bank Nat. Ass'n v. Taylor, Bean & Whitaker Mortg. Corp.*, 2009 WL 2579381, at *1–2 (M.D. Fla. Aug. 18, 2009) (same).

FiCare has not identified any emergency or "imminent" risk of change to the status quo. FiCare has received services under the "Contact Center Services Attachment to the Credit Processing Services Schedule" since 2013. (ECF No. 47-1 at 35–37.) As the Court is no doubt aware, some card transactions flagged as potentially fraudulent are legitimate and, in such cases, FiCare (through Fiserv's services) permits the card holder to authorize that transaction. On this front, the parties have operated substantially in the same way for years—Fiserv has employed IVR at the call center and relied on standard authentication methods using "tokens" (pieces of information unique to the cardholder) to authenticate

the identity of cardholders who respond to fraud alerts. FiCare accepted this without complaint until September 2026. FiCare's "emergency" is that Fiserv is providing substantially the same fraud management and call center services it has provided for years; that is neither an emergency nor a change in the status quo.

Indeed, it is the Motion that seeks to disrupt the status quo and rewrite the Agreement by demanding an order requiring Fiserv to change the configuration of a process that FiCare contends (incorrectly) is insecure. FiCare is careful to use the word "restrained," but the relief it demands, compelling Fiserv to authenticate through processes other than the "automated interactive voice response system" (Motion at 26; *see also* ECF No. 66-1 at 2–3), would require Fiserv to take substantial action to change long-established processes for call-routing, handling, and authentication. Such relief is mandatory and affirmative in nature. FiCare's casual assertion that "[t]he requested relief does not disturb the status quo" (Motion at 22) is both unsupported and wrong. The mandatory relief FiCare seeks is improper, impractical, and would impose an unnecessary and undue burden on Fiserv.[8]

---

[8] FiCare's proposed order impractically demands "immediate" compliance and no bond. (ECF No. 66-1.) Fiserv's Contact Center will handle approximately 40 million calls this year related to debit and credit cards alone, and approximately 6 million calls from the EnFact IVR. (Benn Dec. ¶¶ 5, 7.) Creating a unique authentication process only for FiCare is not as simple as pressing a button. Given the expedited timeline, Fiserv has just begun assessing the feasibility and scope of such a project, but changing established, complex, and largely automated processes for call-routing and handling would necessitate extensive and expensive programming, testing, and

## II. The Motion Should Be Denied Because FiCare Cannot Establish the Elements Required for Extraordinary Injunctive Relief.

To obtain a preliminary injunction or temporary restraining order, the movant must establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "Failure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Here, FiCare failed to do so.

### A. FiCare Fails to Identify an Actual and Imminent Likelihood of Irreparable Harm.

A showing of irreparable harm is "the *sine qua non* of injunctive relief." *Siegel*, 234 F.3d at 1176 (emphasis added) (citation modified). The asserted injury "must be neither remote nor speculative, but actual and imminent." *Ne. Fla.*

validation involving third-party partners and vendors. Even if this could be done, such change could not be accomplished quickly or inexpensively. Fiserv's initial information (which is preliminary) is that a project timeline that would not threaten disruption to the overall call center and other customers would be measured in months, rather than days or weeks, and require substantial resources. FiCare's proposed order is unreasonable and another reason the Motion should be denied. *See Adams v. Bordeau Metals Southeast, LLC*, 2025 WL 1122444, at *5 (11th Cir. Apr. 15, 2025) ("Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties" and "[a]ny injunction that is more burdensome than is necessary to provide complete relief is impermissibly broad.") (quotations and citations omitted); Fed. R. Civ. P. 65(c); *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1299 (S.D. Fla. 2020) (noting "Rule 65 is pellucid that an injunction may issue '***only if***' a bond is posted").

*Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation modified); *Winter*, 555 U.S. at 22 (movant must demonstrate that irreparable harm is not merely possible, but *likely*). An injury is "irreparable" only if it cannot be undone through monetary remedies. *Ne. Fla. Chapter of the Ass'n of Gen. Contractors*, 896 F.2d at 1285 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."). The absence of an actual and imminent irreparable injury alone makes preliminary injunctive relief improper. *Siegel*, 234 F.3d at 1176.

The Motion focuses exclusively on the EnFact IVR's alleged use of only a phone number and social security number as an authentication tool. FiCare's only apparent concern is that "the [EnFact IVR] relies on just two checks—whether the Caller ID matches the cardholder's number, and whether the caller can supply either the case number ***or the cardholder's Social Security Number***—and, if both pass, the [EnFact IVR] reactivates the card with no human involvement." (Motion at 6–7 (emphasis added).) The Motion identifies no other alleged security deficiency as grounds for the relief it requests. (*See generally id.*)

That is not Fiserv's process. There is no circumstance in which a caller may resolve a potentially fraudulent card transaction through the EnFact IVR with only a social security number and a call from the correct phone number. (Soltis Dec.

¶ 14.) FiCare's purported imminent injury does not exist, rendering the relief it requests entirely unnecessary. The Motion should be denied on that basis alone. *See Adams*, 2025 WL 1122444, at *5 ("Once a court identifies the inadequacy that produced the injury in fact that the plaintiffs have established, the court should enjoin the defendants' actions only as needed to provide complete relief ***from that inadequacy***." (citation modified)).

Given these facts, FiCare is left with only the assertion that it faces irreparable harm because "FiCare Federal suffered fraud when Fiserv's call center removed a fraud restriction on a stolen card." (Patterson Dec. ¶ 3 & Ex. 1.) FiCare generally asserts that there have been "at least 18 fraudulent transactions…traceable to this exploit." (Motion at 3.) The Motion contains no detail about these alleged "18" instances (*id.*) and FiCare (despite demanding expedited discovery from Fiserv) has so far declined to provide Fiserv with more information about them. (Patterson Dec. ¶ 3 & Ex. 1.) Such vague allegations fall far short of the particularized showing of irreparable harm a TRO requires. *See, e.g.*, *Ne. Fla. Chapter of the Ass'n of Gen. Contractors*, 896 F.2d at 1285.

More fundamentally, losses FiCare might incur from fraudulent transactions would be compensable through money damages. FiCare explicitly acknowledges this in the SAC. (*See* ECF No. 45, ¶¶ 1, 60, p. 85 (seeking monetary damages for alleged fraud losses).) And, although FiCare speculates about the

impact of card fraud on its members, they are not parties to the Agreement—their injuries are not injuries to FiCare. *See Oviedo Med. Ctr., LLC v. Adventis Health System/Sunbelt, Inc.*, 2020 WL 4218276, at *2 (M.D. Fla. Apr. 28, 2020) (denying preliminary injunction motion, noting "Plaintiff has not cited any authority for the proposition that potential harm to third parties can support a finding of irreparable harm to Plaintiff").

That leaves FiCare with its generic and speculative assertion that fraud losses will irreparably damage its "reputation."[9] Unfortunately, the reality of our modern digital economy is that card fraud sometimes occurs despite best efforts to prevent it. Fraudsters are clever and always evolving. Every financial institution has customers or members that are the victims of fraud. Fiserv's Contact Center will handle over 6 million calls from the EnFact IVR in 2026 (Benn Dec. ¶ 7); FiCare alleges 18 incidents (and suggests they were caused by things outside of Fiserv's control, such as "alert bombing"). FiCare makes no factual showing that the alleged transactions will impact its reputation or business at all, much less in a

[9] The cases FiCare cites (Motion at 19) involve far more egregious and reputation-threatening facts not remotely present here. The two reputational harm cases involve armed activists "seizing" confidential information and an unauthorized individual threatening to publicly disseminate confidential information. *See, e.g.*, *Bank of Am., N.A. v. United Cities Grp., Inc.*, 2008 WL 11466083, at *4 (S.D. Fla. July 25, 2008) (irreparable injury requirement was satisfied where an armed anti-government group threatened to access Bank of America's confidential customer information); *Montenegro v. City Nat'l Bank*, 2018 WL 11444059, at *4 (D. Nev. Dec. 6, 2018) (plaintiff showed irreparable injury was likely where defendant affirmatively threatened to publish confidential bank account statements). Neither case is analogous here.

way that money could not compensate. The alleged injury is too speculative and too remote to provide the basis for a TRO. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Engineers*, 1999 WL 35843413, at *4 (M.D. Fla. Dec. 22, 1999) (denying preliminary injunction motion, noting "the possibilities of harm to the [movants] are too remote and speculative to justify injunctive relief").

Fiserv works diligently with its clients and industry partners to minimize fraud. Ultimately, however, the client determines its risk tolerance. Indeed, even FiCare has not sought to avoid fraud at all costs. It chose not to use OTP until a week or so ago. (Benn Dec. ¶¶ 16–17, 25–26.) Even now, FiCare could stop using Fiserv's call center services and require a member seeking to lift a fraud hold to present him or herself at a branch with photo identification to be authenticated. That would eliminate FiCare's professed security concerns, but FiCare no doubt deems that too expensive (more staff would be required) for itself and too inconvenient for its members (threatening a loss of business), so has chosen an effective, cheaper, and more efficient, but less "perfect," system. FiCare can make that business decision but cannot shift the resulting risk—risk the Agreement does not allocate to Fiserv—through a TRO.

### B. FiCare Cannot Demonstrate a Likelihood of Success on the Merits.

FiCare cannot show a substantial likelihood of success on the merits of its breach of contract claim. Factually, the premise of the Motion—that the EnFact IVR

authenticates callers based only on a phone number and a social security number—is incorrect. (Soltis Dec. ¶ 14.) Legally, FiCare's claim rests on the same faulty contract theories Defendants have shown fail as a matter of law. (*See* ECF No. 47.) FiCare relies on a mutual confidentiality clause (Section 3) and a provision regarding an information security program (Section 4) to manufacture a contractual obligation that Fiserv provide any security features recommended by extra-contractual federal guidance (which FiCare now claims to prefer). (Motion at 4–5, 11–17.) Defendants' motion to dismiss explains in detail why that interpretation is fatally flawed under ordinary principles of contract interpretation. (ECF No. 47 at 5–9.) In opposing dismissal, FiCare has retreated to the position that the Agreement is "ambiguous" (ECF No. 53 at 3–4), but the Motion here offers nothing to suggest FiCare has parol evidence that makes its strained interpretation "likely to succeed" over Fiserv's interpretation of the Agreement's plain language.

FiCare also ignores the Contact Center Services Attachment, which does not require any specific authentication method. (ECF No. 47-1, at 35–37.) Nor does it promise that FiCare and its members will never experience fraud. (*Id.*) Rather, the schedule expressly acknowledges that fraudulent activity may occur, despite efforts to prevent it: "Fiserv will assist Client in attempting to ***prevent*** fraudulent activity, and ***to the extent losses from fraudulent activity are incurred***, attempting

to recover such losses…" (*Id*. at 35, § 1(c) (emphasis added).) At the time of contracting, FiCare understood that card fraud occurs in the financial services industry. FiCare cannot use a TRO to change the deal 13 years later.

## III. The Court Should Summarily Deny FiCare's Motion for a Preliminary Injunction and Expedited Discovery.

The essential elements required for a preliminary injunction are identical to those for a TRO. *Siegel*, 234 F.3d at 1176. FiCare cannot satisfy these elements, and the Court should decline to set a briefing schedule on a preliminary injunction motion unless and until FiCare files one. For the same reason, the Court should deny (both) motions for expedited discovery. Discovery will not cure the mandatory nature of the relief FiCare demands, the fatal weaknesses in its contract claims, or the lack of irreparable injury. Expedited discovery would be a fishing expedition in search of some basis for another TRO or PI motion. This case has been pending for over nine months. Fact discovery is ongoing and closes in May 2027. The case should proceed to the merits on the ordinary discovery and case management schedule the Court has already set.

## CONCLUSION

Defendants respectfully request that this Court deny the Motion in full.

Dated this 5th day of October, 2026.

*/s/ Timothy J. Patterson*

Joseph W. Swanson (Lead Counsel)
(FBN 0029618)
Primary email: joe.swanson@foley.com
Secondary email: jwilliams@foley.com
Ashley C. Grabowski (FBN 1049290)
Primary email: agrabowski@foley.com
Secondary email: dguillen@foley.com
**Foley & Lardner LLP**
100 North Tampa Street
Suite 2700
Tampa, FL 33602
Telephone: (813) 229-2300
Facsimile: (813) 221-4210

Bryan B. House (*pro hac vice*)
Timothy J. Patterson (*pro hac vice*)
**Foley & Lardner LLP**
777 E. Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414)271-2400
Facsimile: (414)297-4900
bhouse@foley.com
tjpatterson@foley.com

Elysia A. Lampert (*pro hac vice*)
**Foley & Lardner LLP**
321 N. Clark St., Suite 3000
Chicago, IL 60654-4762
Telephone: (312)832-4500
Facsimile: (312)832-4700
elampert@foley.com

*Attorneys for Defendants Fiserv Solutions, LLC and Fiserv, Inc.*